UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------X

| | |
|---|---|
| ASSOCIATION OF HOLOCAUST VICTIMS | : |
| FOR RESTITUTION OF ARTWORK | : |
| and MASTERPIECES, a/k/a "AHVRAM"; | :  **04 – CIV - 8457** |
| MRS. ERNA DEUTSCH; DR. JORAM DEUTSCH; | :  **(LTS)** |
| ALICE BURGER – FISCHER; and | : |
| EDWARD DAVIS FAGAN; | :  **FIRST** |
| Plaintiffs, | :  **AMENDED** |
| vs. | :  **COMPLAINT** |
| | : |
| REPUBLIC OF HUNGARY; | : |
| *Individually and/or As Responsible For:* | : |

HUNGARIAN NATIONAL GALLERY,                                    :
MUSEUM DE BEAUX ARTS,                                             :
MINISTRY OF CULTURE, and other                                  :
HUNGARIAN STATE MUSEUMS and/or                             :
STATE & ART RESTORATION FACILITIES                        :
(the name being fictitious and used until                            :
 the actual names is/are discovered);  and                         :
REPUBLIC OF GERMANY;                                                 :
*Individually and/or As Responsible For:*                              :

BUNDESMINISTERIUM DER FINANZEN; BUNDESREPUBLIK:
 DEUTSCHLAND FINANZAGENTUR GmbH; HON. ROLF      :
 DAHLGRÜN by ESTATE OF HON. ROLF DAHLGRÜN;        :
 DR. FÉAUX DE LA CROIX by ESTATE OF DR. FÉAUX         :
 DE LA CROIX; WILHELM HÖTTL by ESTATE OF             :
 WILHELM HÖTTL; MR. FRITZ KOPPE by ESTATE OF
 FRITZ KOPPE; DR. DETLEV HEINRICH by                      :
 ESTATE OF DR. DELEV HEINRICH; OLAF FREIHERR        :
 von KLINGSPOR by ESTATE OF                                   :
 OLAF FREIHERR von KLINGSPOR; GEORGE de                  :
 MASIREVIC by ESTATE OF GEORGE de MASIREVIC;         :
 DR. ERICH FÜHRER by ESTATE OF DR. ERICH FÜHRER;    :
 "GERMAN GOVERNMENT MUSEUMS, GALLERIES,            :
 STORAGE & RESTORATION FACILITIES"                       :
 (fictitious names used until actual names discovered),         :
 "JOHN DOE PRIVATE MUSEUMS, GALLERIES,                  :
 STORAGE & RESTORATION FACILITIES",                       :
 (fictitious names used until actual names discovered),         :
PHILIPS COLLECTION GALLERY / MUSUEM                       :

Dockets.Justia.com

Defendants.    :

-------------------------------------------------------------------------------------X

Plaintiffs ASSOCIATION OF HOLOCAUST VICTIMS FOR RESTITUTION OF

ARTWORK and MASTERPIECES a/k/a "AHVRAM" [1], MRS. ERNA DEUTSCH and DR.

JORAM DEUTSCH, ALICE BURGER FISCHER and EDWARD DAVIS FAGAN, as and for

their complaint against the defendants herein, upon information and belief, state the following:

## INTRODUCTION

One of the last issues related to restitution of property is artwork, masterpieces and/or

collections which was allegedly stolen during the Holocaust[2] (hereinafter "The Stolen Property").

 The US and other countries have passed numerous laws and entered into treaties designed to

assist heirs and/or successors to rights, title or interest to the Looted Artwork in the recovery of

the actual pieces or payment for the Looted Artwork.   One of the largest and most valuable

collections of Impressionist art in Europe prior to Holocaust was known as The Hâtvany

Collection from Budapest Hungary.   Plaintiffs are the successors in interest to rights, title and

interest in The Hâtvany Collection.   Plaintiffs have recently discovered (i) evidence of a

conspiracy surrounding The Hâtvany Collection involving the defendant Germany the object of

which was to interfere with plaintiffs and/or plaintiffs' predecessors property rights, (ii) that

defendant Germany have deprived and/or wrongfully took plaintiffs and/or plaintiffs

---

[1]    AHVRAM was formed to assist Holocaust victims pursue claims for restitution and damages for stolen and/or looted artwork, masterpieces and/or collections.  AHVRAM was formed because its members do not have financial ability to individually pursue claims.  AHVRAM offices are/will be located in New York, Israel and Switzerland.
[2]    As used herein, the Term "Holocaust" shall refer to the period from 1933 to 1945 when the National Socialist Regime in Germany – The Nazi Regime (i) engaged in the intentional murder of 6 million Jews and millions of other innocent men, women and children of different races, ethnic, religious, spiritual backgrounds and beliefs and (ii) systematically stole and plundered the wealth, possessions and assets of its innocent victims .

---------------

predecessors property in violation of international law and (iii) certain pieces from The Hâtvany

Collection in museums and galleries all over the world, including in The United States.

## PARTIES

## PLAINTIFFS

1. Plaintiff ASSOCIATION OF HOLOCAUST VICTIMS FOR RESTITUTION OF

    ARTWORK AND MASTERPIECES a/k/a AHVRAM (hereinafter "AHVRAM") is a

    New York association with offices in the City and State of New York and within this

    judicial district.  Some of Plaintiff AHVRAM's members live in the City and State of

    New York and within this judicial district.

2. Plaintiff AHVRAM is a membership association of persons, residents or citizens of the

    United States, Switzerland, Israel and elsewhere around the world, each of whom has

    similar claims related to, among other things, (i) restitution of The Stolen Property, (ii)

    damages resulting from the conspiracy involving one or more of the defendants which

    conspiracy lasted from the 1950s to the present (hereinafter the "Relevant Period") and

    which was designed to deprive plaintiffs of their property and (iii) damages for

    defendants failure to return and ongoing profiteering from The Stolen Property that came

    into its/their possession, custody and/or control.  Plaintiff AHVRAM's current members

    live in the United States, Israel and Europe.

    **Description of Plaintiff Deutschs' Interests, Conspiracy Discovered & Claims**

3. Plaintiff ERNA DEUTSCH is the widow and heir of Prof. Hans Deutsch לע׳ז.   Plaintiff

    DR. JORAM DEUTSCH is son and heir of Prof. Hans Deutsch.  Plaintiffs ERNA

DEUTSCH & DR. JORAM DEUTSCH (hereinafter collectively "Plaintiffs DEUTSCH")
currently reside in Switzerland.

4.  Prof. Hans Deutsch was the most famous Holocaust reparations lawyer from the 1950s
forward and represented thousands of Holocaust victims against the Federal Republic of
Germany to recover monies for claims based upon artwork, masterpieces, collections and
other items of value stolen by the Nazis and business losses.

5.  In or about 1973, Prof. Hans Deutsch's acquired rights, title and interest to The Hâtvany
Collection from the heirs of Baron Ferencz de Hâtvany (hereinafter "Hâtvany Heirs").
Plaintiffs DEUTSCH are the successors in interest to those rights.

**6.**  Certain specifically identifiable pieces from The Hâtvany Collection which are the
subject of these claims have been located in, or are reasonably suspected to be or to have
been in defendant's possession custody and/or control.

**7.**  Plaintiffs DEUTSCH sold and/or transferred a portion of their rights, title and interest in
The Hâtvany Collection to plaintiff BURGER-FISCHER.

8.  Plaintiffs DEUTSCH sold and/or transferred to plaintiff FAGAN (i) portions of the
rights, title and interest in The Hâtvany Collection and (ii) portions of their interests in the
rights and/or interests acquired by Prof. Deutsch to others of his former clients who had
claims for The Holocaust Victim Looted Artwork and/or Collections.

9.  Plaintiff ERNA DEUTSCH is 92 years old, has serious medical issues, is on a limited
income, is in desperate need of having these claims adjudicated on an expedited basis.
Plaintiff ERNA DEUTSCH is a member of plaintiff AHVRAM.

10. Plaintiff DR. JORAM DEUTSCH is a founding member, official and representative of plaintiff AHVRAM.

### Description of Plaintiff Burger – Fischer/Individual & Representative Claims

11. Plaintiff ALICE BURGER FISCHER (hereinafter plaintiff "BURGER-FISCHER") is a Holocaust victim who currently lives in Queens NY. Plaintiff BURGER-FISCHER is a member of plaintiff AHVRAM. Plaintiff BURGER-FISCHER's family was a wealthy Budapest family with artwork, masterpieces and valuable home furnishings.

12. As a Holocaust victim, Plaintiff BURGER – FISCHER has specific identifiable interests in The Looted Artwork, including items from her families' Budapest home, and also a certain interest in The Hâtvany Collection. Plaintiff BURGER-FISCHER's interests are because she is the only remaining heir of her mother, father and two brothers, all of whom were exterminated by the Nazis.

**13.** As a Holocaust survivor and AHVRAM member for whom restitution has NEVER been made, Plaintiff BURGER-FISCHER's interests and representative capacity include interests in and/or rights to ALL The Stolen Property that came into defendants possession and which were wrongfully and unlawfully withheld and/or never restituted to Plaintiffs/Plaintiffs' Predecessors' in interest.

### Description of Plaintiff Fagan/Individual & Successor Claims

14. Plaintiff EDWARD D. FAGAN (hereinafter plaintiff "FAGAN") is the owner of some of the remaining assets of the law practice of Dr. Hans Deutsch and the open restitution

---------------

*AHVRAM / Deutsch et al v. Hungary, Germany et al* *04 Civ 8457 (LTS)* – First Amended Complaint - Page 5

claims.  Plaintiff FAGAN resides in New Jersey.  Plaintiff FAGAN is an official and

representative of plaintiff AHVRAM.

15. Plaintiff FAGAN has some rights and interests in The Hâtvany Collection which rights

and interests were acquired from Plaintiffs DEUTSCH.

16.Plaintiff FAGAN has some other rights and interests as a result of his purchase of

remaining assets of the law practice of Prof. Deutsch, which includes rights to The Stolen

Property has some other rights.

**Claims Included Ongoing Damages**

17.Plaintiffs' harm is not limited to past, but continues on a daily basis.

18.Plaintiffs' claims include defendants' violations of laws enacted in the United States, and

in particular the States of California, Florida, Illinois and New York related to accounting

for and to Holocaust victims, or their heirs about withheld, concealed, unaccounted for

and/or stolen assets and property, which would arguably include The Stolen Property

mentioned herein.

**DEFENDANTS**
**Defendants HUNGARY**

19.  The Defendant REPUBLIC OF HUNGARY (hereinafter "HUNGARIAN REPUBLIC")

is a Federal Republic which can be sued in US Courts related to its participation in and

profiteering from the below listed conspiracy and its failure to honor the obligations and

requirements of US and International law, customs, conventions and treaties related to the

possession, withholding, refusal to return, wrongful expropriations, retention and

profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

20. Defendant HUNGARIAN MINISTRY OF CULTURE (hereinafter "HUNGARIAN MINISTRY") is/was an official organ, agency and/or department of a Federal Republic which can be sued in US Courts related to its participation in and profiteering from the below listed conspiracy and its failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

21. Defendant HUNGARIAN NATIONAL GALLERY (hereinafter "HUNGARIAN GALLERY") is/was an official organ, agency and/or department of Defendant HUNGARIAN REPUBLIC which can be sued in US Courts related to its participation in and profiteering from the below listed conspiracy and its failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

22. Defendant MUSEUM DE BEAUX ARTS (hereinafter "HUNGARIAN MUSEUM") is/was an official organ, agency and/or department of Defendant HUNGARIAN REPUBLIC which can be sued in US Courts related to its participation in and

---------------

profiteering from the below listed conspiracy and its failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

23. Defendant HUNGARIAN STATE MUSEUMS and/or  STATE & ART RESTORATION FACILITIES (hereinafter "HUNGARIAN ART  FACILITIIES") (the name being fictitious and used until the actual names is/are discovered) are/were official organs agencies and/or departments of Defendant HUNGARIAN REPUBLIC which can be sued in US Courts related to its participation in and profiteering from the below listed conspiracy and its failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

24. Defendant HUNGARIAN REPUBLIC and/or its officials, agents, representatives and/or employees are/were directly and/or indirectly involved in, cooperated with, profited and benefited from the below listed conspiracy with the German defendants, and Defendant HUNGARIAN REPUBLIC did and continues to possess, withhold, refuse to return and benefit from its wrongful expropriation, retention and failure to restitute The Stolen

Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

25. Defendant HUNGARIAN MINISTRY and/or its officials, agents, representatives and/or employees were directly and/or indirectly involved in, cooperated with, profited and benefited from the below listed conspiracy with the German defendants, and Defendant HUNGARIAN MINISTRY did and continues to possess, withhold, refuse to return and benefit from their wrongful expropriation, retention and failure to restitute The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

26.  Defendant HUNGARIAN GALLERY and/or its officials, agents, representatives and/or employees were directly and/or indirectly involved in, cooperated with, profited and benefited from the below listed conspiracy with the German defendants, and Defendant HUNGARIAN GALLERY did and continues to possess, withhold, refuse to return and benefit from their wrongful expropriation, retention and failure to restitute The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

27. Defendant HUNGARIAN MUSEUM and/or its officials, agents, representatives and/or employees were directly and/or indirectly involved in, cooperated with, profited and benefited from the below listed conspiracy with the German defendants, and Defendant HUNGARIAN MUSEUM did and continues to possess, withhold, refuse to return and benefit from their wrongful expropriation, retention and failure to restitute The Stolen

Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs'
Predecessors.

28. Defendant HUNGARIAN ART FACILITIES and/or its/their officials, agents,
representatives and/or employees were directly and/or indirectly involved in, cooperated
with, profited and benefited from the conspiracy as described herein with the German
defendants, and Defendant HUNGARIAN ART FACILITIES did and continue to
possess, withhold, refuse to return and benefit from their wrongful expropriation,
retention and failure to restitute The Stolen Property and certain items from The Hâtvany
Collection to Plaintiffs/Plaintiffs' Predecessors.

29. Defendant HUNGARIAN REPUBLIC was/is responsible for its participation in the
below described conspiracy, and acts, omissions to act, carelessness, negligence and/or
intentional acts of persons, including acts of predecessors in interest, as well as its/their
members of agencies, ministries, museums,  organs and/or entities including but not
limited to HUNGARIAN MINISTRY, HUNGARIAN GALLERY, HUNGARIAN
MUSEUM, and other HUNGARIAN ART  FACILITIIES all of which are hereinafter
referred to collectively as Defendant HUNGARY.

### Defendants GERMANY

30. Defendant REPUBLIC OF GERMANY (hereinafter "GERMAN REPUBLIC") is a
Federal Republic which can be sued in US Courts related to related to it participation in
and profiteering from the below listed conspiracy and its failure to honor the obligations
and requirements of US and International law, customs, conventions and treaties related

--------------

to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

31. Defendant BUNDESMINISTERIUM DER FINANZEN (hereinafter "GERMAN FINANCE MINISTRY") is/was an official organ, agency and/or department of Defendant GERMAN REPUBLIC which can be sued in US Courts related to its participation in and profiteering from the below listed conspiracy and its failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

32. Defendant BUNDESREPUBLIK DEUTSCHLAND FINANZAGENTUR GmbH (hereinafter "GERMAN FINANCE AGENCY") is/was an official organ, agency and/or department of Defendant GERMAN REPUBLIC which can be sued in US Courts related to its participation in and profiteering from the below listed conspiracy and its failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

33. Defendant HON. ROLF DAHLGÜN by ESTATE OF HON. ROLF DAHLGRÜN (hereinafter "DAHLGRÜN") is/was an official, agent and/or representative of Defendant GERMAN

REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

34. Defendant FÉAUX DE LA CROIX by ESTATE OF ESTATE OF FÉAUX DE LA CROIX (hereinafter "DE LA CROIX") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

35. Defendant WILHELM HÖTTL by ESTATE OF WILHELM HÖTTL (hereinafter "HÖTTL") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from

The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

36. Defendant MR. FRITZ KOPPE by ESTATE OF FRITZ "KOPPE") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

37. Defendant DR. DETLEV HEINRICH by ESTATE OF DR. DETLEV HEINRICH ("HEINRICH") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

38. Defendant OLAF FREIHERR von KLINGSPOR by ESTATE OF OLAF FREIHERR von KLINGSPOR (hereinafter " von KLINGSPOR") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to

honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

39. Defendant  GEORGE de MASIREVIC by ESTATE OF GEORGE de MASIREVIC (hereinafter " MASIREVIC") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

40. Defendant DR. ERICH FÜHRER by ESTATE OF DR. ERICH FÜHRER  (hereinafter "FÜHRER") is/was an official, agent and/or representative of Defendant GERMAN REPUBLIC who can be sued in US Courts related to his participation in and profiteering from the below listed conspiracy and his failure to honor the obligations and requirements of US and International law, customs, conventions and treaties related to the possession, withholding, refusal to return, wrongful expropriations, retention and profiteering from The Stolen Property and certain items from The Hâtvany Collection to Plaintiffs/Plaintiffs' Predecessors.

41. Defendant DAHLGÜN was the former Minister of Finance of defendant GERMANY

involved with, profited and benefited from the acts and conspiracy described herein.

42. Defendant DE LA CROIX was the former Minister Director and official of defendants

GERMAN REPUBLIC and GERMAN MINISTRY OF FINANCE involved with,

profited and benefited from the acts and conspiracy described herein.

43. Defendant HÖTTL was involved with, profited and benefited from the acts and conspiracy

described herein.

44. Defendant KOPPE was involved with, profited and benefited from the acts and conspiracy

described herein.

45. Defendant HEINRICH was involved with, profited and benefited from the acts and

conspiracy described herein.

46. Defendant von KLINGSPOR was involved with, profited and benefited from the acts and

conspiracy described herein.

47. Defendant de MASIREVIC was involved with, profited and benefited from the acts and

conspiracy described herein.

48. Defendant FÜHRER was involved with, profited and benefited from the acts and the

conspiracy described herein.

49. Defendants "GERMAN GOVERNMENT MUSEUMS, GALLERIES STORAGE &

RESTORATION FACILITIES" (hereinafter "GERMAN ART FACILITIES") were/are

organs and/or agencies of defendant GERMANY and have and/or had custody possession

and/or control over one or more of the pieces of The Stolen Property and/or pieces from

--------------

The Hâtvany Collections which are the subject of this lawsuit. The name "GERMAN

GOVERNMENT MUSEUMS, GALLERIES STORAGE & RESTORATION

FACILITIES" are fictitious names being used until actual the names are discovered.

50.Defendants "JOHN DOE PRIVATE MUSEUMS, GALLERIES, STORAGE &

RESTORATION FACILITIES" (fictitious names used until actual names discovered) are

commercial entities which have and/or had custody possession and/or control over one or

more of the pieces of The Stolen Property and/or pieces from The Hâtvany Collections.

51.Defendant GERMAN REPUBLIC was and is responsible for the acts, omissions to act,

carelessness, negligence and/or intentional acts of persons, including the acts of its

predecessors in interest, as well as its/their members of agencies, ministries, museums,

organs and/or entities including but not limited to Defendants GERMAN FINANCE

MINISTRY, GERMAN FINANCE AGENCY, DAHLGÜN, DE LA CROIX, HÖTTL, von

KLINGSPOR, de MASIREVIC, FÜHRER and GERMAN ART FACILITIES all of

which shall hereinafter be referred to collectively as Defendant GERMANY.

### Defendant PHILIPS COLLECTION

52.Defendant PHILIPS COLLECTION GALLERY / MUSUEM was/is a commercial entity

whose assets are principally located in Washington DC and which assets are believed to

presently and/or previously include pieces which came into their possession, custody

and/or control as a direct result of the conspiracy by Defendants HUNGARY and

GERMANY against Plaintiffs/Plaintiffs Predecessors, and whose assets are loaned out on

exhibitions around the world and at times beyond the reach of this Court. It is alleged

--------------

that defendant PHILIPS has and/or had custody possession and/or control over one or more of the pieces of from The Hâtvany Collection, and/or others of The Stolen Property or other information related to such Stolen Property and/or The Hatvany Collection and/or the conspiracy against Plaintiffs/Plaintiffs' predecessors.

## JURISDICTION AND VENUE
## General In Personam, In Rem & Subject Matter

53. The Court has jurisdiction as this action involves violation of the laws of the United States, as well as regulations of the City and State of New York, violations of international laws, conventions and/or treaties, related to the unlawful taking of and/or profiteering from Plaintiffs/Plaintiffs' Predecessors property.

54. The Court has jurisdiction over defendants insofar as the acts complained of herein, originated and/or were designed to circumvent laws, regulations, administrative rules, sanctions and/or other restrictions that were imposed on defendants' business in the United States and/or in this judicial district.

55. The Court has jurisdiction over claims against defendants HUNGARY and GERMANY and each of its ministries, agencies, organs, museums and/or other entities controlled by such defendants, pursuant to the relevant provisions of the Foreign Sovereign Immunities Act ("FSIA"). More specifically, the Court has jurisdiction over these claims because:

   a. Defendants transported, shipped, stored, sold, exhibited and/or other acts related to The Stolen Artwork in the US and/or took other actions related to The Stolen Artwork or which had an affect on Plaintiffs/Plaintiffs' Predecessors' rights and property in the US or the commercial art market in the US, or took other actions

--------------

which had a direct affect on similar rights and/or commercial markets in the US as those are defined by *28 U.S.C.A. § 1605 (a) (2)*;

b.  Defendants' actions were designed to and did in fact take, deprive and/or adversely affect Plaintiffs/Plaintiffs' Predecessors' property and rights in the US, or property that had been exchanged for property in the US all of which were taken related to the commercial art market and activities related thereto as those are defined by *28 U.S.C.A. § 1605 (a) (3)*;

c.  Defendants wrongfully expropriated and/or took Plaintiffs'/Plaintiffs' Predecessors' property in the US and elsewhere around the world, including The Stolen Property which is/are in the custody, possession, control and/or are/were being stored in defendants' museums as set forth below, and all of which is and was in violation of international law as those acts are defined by *28 U.S.C.A. § 1605 (a) (3)*;

d.  Defendants' actions caused damage to and/or loss of Plaintiffs'/Plaintiffs' Predecessors' property in the US and these damages and/or losses were caused by tortuous and/or wrongful act(s) or omission(s) of ministers, officials, employees, agents and/or representatives of defendants HUNGARY and GERMANY and/or one of its/their ministries, departments, organs and/or agencies and while they were acting in the scope of their office or employment as those are defined by *28 U.S.C.A. § 1605 (a) (5)*;

e.  Defendants' actions violated the Holocaust Victims Redress Act of 1998;

---------------

f.   Defendants' actions violated the National Stolen Property Act of 1994;

g.   Defendants' actions violated the 1899 and 1907 Hague Conventions;

h.   Defendants' actions violated the 1990 Good Neighborliness Treaty

i.   Defendants' actions violated the 1995 Unidroit Convention; and

j.   Defendants' actions violated other international Treaties & *Jus Cogens*.

56. The Court has jurisdiction over Defendant THE PHILIPS COLLECTION (hereinafter "PHILIPS") , through diversity of citizenship, pursuant to 28 USC § 1332, and because it (i) maintains or maintained agents, representatives, personnel, officials and/or assets within this judicial district and/or (ii) conducts or conducted regular, continuous and systematic business within this judicial district.   Defendant PHILIPS is a museum and/or gallery which is organized and does business under the laws of the United States and is principally located in Washington DC.

57. The Court may also, pursuant to 28 USC ¶ 1531, transfer this case to any other federal court or judicial district in which defendants have continuous and systematic business, should the Court find jurisdiction to lacking in this judicial district.

**VENUE**

58. Venue is proper in this Court since the defendants do business and may be found in the District within the meaning of 28 U.S.C. Sec. 1391(a), as well as, 28 U.S.C. Sec. 1350.

---------------

59.  In the event, the Court should determine that venue may be lacking in this Court, then pursuant to 28 USC ¶ ¶ 1400 and 1401, the Court may transfer this action to any other district in which the case could have been originally brought.

## GENERAL FACTS RELATED TO ALL DEFENDANTS

60. During the Holocaust, the Nazi Regime and its agents engaged in the systematic theft of great artwork, masterpieces and collections ("The Stolen Property[3]") from the persons who were targeted for persecution and death.

61. Toward the end of World War II, defendant HUNGARY saw an opportunity to participate in and benefit from the theft, seizure and/or taking of certain of The Stolen Property.

62. Toward the end of World War II, the Allies were searching all over Europe for the assets and property of individuals and countries which were stolen by the Nazis.

63. As it relates to these defendants, the assets, particularly artwork, paintings, masterpieces and collections of certain wealthy Hungarian Jewish families, which were being stolen by the Nazis, were being transported into the then territory of Germany presumably for accounting or inventorying purposes, and then shipped back out for storage in hidden or remote locations the Nazis had in various locations, including the Salt Mines in the Bad Aussee Region of Austria.

64. The Allies were closing in on the Nazis and were trying to locate, secure and preserve these very valuable and fungible assets for the future.

65. At the same time as the Nazis were trying to secretly store The Stolen Property, and the

---

[3]    As used herein, the phrase "The Stolen Property" shall include works of art, including but not limited to artwork, paintings, ceramics, silver, gold, craftworks, instruments, Persian Rugs and other such items of a unique nature.

--------------

Allies were searching for it, Defendant HUNGARY was in a unique position as it knew the origin of the assets, collections from its nationals and possessed information that it believed could be used for its benefit at the end of World War II and which information would allow Defendant HUNGARY to also profit and benefit from The Stolen Property.

66. Defendant HUNGARY believed that it was probable that the Nazis were going to lose the war and because of that fact, Defendant HUNGARY saw and opportunity to use the information it possessed (i) to assist the Allies searching for the recovery of The Stolen Property and (ii) to place itself in a position from which it could also profit and benefit from The Stolen Property.

67. Some of ways defendant HUNGARY saw it could profit and benefit from The Stolen Property were:

   a. to collect, make a claim against, seize and/or demand that as many of the pieces of The Stolen Property, including those from The Hâtvany Collection, which the Allies located be given to them; and

   b. to itself seize, take, steal, confiscate and expropriate as much of The Stolen Property, including those from The Hâtvany Collection, as it could find.

68. To that end, defendant HUNGARY started to seek out pieces of The Stolen Property in its own country and others which it knew had been intercepted or found by the Allies in the Bad Aussee region of Austria, and which pieces of The Stolen Property had been brought there from within the territory of Germany, either Munich or Berlin depots.

---------------

69. Defendant HUNGARY seized, took, stole, confiscated and expropriated as much of The Stolen Property, including pieces from The Hâtvany Collection and claimed them as their own.  Some of these were placed in museums, storage depots and warehouses.  Others were loaned, transferred and/or sold to others.

70. While all this was going on, defendant GERMANY came under incredible pressure from the Allies to locate, account for The Stolen Property and return as much of The Stolen Property as could be found.

71. Defendant GERMANY established a series of programs through which Holocaust Victims could make claims for and received damages for, among other things, The Stolen Property.

72. As it relates to these claims, defendant GERMANY established a program that would entitle victims to significant compensation and/or restitution monies for The Stolen Property.  To qualify, the victims had to be able to:

   a. Identify specific real and personal property which could be independently valued;

   b. Prove their ownership and/or interests in the property; and

   c. Prove that the property after the Nazis took it, then transported it within the physical boundaries of defendant GERMANY, as those boundaries existed during the Nazi regime.

73. If a Holocaust victim could provide such proofs to defendant GERMANY, such person would be entitled to significant restitution and/or damage payments.

---------------

74. When faced with such claims, Defendant GERMANY almost always claimed that the claiming Holocaust victim had not satisfied all the above requirements, had certainly not provided satisfactory evidence that The Stolen Property made it into the then territory of Germany and as such they were not obligated to pay damages or restitution.

75. This worked with the majority of restitution and damages claims. However, Defendants GERMANY was faced with significant and increasing financial pressure because of the claims for restitution of artwork, masterpieces and/or collections including The Stolen Property and the former Hatvany Collections.

76. The reason for this was because of the way the Nazis handled the artwork, masterpieces and/or collections which they stole from Holocaust victims.

77. The Nazis kept precise records of the inventories, shipments, storage and transfers of the artwork, masterpieces and/or collections which they stole from Holocaust victims

78. It was this fact that allowed Plaintiffs Predecessor Hans Deutsch in the early 1960s to start succeeding in recovering hundreds of millions of dollars (paid in Deutsche Marks) for the restitution and damage claims for the artwork, masterpieces and/or collections which the Nazis stole from Holocaust victims.

79. It was in fact records over which defendant GERMANY had possession, custody or control or to which they had access, including those from defendant HUNGARY, which Plaintiffs Predecessor Hans Deutsch was able to use to force these enormous payments for Holocaust victims.

80. Almost single-handedly, Plaintiffs' Predecessor Hans Deutsch was placing defendant

GERMANY under enormous financial pressure because of the hundreds of millions he

was forcing them to pay in restitution and damages for The Stolen Property, including

millions to his clients such as The Rothschild, Warburg and other of Europe wealthiest

Jewish families whose assets were especially targeted and stolen.

81. Defendant GERMANY wished to avoid, reduce and/or minimize the liabilities into which

Plaintiffs Predecessor Deutsch was forcing it.

82. Defendant HUNGARY also wished to keep The Stolen Property which it had been able to

take at the end of, and/or after the War.

83. Both Defendant GERMANY and HUNGARY knew and had extensive records related to

(i) the fate of The Hatvany Collection; (ii) which portions of The Hatvany Collection

were transported, when and to where; (iii) which portions of The Hatvany Collection

were stolen by The Nazis and were never recovered; and (iv) which part of The Hatvany

Collection was taken by defendant HUNGARY after the War, after the paintings had

been shipped to Germany and then sent for storage to the Bad Aussee region of Austria

or elsewhere.

84. Both Defendant GERMANY and HUNGARY knew that The Hatvany Collection was

conservatively worth hundreds of millions of dollars when it was stolen and they both

knew that Plaintiffs Predecessor Deutsch had taken over the restitution and damages

claims for this file.

85. Both Defendant GERMANY and HUNGARY knew that it was only a matter or time

before Plaintiffs Predecessor Deutsch was able to force Defendant GERMANY to pay for

The Hatvany Collection, and they both know that sooner or later Defendant HUNGARY would have to return the pieces from The Hatvany Collection, it had.

86. This was what Defendant GERMANY and HUNGARY wished to avoid at all costs and it was this fact and the ever present anti-Semitism, racism and bigotry and hatred of Jews, which Plaintiffs believe was present in and throughout the ministries, agencies and other departments of the defendants which were responsible for and/or dealt with restitution and damages claims being paid to Jews for The Stolen Property.

87. And so it was that the conspiracy against Plaintiffs Predecessor was born.

88. During the period from the 1950s to the 1980s, defendant GERMANY sought (i) to wrongfully expropriate plaintiffs' Predecessors property, including The Hâtvany Collection and The Stolen Property, and (ii) to conspire against its obligations to honor post World War II treaties, bi-lateral agreements, as well as existing and binding international treaties, conventions and laws related to the restitution of artwork and the payment of claims to Holocaust victims who could identify The Stolen Property.

89. The conspiracy included the transportation, shipment, storage, seizure, appraisal, exhibition, publication of brochures and/or pamphlets, sales and other acts related to The Stolen Property.

90. The conspiracy also included the taking and/or expropriation of The Stolen Property with knowledge that Plaintiffs'/Plaintiffs' Predecessors had superior rights, claims and/or interests thereto.

91. The conspiracy also involved the taking and/or expropriation of The Stolen Property with

--------------

actual and/or constructive knowledge of the identities and/or places where Plaintiffs/Plaintiffs' Predecessors could be located and without notice.

92. The conspiracy had several components all of which were designed to deprive Plaintiffs/Plaintiffs' Predecessors of The Stolen Property, including pieces from The Hâtvany Collection and which conspiracy's greater objectives were:

a. To prevent Holocaust victims & their representatives from accessing documents needed to locate/recover property and/or damages for same. By doing so, defendants HUNGARY and GERMANY and its/their agents gained a commercial advantage by taking and selling off Plaintiffs/Plaintiffs' Predecessors property and by NOT paying legitimate claims and/or return or pay damages for looted property;

b. To assist in/benefit from creation of new provenance/ownership/title documents, transportation, shipment & sale of The Stolen Property to/thru private collectors, museums or galleries in the US and elsewhere, having direct affect in US;

c. To allow defendants to keep The Stolen Property, including items from The Hatvany Collection, which are/were in their possession, custody or control and/or the profits they made from its/their sales or transfer; and

d. To allow defendants to receive monies, benefits and/or other things of value to which they would not normally be entitled but which were to be paid in exchange for the defendants' assistance in the conspiracy.

93. To achieve the goal of the conspiracy, defendants HUNGARY and GERMANY, determined that they would single out and stop the restitution claims for Holocaust victims which were being made by Plaintiffs' Predecessor Prof. Hans. Deutsch, an Israeli lawyer with offices, property and clients in the United States, Israel, Switzerland, France, Germany and elsewhere around the world.

94. The theory was that if Defendants HUNGARY and GERMANY could stop Prof. Hans Deutsch's restitution claims, they - defendants HUNGARY and GERMANY - could benefit from their ability to retain and not pay for The Stolen Property, which in turn could be moved, transferred and/or in some cases sold to others such as defendants HUNGARY's and/or GERMANY's government owned museums, collections, auction houses and/or galleries and/or to private museums, collections, auction houses and/or galleries such as defendant PHILIPS, and they would receive other benefits.

95. To carry out the conspiracy, defendant GERMANY and HUNGARY used, empowered, employed, paid and/or delegated certain responsibilities to persons within their own governments, ministries, agencies, departments and/or organs of the governments, as well as persons who were hired to work especially for the conspiracy, and which persons included members of the former Nazi Party, in Germany, Switzerland, Austria and elsewhere.

96. Those involved in this conspiracy included and were not limited to (i) Defendant DAHLGRÜN - a close assistant and/or aide to Hermann Goering and as such was responsible for the spoliation of Jewish properties in countries which the Nazis occupied,

--------------

in particular Hungary, (ii) Defendant DE LA CROIX - a member of the Nazi Academy and was responsible for preparation of racist laws under the Nazi Regime, (iii) Defendant HÖTTL - one of Eichmann's chief aides and was part of the Nazi party's counterfeiting and forged documents department, (iv) Defendant FÜHRER - a high ranking member of the Nazi Party and close friend of defendant HÖTTL, (v) Defendant Koppe – was a close and trusted friend of defendant  DE LA CROIX; (vi) Defendant Heinrich – was a close and trusted friend of defendant  DE LA CROIX ; (vii) Defendant KLINSPOR - a Nazi collaborator in Hungary during the War, (viii) Defendant MASIREVIC – a Hungarian art expert who collaborated with defendants GERMANY and HUNGARY and  (ix) several others.

97. The use of the individual named defendants was because they were in unique positions of authority and/or influence, or had access and the ability to manipulate and interfere with documents, witnesses and evidence.   As such they were uniquely situated to execute the conspiracy.

98. Defendant DAHLGRÜN was Minister of Finance of defendant GERMANY.

99. Defendant DE LA CROIX was the Senior Official in defendant GERMANY's Federal Restitution Department, which was a department of the Ministry of Finance.

100. Defendant HÖTTL was an accomplished forger and lier and had network of former Nazis and/or Nazi collaborators and other "special" connections in the Bad Aussee Region of Austria where much of The Stolen Property which had been brought in from

Germany was stored and Defendant HÖTTL was a former employee of the US

Government in the divisions that were searching for The Stolen Property.

101.Defendant KOPPE was an experienced lier and had network of former Nazis and/or Nazi

collaborators with "special" connections in Austria, Germany, Hungary and elsewhere in

Europe.

102.Defendant HEINRICH was an experienced lier and had network of former Nazis and/or

Nazi collaborators with "special" connections in Austria, Germany, Hungary and

elsewhere in Europe.

103.Defendant FÜHRER was a lawyer in Austria who would help with forged

papers/documents.

104.Defendant KLINGSPOR had special connections in Hungary.

105.Defendant MASIREVIC was a former Hungarian who would provide some of the

fabricated documents and evidence.

106.Each of the individual defendants was an official, agent and/or representative of

defendants GERMANY and HUNGARY during the conspiracy.

107.As they carried out the conspiracy, each of the individual defendants acted within the

scope of their employment.

108.As each of the individual conspirators carried out their part in the conspiracy, they did so

with actual and/or constructive knowledge of the responsible persons within the then

governments of defendants HUNGARY and GERMANY.

109.The areas of responsibility and/or the work they were to do in furtherance of the

conspiracy was:

a. Defendant DAHLGRÜN, in his capacity as Defendant GERMANY's Minister of Finance, was to and did recommend, control and/or direct the conspiracy. Defendant DAHLGRÜN was a strong opponent of restitution and reparations payments to Holocaust victims and he delegated it to the others to carry out the conspiracy;

b. Defendant DE LA CROIX , in his capacity as Head of the Federal Restitution Department,  was to and did in fact  organize and carry out the day to day activities of the conspiracy, including the hiring and paying, with government monies, the individual defendants HÖTTL, FÜHRER, KLINGSPOR, MASIREVICH.  Defendant DE LA CROIX was to and did in fact conduct all the face to face meetings in Hungary, Austria and Germany, including meetings with officials of the Defendant HUNGARY about the conspiracy, how to destroy Plaintiffs Predecessor Hans Deutsch and take Plaintiffs Predecessors property, and offered the bribe, payment and/or other consideration to Defendant HUNGARY in exchange for its/their cooperation in the conspiracy;

c. Defendant HÖTTL was to and did in fact engage in tampering with and fabrication of evidence and forgery of documents;

d. Defendant KOPPE was to and did in fact organize the propaganda campaign against Plaintiffs' Predecessor Deutsch and acted as liaison for Defendants GERMANY

--------------

and HUNGARY with the justice officials who would prosecute Plaintiffs

Predecessor Deutsch and strip him of his assets;

e.Defendant HEINRICH was responsible for and did in fact organize the

communications network between the various defendant conspirators and he often

traveled to conduct the face to face meetings in Vienna, Budapest and Bonn;

f.Defendant FÜHRER was to and did in fact engage in tampering with and fabrication

of evidence;

g.Defendant KLINGSPOR was to and did in fact engage in tampering with and

fabrication of evidence;

h.Defendant MASIREVICH was to and did in fact engage in tampering with and

fabrication of evidence.

110.Each of the above named individual defendants worked at the direction and for the benefit

of Defendants GERMANY and/or HUNGARY.

111.Each of the above named individual defendants also received other benefits, including

rights to additional and/or ancillary revenues and/or benefits from the continued

trafficking of as much of The Stolen Property, including The Hatvany Collection, as

could be kept from Plaintiffs/Plaintiffs Predecessors.

112.Defendants HUNGARY and GERMANY believed that they could accomplish the

conspiracy's goal if they were able to "claim" that one or more of Prof. Hans Deutsch's

restitution claims was fraudulent and that to make and prosecute such a claim was a crime

against defendant GERMANY and as such Prof. Hans Deutsch was a criminal.

113. Defendant HUNGARY and GERMANY that they would use Prof. Hans Deutsch's claim for The Hâtvany Collection and would say that this claim was a fraud against defendant GERMANY and as such no restitution for The Hâtvany Collection would be paid, The Stolen Property would not be returned and could stay in defendant GERMANY and HUNGARY's possession and Prof. Hans Deutsch would be jailed.

114. To accomplish this goal, defendants GERMANY and HUNGARY had to discredit the claims that The Hâtvany Collection had been stolen by the Nazis and made it into the territory of defendant GERMANY during World War II – which would trigger the requirement to pay restitution.

115. In furtherance of the conspiracy, Defendants GERMANY and HUNGARY employed persons in the United States, Austria, Hungary, Germany, Switzerland and elsewhere to (i) fabricate and/or conceal evidence; (ii) falsify and/or conceal provenance, title and/or ownership records; (iii) conceal evidence related to the location of specific property; To assist in the transportation and sales of some of The Stolen Property, including specific items from The Hâtvany Collections, to and/or through private collections, museums and/or galleries in the United States.

116. More specifically, the conspiracy required the creation of fabricated evidence, forged documents, intentional misrepresentation and/or concealment of facts, suborning of false testimony, making of fraudulent claims and other knowing, reckless, careless or negligent misstatements of fact or evidence related to, among other things:

--------------

a. the true owners of certain items from The Hâtvany Collection and other pieces of The Stolen Property;

b. when, by whom and to which destination certain pieces from The Hâtvany Collection and other pieces of The Stolen Property were taken by the Nazis before May 8, 1945;

c. which of the transports of the pieces from The Hâtvany Collection and other pieces of The Stolen Property were shipped by the Nazis into the then territory of Germany, to depots in Munich, Berlin or other locations before May 8, 1945;

d. which pieces from The Hâtvany Collection and other pieces of The Stolen Property were "stored" and by whom they were "stored" in the Salt Mines in Bad Aussee Region of Austria where there were after being brought in from Germany;

e. which pieces from The Hâtvany Collection and other pieces of The Stolen Property were "taken" back by the defendant HUNGARY after they were discovered in the Salt Mines in Bad Aussese Region of Austria or elsewhere;

f. which pieces from The Hâtvany Collection and other pieces of The Stolen Property were not taken by the Nazis and remained in the possession of the original owner after 1945;

g. which pieces from The Hâtvany Collection and other pieces of The Stolen Property were taken by defendant HUNGARY after 1945; and

h. which of the pieces from The Hâtvany Collection and other pieces of The Stolen

---------------

Property could be/were claimed by the defendant HUNGARY as national

treasures to be returned by the Allies.

117. Defendant GERMANY, through defendants DAHLGRÜN and DE LA CROIX, had

direct meetings and negotiations with Defendant HUNGARY in which they detailed the

explanation (that The Hatvany Collection had been stolen by the Russians directly from

Budapest) which was to be the basis upon which all false, fabricated or untrue testimony,

evidence and documents would be based.

118. Defendant GERMANY requested that Defendant HUNGARY provide and/or assist with

the creation of fabricated evidence, forged documents, intentional misrepresentation

and/or concealment of facts, suborning of false testimony, making of fraudulent claims

and other knowing, reckless, careless or negligent misstatements of fact or evidence.

119. Defendant HUNGARY knew that what Defendant GERMANY was suggesting was

wrong and would require its and its officials participation in wrongful acts including but

not limited to creation of false, fabricated or untrue testimony, evidence and documents.

120. In exchange for its cooperation and assistance in the conspiracy, Defendant GERMANY

offered and Defendant HUNGARY was to receive or be able to retain some of The Stolen

Property, including items from The Hatvany Collection, as well as restitution, reparations

and/or other benefits for its "losses" caused by the Nazi Regime,

121. Defendant HUNGARY accepted the offer from Defendant GERMANY and agreed to

cooperate and assist in the conspiracy.

122. Defendant HUNGARY provided the requested assistance in and/or with the creation of

such fabricated evidence, forged documents, intentional misrepresentation and/or concealment of facts, suborning of false testimony, making of fraudulent claims and other knowing, reckless, careless or negligent misstatements of fact or evidence.

123. Defendant GERMANY paid Defendant HUNGARY for its providing and/or assisting with the creation of fabricated evidence, forged documents, intentional misrepresentation and/or concealment of facts, suborning of false testimony, making of fraudulent claims and other knowing, reckless, careless or negligent misstatements of fact or evidence.

124. Defendant GERMANY benefited from the creation of fabricated evidence, forged documents, intentional misrepresentation and/or concealment of facts, suborning of false testimony, making of fraudulent claims and other knowing, reckless, careless or negligent misstatements of fact or evidence, purchased from and/or provided by Defendant HUNGARY.

125. Defendant HUNGARY benefited from the creation of fabricated evidence, forged documents, intentional misrepresentation and/or concealment of facts, suborning of false testimony, making of fraudulent claims and other knowing, reckless, careless or negligent misstatements of fact or evidence, purchased by and/or received from Defendant GERMANY.

126. At all times relevant hereto, another object of the conspiracy was to take, expropriate, damage and/or cause losses to Plaintiffs' Predecessors property and assets in the United States.

127. This part of the conspiracy involved actions with which defendants GERMANY and

HUNGARY and the individual named defendants DAHLGRÜN, DE LA CROIX ,

FÜHRER, HÖTTL, KOPPE and HEINRICH, as former Nazis, were all too familiar.

128. One of these acts was the arrest and confinement of Plaintiffs Predecessor Prof. Hans

Deutsch in a German prison for 18 months, without trial.  During this confinement,

Plaintiffs DEUTSCH were told by defendant GERMANY, DAHLGRÜN and DE LA

CROIX, that if they delivered title to their property from the US and/or dispose of same

and deliver the value thereof, Prof. Deutsch would be released "shortly" from prison.

129. This is what the same defendants did when they were acting as Nazis dealing with some

Holocaust victim clients for whom Deutsch was fighting to secure restitution damages.

130. As part of the conspiracy, defendant GERMANY forced Plaintiffs DEUTSCH and

Plaintiffs Predecessor Hans Deutsch to turn over tens of millions of property or the value

thereof, including his interests in (i) The Plainville News and The Southington News

(both 100 % owned by Deutsch, both located in Westchester County and among the

oldest newspapers in the US); (ii) the printing plants and all equipment for the

newspapers; (iii) other real and personal property in New York State; and (iv) ALL stocks

and bonds in US companies, including shares of IBM stock.

131. As part of the conspiracy, when Plaintiffs Predecessor Hans Deutsch was released after

18 months of confinement, and despite repeated demands for same, these monies, assets

and property in the United States were NEVER fully returned.

---------------

132. As part of the conspiracy, defendants GERMANY and HUNGARY assisted in the transportation and/or sales of some of The Stolen Property into and/or through the US.

133. Among the more famous of the items from The Hâtvany Collection that appeared, were sold to and/or through and/or are still in located at or are in the custody, possession or control of galleries, museums and/or auction houses in the US, are:

a. A masterpiece called "Petite Baigneuse" by Ingres, which painting was originally in The National Gallery, Washington DC and is now in the possession of defendant PHILIPS;

b. A masterpiece called "Marine a Berck" by Manet, that appeared at Wildenstein & Co. in New York City, NY and which before that was at The Barnes Foundation in Lower Merion Pennsylvania and which has NOT been seen since 1997;

c. A masterpiece called "Mt. Sinai" which was stolen by the Nazis was offered for sale through Sotheby's to potential buyers in the US and elsewhere the discovery of which documents in 2004 showed that Double Red Flags should have been raised on the Provenance (title) and the identity of the persons claiming to be the "owners" CONFIRMED the painting (and others claimed herein) were STOLEN from plaintiffs' predecessors in interest.

134. The conspiracy carried out by defendants GERMANY and HUNGARY included the shipment, transfer and/or trafficking of The Stolen Property in the United States and had a substantial impact on commerce related to the sales of Artwork, Collections and/or

---------------

Masterpieces in the United States, as well as Holocaust related issues and/or claims in the United States.

135. The conspiracy carried out by defendants GERMANY and HUNGARY included shipment, transfer, payments and/or receipt of monies, notes, securities, commercial instruments and other items of value, which came into and/or through the United States and which had a substantial impact on commerce in the United States, as well as Holocaust related issues and/or claims in the United States.

136. The conspiracy, injury, damage and losses, continue to the present and it was only in the last few months that plaintiffs gained access to certain records and/or evidence, which had been previously withheld, concealed and/or kept secret from plaintiffs, and which evidence shows who was involved and how the conspiracy worked.

137. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate the Holocaust Victims Redress Act of 1988 *[See 112 Stat. 18 (1998) Title II]* which requires ALL governments to return looted assets such as The Stolen Property and items from The Hatvany Collection which are the subject of this claim.

138. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate the National Stolen Property Act of 1994 by virtue of its/their transporting, transmitting or transferring in interstate or foreign commerce and goods of the value of $5,000 or more, knowing same to have been stolen, converted or taken by

--------------

fraud *[ See 18 USCA § 2314]*; and receiving, possessing, concealing, storing, bartering, selling or disposing of any good the value of $5,000 or more, which has crossed a State or United States boundary after being stolen, unlawfully converted or taken, knowing same to have been stolen, converted or taken by fraud *[See 18 USCA § 2315]*.

139. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate "Article 56 of The 1899 Hague Convention" requiring "artwork to be treated as private property not to be damaged, destroyed or expropriated.

140. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate "The 1907 Hague Convention" prohibiting an army from "taking possession of ANY property that is not required for military purposes".

141. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate "The 1990 Good Neighborliness Treaty" between GERMANY and HUNGARY, and which obligated GERMANY to secure the return of The Looted Artwork and/or Collections belonging to plaintiffs currently located in HUNGARY so that they can "be returned to their owners or their legal successors", plaintiffs.

**142.** The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate "The 1995 Unidroit Convention on Stolen or Illegally Exported

--------------

Cultural Objects" (amending the 1970 UNESCO Convention) which calls for "giving priority to the dispossessed owner . . ." (i.e. plaintiffs herein) ". . . as opposed to the purchaser, even if that purchaser acquired the piece in good faith".

143. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate (i) US law, treaties and/or statutes, (ii) international law and *jus cogens*, and (iii) international treaties, conventions and bi-lateral agreements.

144. The conspiracy, which continues to the present, required/requires defendant GERMANY and HUNGARY to knowingly, negligently, carelessly, recklessly and/or otherwise wrongfully violate the laws, statutes, treaties, conventions set forth in exchange for the benefits they received through the conspiracy.

145. As a direct and proximate result of the conspiracy, from the 1950s to the present, defendants GERMANY and HUNGARY have been able to and did in fact retain and keep The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, in secret and/or undisclosed locations.

146. Periodically from the 1960s to the present, Plaintiffs/Plaintiffs Predecessors demanded the return of, restitution and/or payment of damages, and an accounting, for The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property

147. From the 1950s to the present, defendants GERMANY and HUNGARY refused to return, pay restitution and/or damages and/or account for The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property.

148. Recently, defendants GERMAY and HUNGARY admitted that they had within their possession, custody and/or control certain pieces of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property.

149. By way of example only these admissions included but were not limited to:

a. 2003 admission of defendant HUNGARY to Plaintiffs that they had within their possession, custody and/or control certain pieces of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, including items that were in the possession, custody and/or control of one of its museums, storage facilities, auction houses or other agencies of defendant HUNGARY; and

b. 2004 admission of defendant GERMANY to Plaintiffs that they had within their possession, custody and/or control certain pieces of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, including items that were in the possession, custody and/or control of one of its museums, storage facilities, auction houses or other agencies of defendant GERMANY, with a minimum insured value of over 60 million Euro and other property which had no insured value.

--------------

150. In addition to those pieces of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property to which they admitted, defendants GERMANY and HUNGARY are believed to be in possession of, and/or profited from the sales of, items from of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property that were/are stored and/or transported secretly in/through museums and other facilities in their countries.

151. It was only as a direct and proximate result of the above conspiracy that Defendants GERMANY and HUNGARY came into possession, custody and/or control over items from The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property.

152. It was only as a direct and proximate result of the above conspiracy, that Defendants GERMANY and HUNGARY wrongfully retained and/or expropriated items from The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property.

153. Defendants GERMANY and HUNGARY have refused to return of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property.

154. Plaintiffs/Plaintiffs predecessors in interest, in addition to other Hungarian, French, German, Austria and other wealthy collector families, were specially targeted by the defendant GERMANY and HUNGARY so that many of the items from The Stolen Property, including items from The Hâtvany Collection and other of

Plaintiffs/Predecessors property could be taken.

155.Shortly after it became public knowledge that defendants GERMANY and HUNGARY had in their possession custody and/or control items from The Stolen Property, possibly including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, defendants GERMANY and HUNGARY signed international treaties, conventions and/or bi-lateral agreements for its/their mutual exchange.

156.Plaintiffs/Plaintiffs Predecessors were the intended beneficiaries of those international treaties, conventions and/or bilateral agreements.

157.However instead of returning The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, Defendants GERMANY and HUNGARY failed to honor those international treaties, conventions and/or bi-lateral agreements to which Plaintiffs/Plaintiffs Predecessors were intended beneficiaries.

158. In addition to its failure to honor the requirements of the aforementioned international treaties, conventions and/or bi-lateral agreements, after the execution of same, defendant HUNGARY introduced legislation and/or took steps to nationalize and/or resist, interfere with or frustrate the efforts to recover The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, which it had in its possession custody and/or control and which it also obtained through the conspiracy described herein.

159.This introduction of legislation and/or taking of steps by defendant HUNGARY to nationalize The Stolen Property and/or resist, interfere with or frustrate the efforts to recover The Stolen Property, including items from The Hâtvany Collection and other of

Plaintiffs/Predecessors property, was a wrongful and illegal.

160. Defendants HUNGARY's and GERMANY's taking, seizure, retention and/or withholding of The Stolen Property, including items from The Hâtvany Collection and other of Plaintiffs/Predecessors property, was in the direct violation of international treaties, conventions and/or bi-lateral agreements, including those referred to herein, as well as *jus cogens* and other international laws and standards.

161. Defendants HUNGARY's and GERMANY's taking, seizure, retention and/or withholding of The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property violates multiple international treaties, conventions and/or bilateral agreements as follows

162. Defendants HUNGARY and GERMANY are/were parties to treaties which condemned pillage or plunder as compensation for losses suffered in war that prohibited its seizure retention and/or withholding of The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors' property.

163. Defendants GERMANY and HUNGARY are/were signatories to three Hague Conventions prohibited the takings, seizures, retention and/or withholdings and/or expropriation of The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property.

164. Defendants GERMANY and HUNGARY are/were signatories to Article 53 of the 1899 Hague Convention on the Laws and Customs of War which stated that "an army of occupation may only confiscate property which may be used for military operations", and as such

--------------

prohibited the confiscation of The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property.

165.Defendants GERMANY and  HUNGARY are/were signatories to Article 56 of the 1899 Hague Convention on the Laws and Customs of War that established ". . . property such as artworks and religious property are to be treated as private property and not intentionally destroyed or damaged . . . " and which applies to The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property.

166.Defendants GERMANY and HUNGARY are/were signatories to The Hague Convention of 1907 which contained similar provisions to the 1899 Hague Convention.

167.The 1907 Hague Convention prohibited defendants GERMANY and HUNGARY from acts of takings, seizures, retention, withholdings and/or expropriation of The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property.

168.Defendants GERMANY and HUNGARY are/were signatories to The 1954 Hague Convention which prohibited the use, taking, expropriation and/or retention of The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property.

169.Defendants GERMANY and HUNGARY knew or should have known that the aforesaid treaties, conventions and/or bi-lateral agreements, as well as *jus cogens*, and US and international laws and standards, prohibited its/their "damages to property belonging to any people whatsoever means damage to the cultural heritage of all mankind...", such as The Stolen

--------------

Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs

Predecessors property.

170. Defendants GERMANY and HUNGARY are/were signatories to the 1970 UNESCO

Convention that prohibited the continued retention of The Stolen Property, including pieces from

The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property

171. Defendants HUNGARY and GERMANY knew or should have known that the

principles of the 1970 UNESCO Convention required them to take the necessary steps to return

The Stolen Property, including pieces from The Hâtvany Collection, and other of

Plaintiffs/Plaintiffs Predecessors property.

172. Defendants GERMANY and HUNGARY violated failed to honor the

aforementioned Hague Conventions and UNESCO obligations by not returning The Stolen

Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs

Predecessors property.

173. Defendants HUNGARY and GERMANY violated the relevant portions of the

obligations of 1990 Good Neighborliness Treaty by failing to secure the return of The Stolen

Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs

Predecessors property.

174. Defendants GERMANY's and HUNGARY's attempts to initiate legislation through

which it/they could attempt to retroactively legitimize its/their seizure, stealing, retention  and/or

withholding of The Stolen Property, including pieces from The Stolen Property, including pieces

from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property, was wrongful.

175. After The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property, were known and/or discovered to be in, the possession, custody and/or control of defendants GERMANY and/or HUNGARY, they had a duty to take care of them and to return them to Plaintiffs/Plaintiffs Predecessors.

176. Contrary to their obligations, after The Stolen Property, items from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs predecessors property, came into and/or were discovered to be in possession, custody and/or control of defendants GERMANY and HUNGARY, they placed them in galleries, museums, vaults, warehouses, offices and other locations in and/or throughout HUNGARY and GERMANY, facts and/the locations where the items were stored were not and have never been fully disclosed to Plaintiffs/Plaintiffs Predecessors.

177. It was the duty of defendants GERMANY and HUNGARY to insure that The Stolen Property, including pieces from The Hâtvany Collection, and other of Plaintiffs/Plaintiffs Predecessors property which came into and/or were discovered to be their possession, custody and/or control, was restituted to the rightful owners, to wit: Plaintiffs/Plaintiffs Predecessors.

178. As explained above, Defendants HUNGARY and GERMANY conspired to wrongfully retain The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property.

179. As explained above, Defendant HUNGARY and GERMANY assisted others with

--------------

the wrongful transfer of The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property.

180. As explained above, Defendants HUNGARY and GERMANY engaged in actions to conceal their aforesaid acts so they could deprive Plaintiffs/Plaintiffs Predecessors, i.e. the rightful owners, of their rights, title and interests to The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property.

181. Each of the acts or omissions described above were part of a design, plan and/or scheme to defraud Plaintiffs/Plaintiffs Predecessors out of recovery and/or restitution of The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property ( hereinafter *The Scheme to Defraud Plaintiffs/Plaintiffs Predecessors"*).

182. As explained above, defendants HUNGARY's and GERMANY's actions related to The Scheme to Defraud Plaintiffs/Plaintiffs Predecessors was wrongful.

183. The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property, involved in The Scheme to Defraud Plaintiffs/Plaintiffs' Predecessors, included some of the world's greatest, most important and most valuable masterpieces including those from artists such as Rembrandt, Monet, Manet, Renoir, van Gogh, Degas, De La Croix, El Greco, Ingres, Titian, Tintereto and others.

## STATUTE OF LIMITATIONS TOLLED

184.                    The applicable statutes of limitations for the instant causes of action are tolled because the acts complained of herein are those for which there is no statute of limitations, or which could or were only recently discovered and/or ongoing acts and/or continuing wrongs.

185.                    Plaintiffs have only recently discovered The Scheme to Defraud Plaintiffs/Plaintiffs Predecessors, as well as the wrongful seizure, expropriation, concealment, withholding, storage and/or retention of The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property which are the subject of this claim.

186.                    Facts related to The Scheme to Defraud Plaintiffs/Plaintiffs' Predecessors have only recently come to plaintiffs possession and knowledge that show some of the ways how The Stolen Property, including items from The Hâtvany Collections and other of the Plaintiffs/Plaintiffs' Predecessors property which are the subject of this claim, which are conservatively valued in the BILLIONS of dollars, and how these came into defendants' possession, custody and/or control and how they have been wrongfully retained, withheld, shipped, transferred, sold, concealed and/or expropriated.

187.                    Defendants GERMANY and HUNGARY actively concealed and/or sought to and/or continue to conceal their wrongful acts in furtherance of The Scheme to Defraud Plaintiffs/Plaintiffs' Predecessors.

--------------

188.                                    As part of The Scheme to Defraud

Plaintiffs/Plaintiffs' Predecessors, Defendants GERMANY and HUNARY actively concealed,

sought to and continue to conceal their wrongful acts from, among others, plaintiffs, other

victims' representatives, lawyers, politicians, courts, international commissions, mediators,

historians and other interested parties to whom defendants are and have been under an obligation

(i) to restitute The Stolen Property, items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property and (ii) to truthfully and fully disclose the existence of

records and information about of The Stolen Property and The Hâtvany Collection.

## COUNT I – WRONGFUL EXPROPRIATION/TAKING OF PROPERTY

189.                                    Plaintiffs repeat each and every one of

the allegations as contained in the above referenced paragraphs as if the same were set forth fully

and at length herein.

190.                                    The aforesaid described conspiracy and

acts or omissions of defendants GERMANY and HUNGARY constituted a wrongful

expropriation and/or taking of Plaintiffs'/Plaintiffs Predecessors property, items from The

Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property which are the

subject of this claim

191.                                    The aforedescribed conspiracy, acts and

wrongful expropriation and/or takings involved defendants GERMANY and HUNGARY:

     a.  having transported, shipped, stored, sold, exhibited and/or other acts related to

          The Stolen Artwork in the US and/or took other actions related to The Stolen

--------------

Artwork or which had an affect on Plaintiffs/Plaintiffs' Predecessors' rights and property in the US or the commercial art market in the US, or took other actions which had a direct affect on similar rights and/or commercial markets in the US in direct violation of *28 U.S.C.A. § 1605 (a) (2)*;

b. having deprived and/or adversely affected Plaintiffs/Plaintiffs' Predecessors' property and rights in the US, or property that had been exchanged for property in the US all of which were taken related to the commercial art market and activities in direct violation of *28 U.S.C.A. § 1605 (a) (3)*;

c. causing damage to and/or loss of Plaintiffs'/Plaintiffs' Predecessors' property in the US and these damages and/or losses were caused by tortuous and/or wrongful act(s) or omission(s) of ministers, officials, employees, agents and/or representatives of said defendants and/or one of its/their ministries, departments, organs and/or agencies and while they were acting in the scope of their office or employment and in direct violation of *28 U.S.C.A. § 1605 (a) (5)*;

d. having committed acts in violation of the Holocaust Victims Redress Act of 1998;

e. having committed acts in violation of the National Stolen Property Act of 1994;

f. having committed acts in violation of the 1899 and 1907 Hague Conventions;

g. having committed acts in violation of the 1990 Good Neighborliness Treaty

h. having committed acts in violation of the 1995 Unidroit Convention; and

i. having committed acts in violation of other applicable international Treaties & *Jus Cogens*.

---------------

192.                                As a direct and proximate result of defendants GERMANY's and HUNGARY's aforesaid conspiracy, wrongful acts, omissions and/or wrongful expropriations and/or takings, plaintiffs suffered monetary and other damages. WHEREFORE, plaintiffs demand judgment against defendants GERMANY and HUNGARY, individually, jointly, severally, and/or in the alternative on this Count for (i) restitution and/or compensatory damages for the specific items from The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property and which include paintings that have been found in defendants GERMANY and/or HUNGARY's galleries, museums, storage, restoration and other facilities, and in an amount not less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**; (ii) exemplary and/or punitive damages in the amount of **SIX BILLION DOLLARS (US) ($6,000,000,000)**; and (iii) interest, attorneys' fees, and costs of this action.

## COUNT II – CONSPIRACY

193.                                Plaintiffs repeat each and every one of the allegations as contained in the above referenced paragraphs as if the same were set forth fully and at length herein.

194.                                The aforesaid acts or omissions of defendants GERMANY and HUNGARY were part of a fraud designed to deprive the rightful owners, including plaintiffs herein The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

195.                                The aforesaid conspiracy, fraud and

--------------

other acts by defendants GERMANY's and HUNGARY's were wrongful.

196.                                            The aforesaid conspiracy, fraud and

other acts were in violation of applicable laws and regulations governing defendants

GERMANY's and HUNGARY's actions and obligations related to The Stolen Property, items

from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

197.                                            As a direct and proximate result of

defendants GERMANY's and HUNGARY's aforesaid conspiracy, fraud and other wrongful acts,

plaintiffs suffered monetary and other damages.

198.                                            WHEREFORE, plaintiffs demand

judgment against defendants GERMANY and HUNGARY, individually, jointly, severally,

and/or in the alternative on this Count (i) damages for its/their part in the conspiracy and fraud

which shall be in an amount not less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**,

(ii) restitution and/or compensatory damages for the specific items from The Stolen Property,

items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property

and which include paintings that have been found in defendants GERMANY and/or

HUNGARY's galleries, museums, storage, restoration and other facilities, and in an amount not

less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**; (iii) exemplary and/or punitive

damages in the amount of **SIX BILLION DOLLARS (US) ($6,000,000,000)**; and (iv) interest,

attorneys' fees, and costs of this action..

## COUNT III – NEGLIGENCE and/or NEGLIGENT SUPERVISION

199. Plaintiffs repeat each and every one of the allegations as contained in the above referenced paragraphs as if the same were set forth fully and at length herein.

200. Defendants GERMANY and HUNGARY had an obligation to exercise diligence with regard to the identification of The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which came into and/or were discovered to be in its/their possession so as to return same promptly and without delay or damages to the property or the plaintiffs/Plaintiffs Predecessors by reason of a potential delay in the return of such property.

201. Defendants GERMANY and HUNGARY had an obligation to supervise their agents, employees, representatives and/or all persons acting with their actual and/or apparent authority to as to insure that such persons, including the individual named defendant persons and/or entities, acted properly and with due diligence so as not to allow them to commit the acts as alleged herein with regard to the identification of The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

202. Defendants GERMANY and HUNGARY were negligent in honor the aforesaid duties, including (i) the duty to promptly identify and return The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which came into and/or were discovered to be in its/their possession so as to return same promptly and without delay or damages to the property or the plaintiffs/Plaintiffs Predecessors by reason of a potential delay in the return of such property and (ii) the duty to exercise proper control and supervision of the individual named defendant persons and/or entities so as not to allow them to commit the

--------------

acts as alleged herein with regard to The Stolen Property, items from The Hâtvany Collection and

other of the Plaintiffs/Plaintiffs' Predecessors property.

203. As a direct and proximate result of defendants HUNGARY and GERMANY's

negligence and/or failure to properly control and/or supervise the individual named defendant

persons and/or entities, plaintiffs have suffered monetary and other damages.

204. WHEREFORE, plaintiffs demand judgment against defendants GERMANY and

HUNGARY, individually, jointly, severally, and/or in the alternative on this Count for (i)

damages for its negligence and in an amount not less than **ONE BILLION DOLLARS**

**($1,000,000,000) (USD)**, (ii) restitution and/or compensatory damages for the specific items

from The Stolen Property, items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property and which include paintings that have been found in

defendants GERMANY and/or HUNGARY's galleries, museums, storage, restoration and other

facilities, and in an amount not less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**;

(iii) exemplary and/or punitive damages in the amount of **SIX BILLION DOLLARS (US)**

**($6,000,000,000)**; and (iv) interest, attorneys' fees, and costs of this action.

## COUNT IV – UNJUST ENRICHMENT

205. Plaintiffs repeat, re-allege and incorporate herein each and every one of the above

allegations, as if the same were set forth fully and at length herein.

206. By virtue of the aforesaid acts, inactions, negligent, wrongful and/or other improper

acts, defendants GERMANY and HUNGARY were and have been unjustly enriched by seizure,

attempted expropriation, taking, retention, withholding and/or failing to restitute The Stolen

Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

207.Defendants GERMANY and HUNGARY have been unjustly enriched from profits earned through exhibitions and/or other profits related to their retention of The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

208.Defendants GERMANY and HUNGARY have been unjustly enriched through fees and other monies saved, earned and/or retained as a result and/or arising from The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

209. As a direct and proximate result of defendants GERMANY's and HUNGARY's unjust enrichment from The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property which are the subject of this claim, plaintiffs suffered monetary and other damages.

210. WHEREFORE, plaintiffs demand judgment against defendants HUNGARY and GERMANY, individually, jointly, severally, and/or in the alternative for (i) damages equivalent to their unjust enrichment, which amount exceeds the jurisdictional limit of this Court, (ii) restitution and/or compensatory damages for the specific items from The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property and which include paintings that have been found in defendants GERMANY and/or HUNGARY's galleries, museums, storage, restoration and other facilities, and in an amount not less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**; (iii) exemplary and/or punitive damages in the

---------------

amount of **SIX BILLION DOLLARS (US) ($6,000,000,000)**; and (iv) interest, attorneys' fees, and costs of this action.


## COUNT V – EQUITABLE DISGORGEMENT

211.        Plaintiffs repeat, re-allege and incorporate herein each and every one of the above allegations, as if the same were set forth fully and at length herein.

212.        The aforesaid actions and/or inactions of defendants GERMANY and HUNGARY were unjust, improper, wrongful, negligent and/or in violation of applicable laws, treaties, conventions, customs, regulations and standards.

213.        Defendants GERMANY's and HUNGARY's unjust enrichment from the aforesaid actions, inactions, is unjust, improper, inequitable, wrongful, negligent and/or otherwise unlawful.

214.        As a direct and proximate result of defendants GERMANY's and HUNGARY's unjust enrichment, plaintiffs suffered monetary and other damages.

215.        **WHEREFORE,** plaintiffs demand judgment against defendant HUNGARY and GERMANY, individually, jointly, severally, and/or in the alternative for (i) damages equivalent to their unjust enrichment, which amount exceeds the jurisdictional limit of this Court, and which amount should be disgorged and paid over to plaintiffs, (ii) restitution and/or compensatory damages for the specific items from The Stolen

---------------

Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property and which include paintings that have been found in defendants GERMANY and/or HUNGARY's galleries, museums, storage, restoration and other facilities, and in an amount not less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**; (iii) exemplary and/or punitive damages in the amount of **SIX BILLION DOLLARS (US) ($6,000,000,000)**; and (iv) interest, attorneys' fees, and costs of this action.

## COUNT VI – EQUITABLE ACCOUNTING

216.                                    Plaintiffs repeat, re-allege and incorporate herein each and every one of the above allegations, as if the same were set forth fully and at length herein.

217.                                    Defendants GERMANY and HUNGARY owed to Plaintiffs/Plaintiffs Predecessors a duty to account for The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim and/or which are and have been kept in or were discovered in its/their museums, archives, storage facilities, vaults, restoration facilities and/or elsewhere within the territory of GERMANY and HUNGARY, and as to which they had knowledge.

218.                                    At all times relevant hereto, Plaintiffs/Plaintiffs Predecessors made inquiries of and/or requested an accounting from defendants HUNGARY and GERMANY to account for The Stolen Property, items from The

Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim and/or which are and have been kept in or were discovered in its/their museums, archives, storage facilities, vaults, restoration facilities and/or elsewhere within the territory of GERMANY and HUNGARY, and as to which they had knowledge.

219.                                        Defendants GERMANY and HUNGARY never accounted, failed and/or refused to provide to Plaintiffs/Plaintiffs Predecessors the requested an accounting of The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim and/or which are and have been kept in or were discovered in its/their museums, archives, storage facilities, vaults, restoration facilities and/or elsewhere within the territory of GERMANY and HUNGARY, and as to which they had knowledge.

220.                                        Defendants GERMANY and HUNGARY negligently, carelessly, recklessly and/or intentionally misrepresented the true accounting to Plaintiffs/Plaintiffs Predecessors regarding The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim and/or which are and have been kept in or were discovered in its/their museums, archives, storage facilities, vaults, restoration facilities and/or elsewhere within the territory of GERMANY and HUNGARY, and as to which they had knowledge..

221.                                        Through its/their actions or omissions to act, and as a part of The Scheme to Defraud Plaintiffs/Plaintiffs Predecessors, defendants violated their duty Plaintiffs/Plaintiffs Predecessors.

--------------

222.                                    The Stolen Property, items from The

Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, were seized,

taken, expropriated, received, stored, claimed and/or retained in museums, archives, storage

facilities, vaults, restoration facilities and/or elsewhere within the territory of defendants

GERMANY and HUNGARY and were known, should have been known and/or could - with the

exercise of proper and due diligence – have been discovered to have belonged to plaintiffs and

other Holocaust victims.

223.                                    Defendants GERMANY and

HUNGARY were and continue to be under certain contractual and/or legal obligations to

maintain accurate records related to The Stolen Property, items from The Hâtvany Collection and

other of the Plaintiffs/Plaintiffs' Predecessors property.

224.                                    Defendants GERMANY and

HUNGARY assumed affirmative obligations in the post World War II period to maintain

accurate records, accounting and to report the existence of The Stolen Property, items from The

Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which they took,

stole, received, stored, claim and/or which are and have been kept in or were discovered in

its/their museums, archives, storage facilities, vaults, restoration facilities and/or elsewhere

within the territory of GERMANY and HUNGARY, and as to which they had knowledge.

225.                                    Defendants GERMANY and

HUNGARY were and continue to be under a legal obligation, as imposed upon defendants

GERMANY and HUNGARY, by laws of the State of New York, *jus cogens*, pacts and/or other

international agreements, treaties conventions and/or statutes, to report the existence of The

Stolen Property, including items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim and/or

which are and have been kept in or were discovered in its/their museums, archives, storage

facilities, vaults, restoration facilities and/or elsewhere within the territory of GERMANY and

HUNGARY, and as to which they had knowledge.

226.                                      Defendants GERMANY and

HUNGARY were requested by Plaintiffs/Plaintiffs Predecessors and others to disclose the

existence of  The Stolen Property, items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim and/or

which are and have been kept in or were discovered in its/their museums, archives, storage

facilities, vaults, restoration facilities and/or elsewhere within the territory of GERMANY and

HUNGARY, and as to which they had knowledge.

227.                                      It was not until within the last months

that defendants GERMANY and HUNGARY finally reported and/or disclosed the existence

and/or location of certain of The Stolen Property, items from The Hâtvany Collection and other

of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim

and/or which are and have been kept in or were discovered in its/their museums, archives,

storage facilities, vaults, restoration facilities and/or elsewhere within the territory of

GERMANY and HUNGARY, and as to which they had knowledge, other property has never

been reported

228.                              Defendants GERMANY and

HUNGARY have failed to report or disclose the systems and/or procedures through which they

sought to and did in fact benefit from The Stolen Property, items from The Hâtvany Collection

and other of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received,

stored, claim and/or which are and have been kept in or were discovered in its/their museums,

archives, storage facilities, vaults, restoration facilities and/or elsewhere within the territory of

GERMANY and HUNGARY, and as to which they had knowledge.

229.                              At no time did defendants GERMANY

and HUNGARY report or disclose the fact that they benefited from The Stolen Property, items

from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which

they took, stole, received, stored, claim and/or which are and have been kept in or were

discovered in its/their museums, archives, storage facilities, vaults, restoration facilities and/or

elsewhere within the territory of GERMANY and HUNGARY, and as to which they had

knowledge.

230.                              Defendants GERMANY and

HUNGARY never reported or disclosed the fact that they developed systems and schemes by

which they could benefit from The Stolen Property, items from The Hâtvany Collection and other

of the Plaintiffs/Plaintiffs' Predecessors property, which they took, stole, received, stored, claim

and/or which are and have been kept in or were discovered in its/their museums, archives,

storage facilities, vaults, restoration facilities and/or elsewhere within the territory of

GERMANY and HUNGARY, and as to which they had knowledge.

--------------

231.                                    Defendants GERMANY's and
HUNGARY's aforesaid refusal and/or failure to report and/or account for The Stolen Property,
items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property
which are the subject of this claim, which they took, stole, received, stored, claim and/or which
are and have been kept in or were discovered in its/their museums, archives, storage facilities,
vaults, restoration facilities and/or elsewhere within the territory of GERMANY and
HUNGARY, and as to which they had knowledge, was a violation of their aforesaid obligations
to report, and/or account to Plaintiffs/Plaintiffs Predecessors.

232.                                    Defendants GERMANY's and
HUNGARY's aforesaid refusal and/or failure to report and/or account was wrongful, negligent,
careless and/or otherwise improper.

233.                                    As a direct and proximate result of
defendants GERMANY's and HUNGARY's breach of their duty to account, failure and/or
refusal to provide a proper accounting, plaintiffs have suffered monetary and other damages.

**234.**                                    **WHEREFORE**, plaintiffs demand
judgment against defendant HUNGARY, individually, jointly, severally, and/or in the alternative
for damages as follows: (i) An immediate independent accounting of The Stolen Property, items
from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which
they took, stole, received, stored, claim and/or which are and have been kept in or were
discovered in its/their museums, archives, storage facilities, vaults, restoration facilities and/or
elsewhere within the territory of GERMANY and HUNGARY, and as to which they had

--------------

knowledge; (ii) Costs of the aforesaid independent accounting and historical investigation into

defendants GERMANY's and HUNGARY's actions; and (iii) interest, attorneys' fees, and costs

of this action.


## COUNT VII – IMPOSITION OF CONSTRUCTIVE TRUST

235.                                    Plaintiffs repeat, reallege and incorporate

herein each and every one of the above allegations, as if the same were set forth fully and at

length herein.

236.                                    Defendants GERMANY and

HUNGARY knew and/or had reasonable basis to conclude that they were NOT permitted to

engage in the above transactions.

237.                                    Defendants GERMANY and

HUNGARY seized, took, expropriated, received, stored, claimed and/or retained in its museums,

archives, storage facilities, vaults, restoration facilities and/or elsewhere within the territory of

defendants GERMANY and HUNGARY, The Stolen Property, items from The Hâtvany

Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

238.                                    At all times relevant hereto, defendants

GERMANY and HUNGARY had actual and/or constructive possession and/or title to The

Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs'

Predecessors property.


--------------

239.                          The estimated and/or approximate real

value of The Stolen Property, items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, that defendants GERMANY and HUNGARY seized,

took, expropriated, received, stored, claimed and/or retained in museums, archives, storage

facilities, vaults, restoration facilities and/or elsewhere within the territory of defendant

GERMANY and HUNGARY is in the hundreds of millions if not billions of dollars (USD).

**240.**                          The Stolen Property, items from The

Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, belong to

Plaintiffs/Plaintiffs Predecessors and/or other Holocaust victims, heirs, beneficiaries,

representatives and/or predecessors in interest.

241.                          Defendants GERMANY and

HUNGARY knew, should have known and/or could have through the exercise of reasonable

diligence determined that The Stolen Property, items from The Hâtvany Collection and other of

the Plaintiffs/Plaintiffs' Predecessors property, did not belong to them and/or the person(s) and/or

person(s) who caused them to be placed with or come into possession, custody and/or control of

defendants GERMANY and HUNGARY.

**242.**                          **WHEREFORE**, plaintiffs demand

judgment against defendants GERMANY and HUNGARY, individually, jointly, severally,

and/or in the alternative for: (i) imposition of a constructive trust of, upon and/or concerning the

specific items from The Stolen Property, items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, wrongfully held in defendants GERMANY's and

HUNGARY's National Gallery, museums, storage, restoration and other facilities,  in an amount not less than **ONE BILLION DOLLARS ($1,000,000,000) (USD)**; (ii) exemplary and/or punitive damages in the amount of **SIX BILLION DOLLARS (US) ($6,000,000,000)**; and (iii) interest, attorneys' fees, and costs of this action.

### COUNT VIII – RESTITUTION and/or REPLEVIN

243. Plaintiffs repeat, reallege and incorporate herein each and every one of the above allegations, as if the same were set forth fully and at length herein.

244. At all times relevant hereto, Defendants GERMANY and HUNGARY had the obligation to pay specific restitution and/or damages for The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property.

245. At all times relevant hereto, Defendant GERMANY and HUNGARY had the obligation to enforce applicable international, conventions and/or European Union Treaties, to insure that The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property were restituted and/or damages were paid to Plaintiffs/Plaintiffs Predecessors.

246. Defendants GERMANY and HUNGARY have NOT paid for specific restitution and/or damages for The Stolen Property, items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, and the other paintings and/or items wrongfully held in defendants HUNGARY's and GERMANY's museums, storage, restoration and other facilities.

247. Defendants GERMANY and HUNGARY failed to enforce and/or abide by the

applicable international and/or European Union, treaties, conventions and/or agreements, to

insure that The Stolen Property, items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, were restituted and/or damages were paid to

Plaintiffs/Plaintiffs Predecessors.

248. Plaintiffs/Plaintiffs' Predecessors were among the intended beneficiaries of

defendants GERMANY's and HUNGARY's aforesaid obligations.

249. At all times relevant hereto, Defendant PHILIPS had the obligation to check and

double check the provenance, title and ownership documents of The Stolen Property, including

the Ingres masterpiece and potentially other items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, which came into its custody, possession and/or

control.

250. At all times relevant hereto, Plaintiffs/Plaintiffs predecessors discovered evidence to

suggest that the Ingres masterpiece and potentially other items from The Hâtvany Collection and

other of the Plaintiffs/Plaintiffs' Predecessors property, which came into its custody, possession

and/or control, were of questionable origin and came from persons who had dubious ownership

credentials such that the painting(s) should have been double red-flagged.

251. At all times relevant hereto, Defendant PHILIPS failed in its obligation to check and

double check the provenance, title and ownership documents of The Stolen Property, including

the Ingres masterpiece and potentially other items from The Hâtvany Collection and other of the

Plaintiffs/Plaintiffs' Predecessors property, which came into its custody, possession and/or

control.

252. At all times relevant hereto, had Defendant PHILIPS fulfilled its obligation to check and double check the provenance, title and ownership documents of The Stolen Property, including the Ingres masterpiece and potentially other items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, which came into its custody, possession and/or control, it would have known that such paintings had questionable origin and provenance and they should have consulted with and/or returned such paintings to its/their owners, including the Plaintiffs/Plaintiffs Predecessors

253. As a direct and proximate result of defendants GERMANY's, HUNGARY's and PHILIPS failure to honor its/their aforesaid obligations, Plaintiffs/Plaintiffs Predecessors were injured and caused to suffer substantial and ongoing monetary damages.

254. **WHEREFORE**, plaintiffs demand judgment against defendants GERMANY, HUNGARY and PHILIPS, individually, jointly, severally, and/or in the alternative for damages as follows: (i) restitution and/or compensatory damages for the specific items of The Stolen Property, including the Ingres masterpiece and potentially other items from The Hâtvany Collection and other of the Plaintiffs/Plaintiffs' Predecessors property, and which are in said defendants possession custody and/or control, in an amount equivalent to the actual present values of said property; (ii) exemplary and/or punitive damages in the amount of **SIX BILLION DOLLARS (US) ($6,000,000,000)**; and (iv) interest, attorneys' fees, and costs of this action.

Dated:  March 3, 2005

---------------

/s/_____
Edward D. Fagan, Esq.Morse Geller Esq.

140 Broadway, 46th Floor                      277 Sycamore Street
New York, NY  10005                             West Hempstead NY  11552
Tel. (212) 858-7605                             Tel. (516) 564-6734
Plaintiff Pro-Se and Plaintiffs' Co-Counsel     Plaintiffs' Co-Counsel

--------------