*Übersetzung aus dem Englischen*

## BEZIRKSGERICHT DER VEREINIGTEN STAATEN
## FÜR DEN
## SÜDLICHEN BEZIRK VON NEW YORK

-------------------------------------------------------------------------X

| | |
|---|---|
| **VEREINIGUNG VON HOLOCAUST-OPFERN FÜR DIE** : | |
| **RESTITUTION VON KUNST und MEISTERWERKEN** : | **04-CIV-8457** |
| **alias „AHRAM";** : | **(LTS)** |
| **FRAU ERNA DEUTSCH; DR. JORAM DEUTSCH;** : | |
| **ALICE BURGER-FISCHER; und** : | |
| **EDWARD DAVIS FAGAN;** : | |
|        **Kläger,** : | **ERSTE** |
| **gegen** : | **ERGÄNZTE** |
| : | **KLAGE** |
| **REPUBLIK UNGARN;** : | |
| *Persönlich und/oder als Verantwortliche für:* : | |
|     **UNGARISCHE NATIONALGALERIE,** : | |
|     **MUSEUM DER SCHÖNEN KÜNSTE,** : | |
|     **MINISTERIUM FÜR KULTUR und weitere** : | |
|     **STAATLICHE UNGARISCHE MUSEEN und/oder** : | *Stempel* |
|     **STAATLICHE & KUNST-** : | **ERHALTEN** |
|     **RESTAURIERUNGSEINRICHTUNGEN** : | **4. März 2005** |
|     **(der Name ist fiktiv und wird verwendet, bis die** : | US-Bezirksgericht |
|     **tatsächlichen Namen herausgefunden werden); und** : | Südlicher Bezirk NY |
| **REPUBLIK DEUTSCHLAND;** : | **KASSA** |
| *Persönlich und/oder als Verantwortliche für:* : | |
|     **BUNDESMINISTERIUM DER FINANZEN;** : | |
|     **BUNDESREPUBLIK DEUTSCHLAND** : | |
|     **FINANZAGENTUR GmbH; HON. ROLF DAHLGRÜN** | : |
|     **über den NACHLASS VON HON. ROLF DAHLGRÜN;** : | |
|     **DR. FÉAUX DE LA CROIX über den NACHLASS VON** : | |
|     **DR. FÉAUX DE LA CROIX ; WILHELM HÖTTL über** : | |
|     **den NACHLASS VON WILHELM HÖTTL; FRITZ KOPPE** : | |
|     **über den NACHLASS VON FRITZ KOPPE; DETLEV** : | |
|     **HEINRICH über den NACHLASS VON DETLEV** : | |
|     **HEINRICH; OLAF FREIHERR  von KLINGSPOR über** : | |
|     **den NACHLASS VON OLAF FREIHERR von** : | |
|     **KLINGSPOR; GEORGE de MASIREVIC über den** : | |
|     **NACHLASS VON GEORGE de MASIREVIC;** : | |
|     **DR. ERICH FÜHRER über den NACHLASS VON** : | |
|     **DR. ERICH FÜHRER; „DEUTSCHE STAATLICHE** : | |
|     **MUSEEN, GALERIEN, LAGER UND** : | |
|     **RESTAURIERUNGSBETRIEBE" (fiktive Namen werden** : | |
|     **verwendet, bis die richtigen Namen bekannt sind);** : | |
| **PHILIPS CONNECTION GALLERY / MUSEUM** : | |
|        **Beklagte.** : | |

-------------------------------------------------------------------------X

1

Die Kläger VEREINIGUNG VON HOLOCAUST-OPFERN FÜR DIE RESTITUTION VON KUNST und MEISTERWERKEN, alias „AHVRAM"[1], FRAU ERNA DEUTSCH und DR. JORAM DEUTSCH, ALICE BURGER-FISCHER und EDWARD DAVIS FAGAN erklären nach bestem Wissen und Gewissen das Folgende in Bezug auf ihre Klage gegen die hier Beklagten:

## EINLEITUNG

Eine der letzten Streitfragen bei der Restitution von Eigentum betrifft Kunst, Meisterwerke und/oder Sammlungen, die während des Holocaust[2] angeblich gestohlen wurden (im folgenden „Das Gestohlene Eigentum"). Die USA und andere Staaten haben zahlreiche Gesetze verabschiedet und sind Abkommen eingegangen, um Erben und/oder Rechtsnachfolgern mit Rechten, Rechtstiteln oder Interessen an Geraubten Kunstwerken bei der Wiedererlangung der tatsächlichen Werke oder bei Zahlungen für die Geraubten Kunstwerke zu helfen. Eine der größten und wertvollsten Sammlungen von impressionistischer Kunst in Europa vor dem Holocaust war die Hâtvany-Sammlung in Budapest, Ungarn. Die Kläger sind die Rechtsnachfolger mit Rechten, Rechtstiteln und Interessen an der Hâtvany Sammlung. Die Kläger haben kürzlich entdeckt: (i) Beweise für eine Verschwörung rund um die Hâtvany Sammlung, in der die Beklagte Deutschland involviert war, mit dem Ziel, die Eigentumsrechte der Kläger und/oder der Rechtsvorgänger der Kläger zu verletzen, (ii) dass die Beklagte Deutschland in Verletzung internationalen Rechts den Klägern und/oder Rechtsvorgängern der Kläger Eigentum entzogen und/oder unrechtmäßig genommen hat, und (iii) bestimmte Werke der Hâtvany Sammlung in Museen und Galerien auf der ganzen Welt, einschließlich der Vereinigten Staaten.

---

[1] AHVRAM wurde gegründet, um Holocaust-Opfern dabei zu helfen, Ansprüche auf Restitution und Entschädigung für gestohlene und/oder geraubte Kunst, Meisterwerke und/oder Sammlungen zu verfolgen. AHVRAM wurde gegründet, weil ihre Mitglieder nicht die finanziellen Mittel haben, um die Ansprüche individuell zu verfolgen. Die Geschäftsstellen von AHVRAM sind oder werden in New York, Israel und der Schweiz sein.

[2] Der Begriff „Holocaust", wie er hier verwendet wird, bezieht sich auf den Zeitraum von 1933 bis 1945, als das nationalsozialistische Regime in Deutschland – „das Nazi-Regime" – (i) die vorsätzliche Ermordung von sechs Millionen Juden und Millionen anderer unschuldiger Männer, Frauen und Kinder unterschiedlicher Rassen, Ethnien, religiöser und spiritueller Glaubensbekenntnisse betrieb und (ii) systematisch das Vermögen, den Besitz und die Vermögensgegenstände seiner unschuldigen Opfer stahl und raubte.

1.  Die Klägerin VEREINIGUNG VON HOLOCAUST-OPFERN FÜR DIE RESTITUTION VON KUNST UND MEISTERWERKEN, alias „AHVRAM" (im folgenden „AHVRAM") ist eine New Yorker Vereinigung mit Geschäftsstellen in der Stadt und im Bundesstaat New York und innerhalb dieses Gerichtsbezirks. Einige Mitglieder der Klägerin AHVRAM leben in der Stadt und im Bundesstaat New York und innerhalb dieses Gerichtsbezirks.

2.  Die Klägerin AHVRAM ist eine auf Mitgliedschaft basierende Vereinigung von Personen, Bewohnern oder Staatsbürgern der Vereinigten Staaten, der Schweiz, Israels und anderer Orte auf der ganzen Welt, die alle ähnliche Ansprüche haben auf, unter anderem, (i) Restitution des Gestohlenen Eigentums, (ii) Entschädigung für die Verschwörung, an die eine oder mehrere Beklagte involviert waren – eine Verschwörung, die seit den 1950er Jahren bis in die Gegenwart andauert (im folgenden der „Relevante Zeitraum") und geplant wurde, um den Klägern ihr Eigentum zu entziehen und (iii) Entschädigung für die Unterlassung seitens der Beklagten, das Gestohlene Eigentum, das in ihren Besitz, ihre Obhut und/oder Kontrolle kam, sowie die fortlaufenden Profite daraus zurückzugeben. Die gegenwärtigen Mitglieder der Klägerin AHVRAM leben in den Vereinigten Staaten, Israel und Europa.

**Beschreibung der Interessen der Kläger DEUTSCH, der entdeckten
Verschwörung  und der Ansprüche**

3.  Die Klägerin ERNA DEUTSCH ist die Witwe und Erbin von Prof. Hans Deutsch ז״ל. Der Kläger DR. JORAM DEUTSCH ist der Sohn und Erbe von Prof. Hans Deutsch. Die Kläger ERNA DEUTSCH & DR. JORAM DEUTSCH (im folgenden kollektiv „Kläger DEUTSCH") leben derzeit in der Schweiz.

4.  Prof. Hans Deutsch war der berühmteste Anwalt für Holocaust-Entschädigungen ab den 1950er Jahren und vertrat Tausende von Holocaust-Opfern gegen die Bundesrepublik Deutschland, um Gelder für Ansprüche einzutreiben, die auf von den Nazis gestohlenen Kunstwerken, Meisterwerken, Sammlungen und anderen Wertgegenständen sowie den Verlust von Geschäften basieren.

5.  In oder um 1973 erwarb Prof. Hans Deutsch die Rechte, Rechtstitel und Interessen an der Hâtvany-Sammlung von den Erben nach Baron Ferencz de Hâtvany (im folgenden „Hâtvany Erben"). Die Kläger DEUTSCH sind die Rechtsnachfolger an diesen Rechten.

6.  Bestimmte spezifisch identifizierbare Werke der Hâtvany-Sammlung, die Gegenstand dieser Ansprüche sind, wurden im Besitz, der Obhut und/oder Kontrolle der Beklagten ausfindig gemacht, oder es besteht der begründete Verdacht, dass sie in ihrem Besitz, ihrer Obhut und/oder ihrer Kontrolle sind oder waren.

7.  Die Kläger DEUTSCH verkauften und/oder transferierten einen Anteil an ihren Rechten, Rechtstiteln und Interessen an der Hâtvany-Sammlung an die Klägerin BURGER-FISCHER.

8.  Die Kläger DEUTSCH verkauften und/oder transferierten an den Kläger FAGAN (i) Teile ihrer Rechte, Rechtstitel und Interessen an der Hâtvany-Sammlung und (ii) Teile ihrer Interessen an den Rechten und/oder Interessen, die von Prof. Deutsch von anderen seiner früheren Mandanten, die Ansprüche auf die von Holocaust-Opfern Geraubten Kunstwerke und/oder Sammlungen hatten, akquiriert wurden.

9.  Die Klägerin ERNA DEUTSCH ist 92 Jahre alt, hat ernstliche gesundheitliche Probleme, lebt von einem begrenzten Einkommen und ist in der verzweifelten Notlage, dass über diese Ansprüche rasch gerichtlich entschieden werden sollte. Die Klägerin ERNA DEUTSCH ist Mitglied der Klägerin AHVRAM.

10. Der Kläger DR. JORAM DEUTSCH ist Gründungsmitglied, Funktionär und Repräsentant der Klägerin AHVRAM.


**Beschreibung der Klägerin Burger-Fischer / Individuelle und repräsentative Ansprüche**


11. Die Klägerin ALICE BURGER FISCHER (nachfolgend Klägerin „BURGER-FISCHER") ist ein Holocaust-Opfer und lebt derzeit in Queens, New York. Klägerin BURGER-FISCHER ist Mitglied der Klägerin AHVRAM. Klägerin BURGER-FISCHERS Familie war eine reiche Budapester Familie, die Kunst, Meisterwerke und wertvolle Einrichtungsgegenstände besaß.

12. Als Holocaust-Opfer hat die Klägerin BURGER-FISCHER spezifische, identifizierbare Interessen an den Geraubten Kunstwerken, einschließlich Gegenstände aus dem Haus ihrer Familie in Budapest und auch bestimmte Interessen an der Hâtvany-Sammlung. Klägerin BURGER-FISCHER hat Interessen, da sie die einzige überlebende Erbin nach ihrer Mutter, ihrem Vater und zwei Brüdern ist, die alle von den Nazis umgebracht wurden.

13. Als eine Holocaust-Überlebende und AHVRAM-Mitglied, der NIE eine Rückerstattung zuteil wurde, hat die Klägerin BURGER-FISCHER Interessen und eine repräsentative Funktion, die Interessen an und/oder Rechte am GESAMTEN Gestohlenen Eigentum

4

beinhalten, welches in den Besitz der Beklagten kam und unrechtmäßig und ungesetzlich den Klägern und den Rechtsvorgängern der Kläger vorenthalten und/oder nie rückerstattet wurde.

### Beschreibung des Klägers Fagan/ Individuelle und Rechtsnachfolge-Ansprüche

14. Der Kläger EDWARD D. FAGAN (im folgenden Kläger „FAGAN") ist Eigentümer von einigen der verbleibenden Vermögenswerte der Anwaltspraxis von Dr. Hans Deutsch und der offenen Restitutionsansprüche. Kläger FAGAN ist in New Jersey wohnhaft. Kläger FAGAN ist Funktionär und Repräsentant der Klägerin AHVRAM.

15. Kläger FAGAN hat einige Rechte und Interessen an der Hâtvany-Sammlung; diese Rechte und Interessen wurden von den Klägern DEUTSCH erworben.

16. Kläger FAGAN hat einige andere Rechte und Interessen als Folge seines Kaufs der verbleibenden Vermögenswerte der Anwaltspraxis von Prof. Deutsch, einschließlich Rechte am Gestohlenen Eigentum.

### Ansprüche beinhalteten laufende Schäden

17. Der Schaden der Kläger ist nicht auf die Vergangenheit beschränkt, sondern geht täglich weiter.

18. Die Ansprüche der Kläger beinhalten die von den Beklagten begangene Verletzung von Gesetzen, die in den Vereinigten Staaten erlassen wurden, insbesondere in den Bundesstaaten Kalifornien, Florida, Illinois und New York, bezüglich Abrechnungen für Holocaust-Opfer oder ihre Erben über zurückgehaltene, geheim gehaltene, vermisste und/oder gestohlene Vermögensgegenstände und Eigentum, inklusive des hier erwähnten „Gestohlenen Eigentums"..

### BEKLAGTE
### Beklagte UNGARN

19. Die Beklagte REPUBLIK UNGARN (im Folgenden „UNGARISCHE REPUBLIK") ist eine föderale Republik, die in US-Gerichten geklagt werden kann für ihre Mitwirkung an und dem Profitieren aus der unten beschriebenen Verschwörung sowie der Unterlassung, die

Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

20. Die Beklagte UNGARISCHES MINISTERIUM FÜR KULTUR (im Folgenden „UNGARISCHES MINISTERIUM") ist/war ein offizielles Organ, eine Behörde und/oder Regierungsstelle einer föderalen Republik, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

21. Die Beklagte UNGARISCHE NATIONALGALERIE (im Folgenden „UNGARISCHE GALERIE") ist/war ein offizielles Organ, eine Behörde und/oder Regierungsstelle der Beklagten UNGARISCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

22. Die Beklagte MUSEUM DER SCHÖNEN KÜNSTE (im Folgenden „UNGARISCHES MUSEUM") ist/war ein offizielles Organ, eine Behörde und/oder Regierungsstelle der Beklagten UNGARISCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

23. Die Beklagten UNGARISCHE STAATLICHE MUSEEN und/oder STAATLICHE & KUNST-RESTAURIERUNGSEINRICHTUNGEN (im Folgenden „UNGARISCHE KUNSTEINRICHTUNGEN") (der Name ist fiktiv und wird verwendet, bis die tatsächlichen Namen herausgefunden werden) ") sind/waren ein offizielle Organe, Behörden und/oder Regierungsstellen der Beklagten UNGARISCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

24. Die Beklagte UNGARISCHE REPUBLIK und/oder ihre Beamten, Vertreter, Repräsentanten und/oder Angestellten sind/waren direkt und/oder indirekt involviert in, kooperierten mit, profitierten von und zogen Nutzen aus der unten beschriebenen Verschwörung mit den deutschen Beklagten, und die Beklagte UNGARISCHE REPUBLIK besaß und besitzt weiterhin, hält zurück, weigert sich zurückzugeben, zieht Nutzen aus der unrechtmäßigen Enteignung, Zurückbehaltung und Unterlassung, das Gestohlene Eigentum und bestimmte Stücke der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger zurückzugeben.

25. Die Beklagte UNGARISCHES MINISTERIUM und/oder ihre Beamten, Vertreter, Repräsentanten und/oder Angestellten sind/waren direkt und/oder indirekt involviert in, kooperierten mit, profitierten von und zogen Nutzen aus der unten beschriebenen Verschwörung mit den deutschen Beklagten, und die Beklagte UNGARISCHES MINISTERIUM besaß und besitzt weiterhin, hält zurück, weigert sich zurückzugeben, zieht Nutzen aus der unrechtmäßigen Enteignung, Zurückbehaltung und Unterlassung, das Gestohlene Eigentum und bestimmte Stücke der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger zurückzugeben.

26. Die Beklagte UNGARISCHE GALERIE und/oder ihre Beamten, Vertreter, Repräsentanten und/oder Angestellten sind/waren direkt und/oder indirekt involviert in, kooperierten mit, profitierten von und zogen Nutzen aus der unten beschriebenen Verschwörung mit den deutschen Beklagten, und die Beklagte UNGARISCHE GALERIE besaß und besitzt weiterhin, hält zurück, weigert sich zurückzugeben, zieht Nutzen aus der unrechtmäßigen Enteignung, Zurückbehaltung und Unterlassung, das Gestohlene Eigentum und bestimmte Stücke der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger zurückzugeben.

27. Die Beklagte UNGARISCHES MUSEUM und/oder ihre Beamten, Vertreter, Repräsentanten und/oder Angestellten sind/waren direkt und/oder indirekt involviert in, kooperierten mit, profitierten von und zogen Nutzen aus der unten beschriebenen Verschwörung mit den deutschen Beklagten, und die Beklagte UNGARISCHE MUSEUM besaß und besitzt weiterhin, hält zurück, weigert sich zurückzugeben, zieht Nutzen aus der unrechtmäßigen Enteignung, Zurückbehaltung und Unterlassung, das Gestohlene Eigentum und bestimmte Stücke der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger zurückzugeben.

28. Die Beklagte UNGARISCHE KUNSTEINRICHTUNGEN und/oder ihre Beamten, Vertreter, Repräsentanten und/oder Angestellten sind/waren direkt und/oder indirekt involviert in, kooperierten mit, profitierten von und zogen Nutzen aus der hier beschriebenen Verschwörung mit den deutschen Beklagten, und die Beklagte UNGARISCHE KUNSTEINRICHTUNGEN besaß und besitzt weiterhin, hält zurück, weigert sich zurückzugeben, zieht Nutzen aus der unrechtmäßigen Enteignung, Zurückbehaltung und Unterlassung, das Gestohlene Eigentum und bestimmte Stücke der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger zurückzugeben.

29. Die Beklagte UNGARISCHE REPUBLIK war/ist verantwortlich für ihre Mitwirkung in der unten beschriebenen Verschwörung, sowie Handlungen, unterlassene Handlungen, Sorglosigkeit, Fahrlässigkeit und/oder vorsätzliche Handlungen von Personen, einschließlich der Handlungen ihrer Rechtsvorgänger, wie auch für ihre Mitarbeiter von Behörden, Ministerien, Museen, Organen und/oder Einrichtungen, einschließlich aber nicht beschränkt auf das UNGARISCHE MINISTERIUM, die UNGARISCHE GALERIE, das UNGARISCHE MUSEUM und andere UNGARISCHE KUNSTEINRICHTUNGEN, die im Folgenden alle kollektiv als Beklagte UNGARN bezeichnet werden.

**Beklagte DEUTSCHLAND**

30. Die Beklagte REPUBLIK DEUTSCHLAND (im Folgenden „DEUTSCHE REPUBLIK") ist eine föderale Republik, die in US-Gerichten geklagt werden kann für ihre Mitwirkung an und dem Profitieren aus der unten beschriebenen Verschwörung sowie der Unterlassung, die Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem

Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

31. Die Beklagte BUNDESMINISTERIUM DER FINANZEN (im Folgenden „DEUTSCHES FINANZMINISTERIUM") ist/war ein offizielles Organ, eine Behörde und/oder Regierungsstelle der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

32. Die Beklagte BUNDESREPUBLIK DEUTSCHLAND FINANZAGENTUR GmbH (im Folgenden „DEUTSCHE FINANZAGENTUR") ist/war ein offizielles Organ, eine Behörde und/oder Regierungsstelle der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

33. Der Beklagte HON. ROLF DAHLGRÜN über den NACHLASS VON HON. ROLF DAHLGRÜN (im Folgenden „DAHLGRÜN") ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

34. Der Beklagte FÉAUX DE LA CROIX über den NACHLASS VON FÉAUX DE LA CROIX (im Folgenden „DE LA CROIX") ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die

Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

35. Der Beklagte WILHELM HÖTTL über den NACHLASS VON WILHELM HÖTTL (im Folgenden „HÖTTL") ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

36. Der Beklagte FRITZ KOPPE über den NACHLASS VON FRITZ KOPPE ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

37. Der Beklagte DR. DETLEV HEINRICH über den NACHLASS VON DR. DETLEV HEINRICH („HEINRICH") ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

38. Der Beklagte OLAF FREIHERR von KLINGSPOR über den NACHLASS VON OLAF FREIHERR von KLINGSPOR (im Folgenden „von KLINGSPOR") ist/war ein Beamter,

Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

39. Der Beklagte GEORGE de MASIREVIC über den NACHLASS VON GEORGE de MASIREVIC (im Folgenden „MASIREVIC") ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

40. Der Beklagte DR. ERICH FÜHRER über den NACHLASS VON DR. ERICH FÜHRER (im Folgenden „FÜHRER") ist/war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHE REPUBLIK, die in US-Gerichten geklagt werden kann in Bezug auf ihre Mitwirkung an und Profitieren von der unten beschriebenen Verschwörung und die Unterlassung, Verpflichtungen und Anforderungen von US- und internationalem Recht, Gebräuchen, Konventionen und Verträgen einzuhalten in Bezug auf Besitz, Vorenthalten, Weigerung der Rückgabe, unrechtmäßige Enteignung, Zurückbehaltung und Profitieren vom Gestohlenem Eigentum und bestimmten Stücken der Hâtvany-Sammlung an die Kläger/Rechtsvorgänger der Kläger.

41. Der Beklagte DAHLGRÜN war der frühere Finanzminister der Beklagten DEUTSCHLAND und war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

42. Der Beklagte DE LA CROIX war der frühere Ministerialdirektor und Beamte der Beklagten DEUTSCHE REPUBLIK und DEUTSCHES FINANZMINISTERIUM und war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

11

43. Der Beklagte HÖTTL war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

44. Der Beklagte KOPPE war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

45. Der Beklagte HEINRICH war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

46. Der Beklagte von KLINGSPOR war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

47. Der Beklagte de MASIREVIC war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

48. Der Beklagte FÜHRER war in den hier beschriebenen Handlungen und der Verschwörung involviert, profitierte davon und zog daraus Nutzen.

49. Die Beklagten „DEUTSCHE STAATLICHE MUSEEN, GALERIEN, LAGER- UND RESTAURIERUNGSEINRICHTUNGEN" (im Folgenden „DEUTSCHE KUNST-EINRICHTUNGEN" waren/sind Organe und/oder Behörden der Beklagten DEUTSCHLAND und haben und/oder hatten eines oder mehrere Stücke des Gestohlenen Eigentums und/oder Werke der Hâtvany-Sammlung, die Gegenstand dieser Klage sind, zur Verwahrung, in Besitz und/oder zur Beaufsichtigung. Die Namen „DEUTSCHE STAATLICHE MUSEEN, GALERIEN, LAGER- UND RESTAURIERUNGS-EINRICHTUNGEN" sind fiktive Namen, die benutzt werden, bis die tatsächlichen Namen herausgefunden werden.

50. Die Beklagten „JOHN DOE PRIVATE MUSEEN, GALERIEN, LAGER & RESTAURIERUNGSEINRICHTUNGEN" (fiktive Namen werden benutzt, bis die tatsächlichen Namen herausgefunden werden) sind kommerzielle Unternehmen, die eines oder mehrere Stücke des Gestohlenen Eigentums und/oder Werke der Hâtvany-Sammlung zur Verwahrung, in Besitz und/oder zur Beaufsichtigung haben und/oder hatten.

51. Die Beklagte DEUTSCHE REPUBLIK war und ist verantwortlich für Handlungen, unterlassene Handlungen, Sorglosigkeit, Fahrlässigkeit und/oder vorsätzliche Handlungen von Personen, einschließlich der Handlungen ihrer Rechtsvorgänger, wie auch für ihre Mitarbeiter von Behörden, Ministerien, Museen, Organen und/oder Einrichtungen, einschließlich aber nicht beschränkt auf die Beklagten DEUTSCHES FINANZ-MINISTERIUM, DEUTSCHE FINANZAGENTUR, DAHLGRÜN, DE LA CROIX, HÖTTL, von KLINGSPOR, de MASIREVIC, FÜHRER und DEUTSCHE KUNST-

EINRICHTUNGEN, die im Folgenden alle kollektiv als Beklagte DEUTSCHLAND bezeichnet werden.

## Beklagte PHILIPS COLLECTION

52. Die Beklagte PHILIPS COLLECTION GALERIE / MUSEUM war/ist ein kommerzielles Unternehmen, dessen Vermögen sich hauptsächlich in Washington D.C. befindet; es wird angenommen, dass dessen Vermögen gegenwärtig und/oder früher Werke beinhaltet/e, die als direkte Folge der Verschwörung der Beklagten UNGARN und DEUTSCHLAND gegen die Kläger/Rechtsvorgänger der Kläger in ihren Besitz, ihre Verwahrung und/oder ihre Beaufsichtigung gelangten; ihr Vermögen wird in Ausstellungen auf der ganzen Welt verliehen und ist manchmal außerhalb der Reichweite dieses Gerichts. Es wird vorgebracht, dass die Beklagte PHILIPS eines oder mehrere Werke der Hâtvany-Sammlung und/oder andere aus dem Gestohlenen Eigentum in Verwahrung, Besitz und/oder die Aufsicht darüber hat und/oder hatte oder andere Informationen über solches Gestohlene Eigentum und/oder die Hâtvany-Sammlung und/oder die Verschwörung gegen die Kläger/Rechtsvorgänger der Kläger.

## GERICHTSZUSTÄNDIGKEIT UND GERICHTSSTAND
### Allgemein, persönlich, dinglich & sachlich

53. Das Gericht hat Zuständigkeit, da diese Klage die Verletzung von Gesetzen der Vereinigten Staaten sowie von Verordnungen der Stadt und des Bundesstaats New York, Verletzungen von internationalen Gesetzen, Konventionen und/oder Abkommen bezüglich unrechtmäßiger Wegnahme und/oder Profitieren vom Eigentum der Kläger/Rechtsvorgänger der Kläger betrifft.

54. Das Gericht hat Zuständigkeit über die Beklagten insofern als die hier beklagten Handlungen darin begründet sind und/oder darauf angelegt waren, Gesetze, Verordnungen, Verwaltungsregeln, Sanktionen und/oder andere Einschränkungen, die den Geschäften der Beklagten in den Vereinigten Staaten und/oder in diesem Gerichtsbezirk auferlegt wurden, zu umgehen.

55. Das Gericht hat Zuständigkeit über die Ansprüche gegen die Beklagten UNGARN und DEUTSCHLAND und jedes ihrer Ministerien, Behörden, Organe, Museen und/oder anderen

13

Einheiten, über die diese Beklagten Kontrolle ausüben, gemäß den relevanten Bestimmungen des Gesetzes über die Staatenimmunität. Im speziellen hat das Gericht Zuständigkeit über diese Ansprüche, weil:

a. Die Beklagten transportierten, schickten, lagerten, verkauften, stellten aus und/oder handelten in Bezug auf die Gestohlenen Kunstwerke in den USA und/oder setzten andere Handlungen in Bezug auf die Gestohlenen Kunstwerke, welche sich auf die Rechte und das Eigentum der Kläger/Rechtsvorgänger der Kläger in den USA oder auf dem kommerziellen Kunstmarkt in den USA auswirkten, oder setzten andere Handlungen, die eine direkte Auswirkung auf ähnliche Rechte und/oder die kommerziellen Kunstmärkte in den USA hatten, so wie in 28 U.S.C.A. § 1605 (a) (2) definiert;

b. Die Handlungen der Beklagten waren darauf ausgerichtet und nahmen in der Tat den Klägern/Rechtsvorgängern der Kläger Eigentum und Rechte in den USA weg oder Eigentum, das für Eigentum in den USA getauscht worden war, entzogen es ihnen und/oder wirkten nachteilig darauf ein; all dies stand in Bezug zum kommerziellen Kunstmarkt und damit zusammenhängenden Aktivitäten, so wie in 28 U.S.C.A. § 1605 (a) (3) definiert;

c. Die Beklagten enteigneten die Kläger/Rechtsvorgänger der Kläger unrechtmäßig und/oder nahmen ihnen Eigentum in den USA und an anderen Orten der Welt weg, einschließlich das Gestohlene Eigentum, welches in Obhut, Besitz, unter Kontrolle der Museen der Beklagten ist und/oder dort aufbewahrt wird/wurde, wie im folgenden dargelegt; all dies ist und war eine Verletzung internationalen Rechts so wie in 28 U.S.C.A. § 1605 (a) (3) definiert;

d. Die Handlungen der Beklagten verursachten Schäden an und/oder Verlust des Eigentums der Kläger/Rechtsvorgänger der Kläger in den USA, und diese Schäden und/oder Verluste wurden durch unerlaubte und/oder unrechtmäßige Handlung(en) oder Unterlassung(en) von Ministern, Beamten, Angestellten, Vertretern und/oder Repräsentanten der Beklagten UNGARN und DEUTSCHLAND und/oder eines ihrer Ministerien, Regierungsstellen, Organe und/oder Behörden verursacht, während diese im Rahmen ihres Amtes oder ihrer Beschäftigung handelten, so wie in 28 U.S.C.A. § 1605 (a) (5) definiert;

e. Die Handlungen der Beklagten verletzten das Gesetz zur Entschädigung von Opfern des Holocaust von 1998;

f.  Die Handlungen der Beklagten verletzten das Gesetz über nationales gestohlenes Eigentum von 1994;

g.  Die Handlungen der Beklagten verletzten die Haager Konvention von 1899 und 1907;

h.  Die Handlungen der Beklagten verletzten den Vertrag über gute Nachbarschaft von 1990;

i.  Die Handlungen der Beklagten verletzten die Unidroit-Konvention von 1995; und

j.  Die Handlungen der Beklagten verletzten andere internationale Abkommen und *jus cogens*.

56. Das Gericht hat Zuständigkeit über die Beklagte THE PHILIPS COLLECTION (im Folgenden „PHILIPS") wegen Diversität von Staatszugehörigkeit, gemäß 28 USC § 1332 und weil sie (i) Vertreter, Repräsentanten, Personal, Funktionäre und/oder Vermögen innerhalb dieses Gerichtsbezirks hat oder hatte und/oder (ii) regelmäßige, kontinuierliche und systematische Geschäftsbeziehungen innerhalb dieses Gerichtsbezirks hat oder hatte. Die Beklagte PHILIPS ist ein Museum und/oder eine Galerie, das/die gemäß den Gesetzen der Vereinigten Staaten organisiert ist und Geschäfte tätigt und sich hauptsächlich in Washington D.C. befindet.

57. Gemäß 28 USC ¶1531 kann das Gericht diesen Fall auch an jedes andere Bundesgericht oder in jeden Gerichtsbezirk transferieren, in welchem die Beklagten kontinuierliche und systematische Geschäftsbeziehungen haben, wenn das Gericht keine Zuständigkeit in diesem Gerichtsbezirk feststellen sollte.

58. Dieses Gericht ist als Gerichtsstand geeignet, da die Beklagten im Sinne von 28 U.S.C. Paragraph 1391(a) sowie 28 U.S.C. Paragraph 1350 in diesem Bezirk Geschäfte tätigen und gefunden werden können.

59. Sollte das Gericht entscheiden, dass der Gerichtsstand nicht bei diesem Gericht sei, kann es gemäß 28 USC ¶¶ 1400 und 1401 die Klage an jeden anderen Bezirk transferieren, in welchem die Klage ursprünglich eingebracht hätte werden können.

### ALLGEMEINE FAKTEN HINSICHTLICH ALLER BEKLAGTEN

60. Während des Holocaust stahlen das Nazi-Regime und seine Vertreter systematisch bedeutende Kunstwerke, Meisterwerke und Sammlungen („Das Gestohlene Eigentum"[3]) von den Menschen, die für Verfolgung und Tod ausgesondert wurden.

61. Gegen Ende des Zweiten Weltkriegs sah die Beklagte UNGARN eine Gelegenheit, an Diebstahl, Beschlagnahme und/oder Wegnahme von Teilen des Gestohlenen Eigentums mitzuwirken und davon zu profitieren.

62. Gegen Ende des Zweiten Weltkriegs suchten die Alliierten in ganz Europa nach dem von den Nazis gestohlenen Vermögen und Eigentum von Personen und Ländern.

63. Was die hier Beklagten betrifft, so wurde das Vermögen, insbesondere Kunstwerke, Gemälde, Meisterwerke und Sammlungen bestimmter vermögender ungarischer jüdischer Familien, die von den Nazis gestohlen wurden, in das damalige Gebiet von Deutschland transportiert, vermutlich für Abrechnungs- oder Inventurzwecke, und dann zur Lagerung in versteckte oder entlegene Plätze gebracht, die die Nazis an verschiedenen Orten hatten, einschließlich der Salzbergwerke im Gebiet um Bad Aussee in Österreich.

64. Die Alliierten rückten immer näher an die Nazis heran und versuchten, dieses sehr wertvolle und vertretbare Vermögen ausfindig zu machen, zu sichern und für die Zukunft zu bewahren.

65. Zur selben Zeit als die Nazis versuchten, das Gestohlene Eigentum geheim zu deponieren und die Alliierten danach suchten, war die Beklagte UNGARN in einer einzigartigen Position, da sie die Herkunft des Vermögens, der Sammlungen ihrer Staatsbürger kannte und Informationen besaß, von denen anzunehmen war, dass sie am Ende des Zweiten Weltkrieges zum eigenen Nutzen verwendet werden könnten, Informationen, die es der Beklagten UNGARN ermöglichen würden, vom Gestohlenen Eigentum zu profitieren und Nutzen daraus zu ziehen.

66. Die Beklagte UNGARN glaubte, dass die Nazis den Krieg wahrscheinlich verlieren würden, und deswegen sah die Beklagte UNGARN eine Möglichkeit, die Informationen, die sie besaß, zu verwenden, um (i) den Alliierten bei der Suche nach dem Gestohlenen Eigentum zu helfen und (ii) sich selber in eine Position zu bringen, aus der sie ebenfalls vom Gestohlenen Eigentum profitieren und daraus Nutzen ziehen könnte.

---

[3] Der Begriff „Gestohlenes Eigentum", so wie hier verwendet, inkludiert Kunstgegenstände, einschließlich, aber nicht darauf beschränkt, Kunstwerke, Gemälde, Keramik, Silber, Gold, Kunsthandwerk, Instrumente, Perserteppiche und andere derartige Gegenstände, die einzigartiger Natur waren.

67. Zu den von der Beklagten UNGARN überlegten Möglichkeiten, vom Gestohlenen Eigentum zu profitieren und daraus Nutzen zu ziehen, zählten:

   a. Gegenstände des Gestohlenen Eigentums, einschließlich der Hâtvany/Sammlung, zu sammeln, einen Anspruch auf sie zu erheben, sie zu beschlagnahmen und/oder zu verlangen, dass die Alliierten ihr das, was sie gefunden hatten, zurückgeben würden; und

   b. soviel vom Gestohlenen Eigentum, einschließlich der Hâtvany Sammlung, gefunden werden konnte zu beschlagnahmen, wegzunehmen, zu stehlen, zu konfiszieren und zu enteignen.

68. Zu diesem Zweck begann die Beklagte UNGARN, Teile des Gestohlenen Eigentums, von denen sie wusste, dass die Alliierten es im Gebiet um Bad Aussee in Österreich abgefangen oder gefunden hatten und es aus dem Gebiet von Deutschland, entweder von Depots in München oder Berlin, dort hingebracht wurde, im eigenen Land oder in anderen Ländern zu suchen.

69. Die Beklagte UNGARN beschlagnahmte, nahm, stahl, konfiszierte und enteignete so viel vom Gestohlenen Eigentum, einschließlich Werke der Hâtvany Sammlung, und stellte den Anspruch, dass diese ihr gehörten. Einige dieser Werke gingen in Museen, Depots und Lagerhallen. Andere Werke wurden an andere verliehen, übergeben und/oder verkauft.

70. Während all dies vonstatten ging, geriet die Beklagte DEUTSCHLAND unter unglaublichen Druck von Seiten der Alliierten, das Gestohlene Eigentum zu lokalisieren, Rechenschaft darüber abzulegen und so viel vom Gestohlenen Eigentum gefunden wurde zurückzugeben.

71. Die Beklagte Deutschland schuf eine Reihe von Programmen, durch die Holocaust-Opfer Ansprüche für, unter anderem, das Gestohlene Eigentum stellen und Entschädigung dafür erhalten konnte.

72. In Bezug auf die vorliegenden Ansprüche schuf die Beklagte DEUTSCHLAND ein Programm, welches die Opfer zu einer bedeutsamen Entschädigung und/oder Entschädigungsgelder für das Gestohlene Eigentum berechtigte. Um dazu berechtigt zu sein, mussten die Opfer fähig sein:

   a. reales und persönliches Eigentum zu identifizieren, dessen Wert unabhängig festgestellt werden konnte;

   b. ihre Eigentümerschaft und/oder Rechte am Eigentum zu beweisen; und

c. zu beweisen, dass das Eigentum, nachdem es von den Nazis weggenommen wurde, innerhalb der physischen Grenzen der Beklagten DEUTSCHLAND, so wie sie während des Nazi-Regimes existierten, transportiert wurde.

73. Wenn ein Holocaust-Opfer der Beklagten DEUTSCHLAND solchen Beweis vorlegen konnte, war diese Person zu einer bedeutenden Entschädigung und/oder Entschädigungszahlungen berechtigt.

74. Wenn die Beklagte DEUTSCHLAND mit solchen Ansprüchen konfrontiert wurde, behauptete sie fast immer, dass das Holocaust-Opfer nicht alle obigen Anforderungen erfüllte, dass es sicherlich nicht zufriedenstellende Beweise dafür lieferte, dass das Gestohlene Eigentum auf das Gebiet von Deutschland gelangt war, und dass sie deshalb nicht verpflichtet war, Entschädigungen oder Restitution zu leisten.

75. Dies funktionierte bei einem Großteil der Restitutions- und Entschädigungsansprüche. Jedoch sah sich die Beklagte DEUTSCHLAND wegen der Ansprüche auf Restitution von Kunst, Meisterwerken und/oder Sammlungen, einschließlich des Gestohlenen Eigentums und der früheren Hâtvany-Sammlung, einem großen und steigenden finanziellen Druck ausgesetzt.

76. Der Grund dafür war die Art und Weise, wie die Nazis mit Kunst, Meisterwerken und/oder Sammlungen, die sie den Holocaust-Opfern gestohlen hatten, umgingen.

77. Die Nazis machten präzise Aufzeichnungen über Inventar, Transporte, Lagerung und Transfer von Kunst, Meisterwerken und/oder Sammlungen, die sie den Holocaust-Opfern gestohlen hatten.

78. Diese Tatsache ermöglichte dem Vorgänger der Kläger, Hans Deutsch, in den frühen 1960er Jahren Hunderte von Millionen von Dollar (in D-Mark bezahlt) als Restitution und Entschädigung für Kunst, Meisterwerke und/oder Sammlungen, die die Nazis den Holocaust-Opfern gestohlen hatten, zu erzielen.

79. Der Vorgänger der Kläger, Hans Deutsch, konnte diese enormen Zahlungen für Holocaust-Opfer erzwingen, weil er Aufzeichnungen verwenden konnte, die im Besitz, in Verwahrung oder unter Kontrolle der Beklagten DEUTSCHLAND waren oder zu denen sie Zugang hatte, einschließlich jener der Beklagten UNGARN.

80. Der Vorgänger der Kläger, Hans Deutsch, brachte die Beklagte DEUTSCHLAND fast ganz allein unter enormen finanziellen Druck wegen der Hunderte von Millionen, die sie an Restitution und Entschädigung für das Gestohlene Eigentum zahlen musste, inklusive Millionen an seine Mandanten wie die Rothschilds, Warburg und andere der reichsten

jüdischen Familien in Europa, auf deren Vermögen man es besonders abgesehen hatte und welches gestohlen worden war.

81. Die Beklagte DEUTSCHLAND wollte die Verpflichtungen, die ihr vom Vorgänger der Kläger, Deutsch, aufgezwungen wurden, vermeiden, reduzieren und/oder minimieren.

82. Die Beklagte UNGARN wollte ebenfalls das Gestohlene Eigentum, das es bei und/oder nach Ende des Krieges an sich nehmen konnte, behalten.

83. Sowohl die Beklagte DEUTSCHLAND als auch UNGARN wussten und hatten umfangreiche Aufzeichnungen über (i) das Schicksal der Hâtvany-Sammlung; (ii) welche Teile der Hâtvany-Sammlung wann und wohin transportiert wurden; (iii) welche Teile der Hâtvany-Sammlung von den Nazis gestohlen und nie zurückbekommen wurden; und (iv) welcher Teil der Hâtvany-Sammlung von der Beklagten UNGARN nach dem Krieg genommen wurde, nachdem die Gemälde nach Deutschland transportiert und dann zur Lagerung in das Gebiet um Bad Aussee in Österreich oder anderswo verbracht worden waren.

84. Sowohl die Beklagte DEUTSCHLAND als auch UNGARN wussten, dass die Hâtvany-Sammlung konservativ gerechnet Hunderte Millionen Dollar wert war, als sie gestohlen wurde, und sie wussten beide, dass der Vorgänger der Kläger, Deutsch, den Fall der Restitutions- und Entschädigungsansprüche übernommen hatte.

85. Sowohl die Beklagte DEUTSCHLAND als auch UNGARN wussten, dass es nur eine Frage der Zeit wäre, bis der Vorgänger der Kläger, Deutsch, in der Lage sein würde, die Beklagte DEUTSCHLAND zu zwingen, für die Hâtvany-Sammlung zu zahlen, und beide wussten, dass früher oder später die Beklagte UNGARN Werke der Hâtvany-Sammlung, wenn sie welche hatte, zurückgeben würde müssen.

86. Dies wollten die Beklagten DEUTSCHLAND und UNGARN mit allen Mitteln verhindern, aus diesem Grund und wegen des ständig gegenwärtigen Antisemitismus, Rassismus und der Bigotterie und dem Hass auf Juden, von dem die Kläger glauben, dass dies immer gegenwärtig war in den Ministerien, Behörden und anderen Regierungsstellen der Beklagten, die mit den Restitutions- und Entschädigungsansprüchen der Juden für das Gestohlene Eigentum befasst und/oder beschäftigt waren.

87. So entstand die Verschwörung gegen den Vorgänger der Kläger.

88. Von den 1950er bis in die 1980er Jahre versuchte die Beklagte DEUTSCHLAND, (i) den Vorgänger der Kläger unrechtmäßig um sein Eigentum zu bringen, einschließlich der Hâtvany-Sammlung und des Gestohlenen Eigentums, und (ii) gegen ihre Verpflichtung auf

19

Einhaltung der den Zweiten Weltkrieg betreffenden Abkommen, bilateralen Abkommen sowie existierenden, bindenden internationalen Vereinbarungen, Konventionen und Gesetzen über die Restitution von Kunst und Entschädigungszahlungen an Holocaust-Opfer, die Gestohlenes Eigentum identifizieren konnten, zu verstoßen.

89. Die Verschwörung betraf auch den Transport, Versand, die Lagerung, Beschlagnahmung, Schätzung, Ausstellung, Publikation von Broschüren und/oder Prospekten, Verkauf und andere Handlungen in Zusammenhang mit dem Gestohlenen Eigentum.

90. Die Verschwörung betraf auch die Wegnahme und/oder Enteignung von Gestohlenem Eigentum, mit dem Wissen, dass die Kläger/Vorgänger der Kläger vorrangige Rechte, Ansprüche und/oder Interessen daran hatten.

91. Die Verschwörung betraf auch die Wegnahme und/oder Enteignung des Gestohlenen Eigentums mit dem unmittelbaren und/oder mittelbaren Wissen um Identitäten und/oder Orte, wo die Kläger/Vorgänger der Kläger zu finden waren, und ohne Ankündigung.

92. Die Verschwörung hatte mehrere Komponenten, die alle dazu dienten, die Kläger/Vorgänger der Kläger um das Gestohlene Eigentum zu bringen, einschließlich Werke der Hâtvany-Sammlung; die weiterreichenden Ziele der Verschwörung waren:

    a. Holocaust-Opfer und ihre Vertreter daran zu hindern, Zugang zu Dokumenten zu bekommen, die sie benötigten, um Eigentum und/oder Entschädigung dafür zu lokalisieren/zurückzubekommen. Indem sie dies taten, gewannen die Beklagten UNGARN und DEUTSCHLAND und ihre Vertreter einen geschäftlichen Vorteil, indem sie das Eigentum der Kläger/Vorgänger der Kläger nahmen und verkauften, und indem sie NICHT die legitimen Ansprüche befriedigten und/oder das geraubte Eigentum zurückgaben oder dafür Entschädigung zahlten;

    b. bei der Herstellung von neuen Dokumenten zu Provenienz/Eigentümerschaft/ Rechtsansprüchen, Transport, Versand & Verkauf von Gestohlenem Eigentum an/durch private Sammler, Museen oder Galerien in den USA und anderorten mitzuwirken/daraus Nutzen zu ziehen, was eine direkte Auswirkung in den USA hat;

    c. den Beklagten zu ermöglichen, das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung, die in ihrem Besitz, ihrer Obhut oder Kontrolle sind/waren, und/oder die Profite, die sie aus ihrem Verkauf oder Transfer machten, zu behalten; und

d. den Beklagten zu ermöglichen, Gelder, Vorteile und/oder andere Wertsachen zu erhalten, zu denen sie normalerweise nicht berechtigt wären, welche aber im Austausch für die Hilfe der Beklagten bei der Verschwörung gezahlt wurden.

93. Um das Ziel der Verschwörung zu erreichen, entschieden die Beklagten UNGARN und DEUTSCHLAND, dass sie die vom Vorgänger der Kläger, Prof. Hans Deutsch - einem israelischen Anwalt mit Geschäftsstellen, Eigentum und Mandanten in den Vereinigten Staaten, Israel, der Schweiz, Frankreich, Deutschland und an anderen Orten auf der Welt - gestellten Restitutionsansprüche von Holocaust-Opfern herausgreifen und stoppen würden.

94. Die Theorie dahinter war, dass, wenn die Beklagten UNGARN und DEUTSCHLAND die Restitutionsansprüche von Prof. Hans Deutsch stoppen könnten, sie - die Beklagten UNGARN und DEUTSCHLAND - aus ihrer Möglichkeit, das Gestohlene Eigentum zu behalten und nicht dafür zu bezahlen, Nutzen ziehen könnten; dieses könnte wiederum verlagert, transferiert und/oder in einigen Fällen an andere verkauft werden, wie beispielsweise an die staatlichen Museen, Sammlungen, Auktionshäuser und/oder Galerien der Beklagten UNGARN und/oder DEUTSCHLAND, und/oder an private Museen, Sammlungen, Auktionshäuser und/oder Galerien wie die Beklagte PHILIPS, und sie würden andere Vorteile daraus ziehen.

95. Um die Verschwörung durchzuziehen, benützten, ermächtigten, beschäftigten, bezahlten die Beklagten DEUTSCHLAND und UNGARN Personen und/oder delegierten bestimmte Verantwortlichkeiten an Personen innerhalb ihrer Regierungen, Ministerien, Behörden, Regierungsstellen und/oder Regierungsorgane sowie an Personen, die speziell für die Verschwörung angeheuert wurden; unter diesen Personen waren Mitglieder der früheren Nazi-Partei in Deutschland, der Schweiz, Österreich und anderswo.

96. Involviert in diese Verschwörung waren, unter anderen, (i) der Beklagte DAHLGRÜN - ein enger Assistent und/oder Mitarbeiter von Hermann Göring; als solcher war er für die Plünderung des jüdischen Eigentums in den von den Nazis besetzten Ländern, insbesondere Ungarn, verantwortlich, (ii) der Beklagte DE LA CROIX - ein Mitglied der Nazi-Akademie, der für die Vorbereitung der rassistischen Gesetze unter dem Nazi-Regime verantwortlich war, (iii) der Beklagte HÖTTL - einer von Eichmanns wichtigsten Mitarbeitern, der zur Abteilung für Fälschungen und gefälschte Dokumente der Nazi-Partei gehörte, (iv) der Beklagte FÜHRER - ein hochrangiges Mitglied der Nazi-Partei und enger Freund des Beklagten HÖTTL, (v) der Beklagte Koppe - ein enger und getreuer Freund des Beklagten DE LA CROIX; (vi) der Beklagte Heinrich - ein enger und getreuer Freund des Beklagten

DE LA CROIX; (vii) der Beklagte KLINGSPOR - ein Nazi-Kollaborateur in Ungarn während des Kriegs, (viii) der Beklagte MASIREVIC - ein ungarischer Kunstexperte, der mit den Beklagten DEUTSCHLAND und UNGARN kollaborierte und (ix) mehrere andere.

97. Die Verwendung der individuell genannten Beklagten erfolgte, weil sie einzigartige Positionen von Autorität und/oder Einfluss innehatten, oder Zugang und die Fähigkeit hatten, Dokumente, Zeugen und Beweismittel zu manipulieren und auf sie störend einzuwirken. Als solche waren sie in einer besonderen Lage, die Verschwörung durchzuführen.

98. Der Beklagte DAHLGRÜN war Finanzminister der Beklagten DEUTSCHLAND.

99. Der Beklagte DE LA CROIX war der höchstrangige Beamte in der Bundesabteilung für Restitution der Beklagten DEUTSCHLAND, einer Abteilung des Finanzministeriums.

100. Der Beklagte HÖTTL war ein fähiger Fälscher und Lügner und hatte ein Netzwerk von früheren Nazis und/oder Nazi-Kollaborateuren und andere „spezielle" Verbindungen in der Gegend um Bad Aussee in Österreich, wo viel des Gestohlenen Eigentums, das aus Deutschland angeliefert worden war, gelagert wurde; weiters war der Beklagte HÖTTL ein früherer Beschäftigter der US-Regierung - jener Abteilungen, die nach dem Gestohlenen Eigentum suchten.

101. Der Beklagte KOPPE war ein erfahrener Lügner und hatte ein Netzwerk von früheren Nazis und/oder Nazi-Kollaborateuren mit „speziellen" Verbindungen in Österreich, Deutschland, Ungarn und anderswo in Europa.

102. Der Beklagte HEINRICH war ein erfahrener Lügner und hatte ein Netzwerk von früheren Nazis und/oder Nazi-Kollaborateuren mit „speziellen" Verbindungen in Österreich, Deutschland, Ungarn und anderswo in Europa.

103. Der Beklagte FÜHRER war ein Anwalt in Österreich, der bei gefälschten Papieren/Dokumenten half.

104. Der Beklagte KLINGSPOR hatte spezielle Verbindungen in Ungarn.

105. Der Beklagte MASIREVIC war ein früherer Ungar, der einige der fabrizierten Dokumente und Beweismittel beschaffte.

106. Jeder der individuellen Beklagten war ein Beamter, Vertreter und/oder Repräsentant der Beklagten DEUTSCHLAND und UNGARN während der Verschwörung.

107. Als sie die Verschwörung durchführten, agierte jeder der individuell Beklagten innerhalb des Rahmens seiner Beschäftigung.

108. Als jeder der individuellen Verschwörer seine Teil an der Verschwörung durchführte, taten sie dies mit unmittelbarer und/oder mittelbarer Kenntnis der verantwortlichen Personen innerhalb der damaligen Regierung der Beklagten UNGARN und DEUTSCHLAND.

109. Der Aufgabenbereich und/oder die Arbeit, die sie zur Durchführung der Verschwörung zu erfüllen hatten, war:

a. Der Beklagte DAHLGRÜN, in seiner Position als Finanzminister der Beklagten DEUTSCHLAND, sollte die Verschwörung empfehlen, kontrollieren und/oder leiten, und er tat dies. Der Beklagte DAHLGRÜN war ein starker Gegner von Restitutions- und Reparationszahlungen an Holocaust-Opfer, und er delegierte die Durchführung der Verschwörung an andere;

b. Der Beklagte DE LA CROIX, in seiner Position als Leiter der Bundesabteilung für Restitution, sollte die laufenden Aktivitäten der Verschwörung organisieren und durchführen, und er tat dies; dazu gehörte, die individuell Beklagten HÖTTL, FÜHRER, KLINGSPOR, MASIREVICH zu beschäftigen und mit Regierungsgeldern zu bezahlen. Der Beklagte DE LA CROIX sollte alle persönlichen Treffen in Ungarn, Österreich und Deutschland durchführen, und er tat dies; dazu gehörten Treffen mit Vertretern der Beklagten UNGARN bezüglich der Verschwörung, wie das Vermögen des Vorgängers der Kläger, Hans Deutsch, zu zerstören und ihm wegzunehmen sei, und er bot der Beklagten UNGARN eine Bestechung, Zahlung und/oder eine andere Gegenleistung für ihre Kooperation bei der Verschwörung;

c. Der Beklagte HÖTTL sollte bei der Verfälschung und Fabrikation von Beweismittel und Fälschung von Dokumenten mitarbeiten, und er tat dies;

d. Der Beklagte KOPPE sollte die Propagandakampagne gegen den Vorgänger der Kläger, Deutsch, organisieren und als Verbindung dienen zwischen den Beklagten DEUTSCHLAND und UNGARN mit den Vertretern des Gerichts, die den Vorgänger der Kläger, Deutsch, anklagten und ihn seines Vermögens beraubten, und er tat dies;

e. Der Beklagte HEINRICH war verantwortlich dafür, das Kommunikationsnetz zwischen den verschiedenen beklagten Verschwörern zu organisieren, und er tat dies; er reiste oft, um persönliche Treffen in Wien, Budapest und Bonn durchzuführen;

f. Der Beklagte FÜHRER sollte bei der Verfälschung und Fabrikation von Beweismittel mitarbeiten, und er tat dies;

g. Der Beklagte KLINGSPOR sollte bei der Verfälschung und Fabrikation von Beweismittel mitarbeiten, und er tat dies;

h. Der Beklagte MASIREVICH sollte bei der Verfälschung und Fabrikation von Beweismittel mitarbeiten, und er tat dies.

110. Jeder der oben genannten individuellen Beklagten arbeitete unter der Leitung und zu Nutzen der Beklagten DEUTSCHLAND und/oder UNGARN.

111. Jeder der oben genannten individuellen Beklagten erhielt auch andere Leistungen, einschließlich Rechte auf gesonderte und/oder zusätzliche Einkommen und/oder Leistungen aus dem fortgesetzten Handel von so viel vom Gestohlenen Eigentum, einschließlich der Hâtvany-Sammlung, wie den Klägern/Vorgängern der Kläger vorenthalten werden konnte.

112. Die Beklagten UNGARN und DEUTSCHLAND glaubten, dass sie das Ziel der Verschwörung erreichen könnten, wenn sie „behaupten" könnten, dass einer oder mehrere der Restitutionsansprüche von Prof. Hans Deutsch betrügerisch wäre/n und dass die Erhebung und Verfolgung eines solchen Anspruches ein Verbrechen gegen die Beklagte DEUTSCHLAND wäre, und dass daher Prof. Hans Deutsch ein Krimineller wäre.

113. Die Beklagten UNGARN und DEUTSCHLAND - dass sie die Ansprüche von Prof. Hans Deutsch auf die Hâtvany-Sammlung benützen und behaupten würden, dass dieser Anspruch ein Betrug gegenüber der Beklagten DEUTSCHLAND wäre und dass deshalb für die Hâtvany-Sammlung keine Restitution bezahlt und das Gestohlene Eigentum nicht rückerstattet werden würde und im Besitz der Beklagten DEUTSCHLAND und UNGARN verbleiben könnte, und dass Prof. Hans Deutsch verhaftet werden würde.

114. Um dieses Ziel zu erreichen, mussten die Beklagten DEUTSCHLAND und UNGARN die Aussagen diskreditieren, wonach die Hâtvany-Sammlung von den Nazis gestohlen worden und in das Gebiet der Beklagten DEUTSCHLAND während des Zweiten Weltkriegs verbracht worden war - was die Erfordernis, Restitution zu zahlen, nach sich ziehen würde.

115. Zur Förderung der Verschwörung beschäftigten die Beklagten DEUTSCHLAND und UNGARN Personen in den Vereinigten Staaten, Österreich, Ungarn, Deutschland, der Schweiz und anderswo, um (i) Beweismittel zu fabrizieren und/oder zu verheimlichen; (ii) Aufzeichnungen über Provenienz, Rechtstitel und/oder Eigentümerschaft zu fälschen und/oder zu verheimlichen; (iii) Beweismittel bezüglich der Lokalisierung von bestimmtem Eigentum geheim zu halten; beim Transport und Verkauf von Teilen des Gestohlenen Eigentums, einschließlich bestimmter Werke der Hâtvany-Sammlung, an und/oder durch private Sammlungen, Museen und/oder Galerien in den Vereinigten Staaten mitzuwirken.

116. Im speziellen erforderte die Verschwörung die Herstellung von fabrizierten Beweismitteln, gefälschten Dokumenten, absichtlichen Fehlinterpretationen und/oder Geheimhaltung von

24

Fakten, Anstiftung zu falschen Zeugenaussagen, Vorbringen von betrügerischen Ansprüchen und anderen wissentlichen, mutwilligen, sorglosen oder fahrlässigen falschen Angaben über Fakten oder Beweismittel, die sich unter anderem beziehen auf:

a. die wahren Eigentümer von bestimmten Werken der Hâtvany-Sammlung und anderen Teilen des Gestohlenen Eigentums;

b. wann, durch wen und mit welchem Bestimmungsort bestimmte Werke der Hâtvany-Sammlung und andere Teile des Gestohlenen Eigentums von den Nazis vor dem 8. Mai 1945 weggenommen wurden;

c. welche der Transporte von Werken der Hâtvany-Sammlung und anderen Teilen des Gestohlenen Eigentums von den Nazis in das damalige Gebiet von Deutschland in Depots in München, Berlin oder an andere Orten vor dem 8. Mai 1945 geschickt wurden;

d. welche Werke der Hâtvany-Sammlung und andere Teile des Gestohlenen Eigentums in den Salzbergwerken in der Gegend um Bad Aussee in Österreich „gelagert“ und von wem sie dort „gelagert“ wurden, nachdem sie aus Deutschland gebracht wurden;

e. welche Werke der Hâtvany-Sammlung und andere Teile des Gestohlenen Eigentums von der Beklagten UNGARN zurück"genommen“ wurden, nachdem sie in den Salzbergwerken im Gebiet um Bad Aussee in Österreich oder anderswo entdeckt wurden;

f. welche Werke der Hâtvany-Sammlung und andere Teile des Gestohlenen Eigentums nicht von den Nazis weggenommen wurden und im Besitz der ursprünglichen Eigentümer nach 1945 blieben;

g. welche Werke der Hâtvany-Sammlung und andere Teile des Gestohlenen Eigentums von der Beklagten UNGARN nach 1945 genommen wurden; und

h. welche der Werke der Hâtvany-Sammlung und andere Teilen des Gestohlenen Eigentums von der Beklagten UNGARN als nationales Kulturgut beansprucht wurde/werden konnte, das von den Alliierten zurückzugeben wäre.

117. Die Beklage DEUTSCHLAND, durch die Beklagten DAHLGRÜN und DE LA CROIX, hatte direkte Treffen und Verhandlungen mit der Beklagten UNGARN, in denen sie die Erklärung (dass die Hâtvany-Sammlung von den Russen direkt aus Budapest gestohlen worden war) detailliert darstellten, die die Grundlage bilden sollte, auf der alle falschen, fabrizierten oder unrichtigen Zeugenaussagen, Beweismittel und Dokumente beruhten.

118. Die Beklagte DEUTSCHLAND ersuchte die Beklagte UNGARN, die Herstellung von fabrizierten Beweismitteln, gefälschten Dokumenten, absichtlichen Fehlinterpretationen und/oder Geheimhaltung von Fakten, Anstiftung zu falschen Zeugenaussagen, Vorbringen von betrügerischen Ansprüchen und anderen wissentlichen, mutwilligen, sorglosen oder fahrlässigen falschen Angaben über Fakten oder Beweismittel zu ermöglichen und/oder dabei zu helfen.

119. Die Beklagte UNGARN wusste, dass das, was die Beklagte DEUTSCHLAND vorschlug, falsch war und von ihr und ihren Vertretern die Teilnahme an unrechtmäßigen Handlungen, einschließlich der Schaffung von falschen, fabrizierten oder unrichtigen Zeugenaussagen, Beweismitteln und Dokumenten, aber nicht darauf beschränkt, erforderlich machen würde.

120. Im Austausch für ihre Kooperation und Hilfe bei der Verschwörung bot die Beklagte DEUTSCHLAND an, dass die Beklagte UNGARN Teile des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung, sowie Restitution, Reparationen und/oder andere Vergünstigungen für ihre vom Nazi-Regime verursachten „Verluste" erhalten oder behalten sollte.

121. Die Beklagte UNGARN akzeptierte das Angebot der Beklagten DEUTSCHLAND und stimmte zu, bei der Verschwörung zu kooperieren und mitzuhelfen.

122. Die Beklagte UNGARN lieferte die geforderte Hilfe bei und/oder mit der Herstellung von solchen fabrizierten Beweismitteln, gefälschten Dokumenten, absichtlichen Fehlinterpretationen und/oder Geheimhaltung von Fakten, Anstiftung zu falschen Zeugenaussagen, Vorbringen von betrügerischen Ansprüchen und anderen wissentlichen, mutwilligen, sorglosen oder fahrlässigen falschen Angaben über Fakten oder Beweismittel.

123. Die Beklagte DEUTSCHLAND bezahlte die Beklagte UNGARN für ihre Bereitstellung und/oder Hilfe bei der Herstellung von fabrizierten Beweismitteln, gefälschten Dokumenten, absichtlichen Fehlinterpretationen und/oder Geheimhaltung von Fakten, Anstiftung zu falschen Zeugenaussagen, Vorbringen von betrügerischen Ansprüchen und anderen wissentlichen, mutwilligen, sorglosen oder fahrlässigen falschen Angaben über Fakten oder Beweismittel.

124. Die Beklagte DEUTSCHLAND profitierte von der Herstellung von fabrizierten Beweismitteln, gefälschten Dokumenten, absichtlichen Fehlinterpretationen und/oder Geheimhaltung von Fakten, Anstiftung zu falschen Zeugenaussagen, Vorbringen von betrügerischen Ansprüchen und anderen wissentlichen, mutwilligen, sorglosen oder

fahrlässigen falschen Angaben über Fakten oder Beweismittel, die von der Beklagten UNGARN gekauft und/oder bereitgestellt wurden.

125. Die Beklagte UNGARN profitierte von der Herstellung von fabrizierten Beweismitteln, gefälschten Dokumenten, absichtlichen Fehlinterpretationen und/oder Geheimhaltung von Fakten, Anstiftung zu falschen Zeugenaussagen, Vorbringen von betrügerischen Ansprüchen und anderen wissentlichen, mutwilligen, sorglosen oder fahrlässigen falschen Angaben über Fakten oder Beweismittel, die von der Beklagten DEUTSCHLAND gekauft und/oder bereitgestellt wurden.

126. Zu allen hier relevanten Zeiten war ein weiteres Ziel der Verschwörung, den Vorgängern der Kläger das Eigentum und Vermögen in den Vereinigten Staaten wegzunehmen, zu enteignen, zu schädigen und/oder Verluste zu erzeugen.

127. Dieser Teil der Verschwörung involvierte Handlungen, mit denen die Beklagten DEUTSCHLAND und UNGARN und die individuell genannten Beklagten DAHLGRÜN, DE LA CROIX, FÜHRER, HÖTTL, KOPPE und HEINRICH als frühere Nazis nur allzu vertraut waren.

128. Eine dieser Handlungen war die Festnahme und Inhaftierung des Vorgängers der Kläger, Prof. Hans Deutsch, in einem deutschen Gefängnis für einen Zeitraum von 18 Monaten, ohne Prozess. Während dieser Inhaftierung wurde dem Kläger DEUTSCH von den Beklagten DEUTSCHLAND, DAHLGRÜN und DE LA CROIX gesagt, dass Prof. Hans Deutsch „in Kürze" aus dem Gefängnis freikäme, wenn sie den Rechtsanspruch auf ihr Eigentum in den USA aufgäben und/oder dieses veräußerten und den Wert davon ablieferten.

129. Dies hatten die gleichen Beklagten getan, als sie als Nazis mit einigen der Holocaust-Opfer zu tun hatten, für die Deutsch kämpfte, um für sie Restitutionsentschädigungen zu erhalten.

130. Als Teil der Verschwörung zwang die Beklagte DEUTSCHLAND die Kläger Deutsch und den Vorgänger der Kläger Hans Deutsch, Eigentum im Werte von Dutzenden Millionen oder den Wert davon abzutreten, einschließlich seiner Anteile an (i) The Plainville News und The Southington News (beide zu 100 % im Eigentum von Deutsch, beide befanden sich im Westchester County und zählten zu den ältesten Zeitungen in den USA); (ii) die Druckereien und das komplette Inventar der Zeitungen; (iii) anderen Grund- und persönlichen Besitz im Bundesstaat New York; und (iv) ALLE Aktien und Anleihen von US Unternehmen, einschließlich IBM-Aktien.

131. Als Teil der Verschwörung, als der Vorgänger der Kläger Hans Deutsch nach 18 Monaten Inhaftierung freigelassen wurde, und trotz wiederholter Forderungen wurden diese Gelder, Vermögen und Eigentum in den Vereinigten Staaten NIE zur Gänze zurückgegeben.

132. Als Teil der Verschwörung halfen die Beklagten DEUTSCHLAND und UNGARN beim Transport und/oder Verkauf von Teilen des Gestohlenen Eigentums in und/oder durch die USA.

133. Zu den bekannteren Werken der Hâtvany-Sammlung, die in Galerien, Museen und/oder Auktionshäusern in den USA auftauchten, an und/oder durch sie verkauft wurden und/oder sich noch immer dort befinden oder in ihrer Obhut, ihrem Besitz oder ihrer Kontrolle sind, zählen:

   a. ein Meisterwerk namens „Petite Baigneuse" von Ingres; dieses Gemälde war ursprünglich in der National Gallery, Washington DC, und ist nun im Besitz der Beklagen PHILIPS;

   b. ein Meisterwerk namens „Marine à Berck" von Manet, das bei Wildenstein & Co. in New York City, N.Y. auftauchte und zuvor in The Barnes Foundation in Lower Merion, Pennsylvania, war und seit 1997 NICHT mehr gesehen wurde;

   c. ein Meisterwerk namens „Mt. Sinai", das von den Nazis gestohlen worden war, durch Sothetby's zum Verkauf an potentielle Käufer in den USA und anderswo angeboten wurde; das Auffinden der Dokumente im Jahr 2004 zeigte, dass Alarmglocken über die Provenienz (Rechtstitel) und die Identität jener Personen, die behaupteten, die „Eigentümer" zu sein, läuten hätten sollen; die Dokumente BESTÄTIGTEN, dass das Gemälde (und andere hier beanspruchten) den Rechtsvorgängern der Kläger GESTOHLEN wurde.

134. Die von den Beklagten DEUTSCHLAND und UNGARN eingegangene Verschwörung beinhaltete den Versand, Transfer und/oder Handel des Gestohlenen Eigentums in den Vereinigten Staaten und hatte eine substantielle Auswirkung auf den Handel in Bezug auf Verkäufe von Kunst, Sammlungen und/oder Meisterwerken in den Vereinigten Staaten sowie mit dem Holocaust zusammenhängende Angelegenheiten und/oder Ansprüche in den Vereinigten Staaten.

135. Die von den Beklagten DEUTSCHLAND und UNGARN eingegangene Verschwörung beinhaltete den Versand, Transfer, Zahlungen und/oder Erhalt von Geldern, Schuldscheinen, Wertpapieren, kommerziellen Instrumenten und anderen Wertgegenständen, die in und/oder durch die Vereinigten Staaten kamen und eine substantielle Auswirkung auf den Handel in

den Vereinigten Staaten sowie mit dem Holocaust zusammenhängende Angelegenheiten und/oder Ansprüche in den Vereinigten Staaten hatten.

136. Die Verschwörung, Schädigung, Schäden und Verluste dauern bis in die Gegenwart an, und es passierte erst in den letzten Monaten, dass die Kläger Zugang zu bestimmten Aufzeichnungen und/oder Beweismittel bekamen, die den Klägern vorher vorenthalten, verschwiegen und/oder vor ihnen geheim gehalten wurden; diese Beweismittel zeigen, wer involviert war und wie die Verschwörung funktionierte.

137. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig gegen das Gesetz zur Entschädigung von Opfern des Holocaust von 1998 zu verstoßen *[Siehe 112 Stat. 18 (1998) Kapitel II]*, welches von ALLEN Regierungen verlangt, dass geraubtes Vermögen wie das Gestohlene Eigentum und Werke der Hâtvany-Sammlung, die Gegenstand dieses Klagebegehrens sind, zurückzugeben sind.

138. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig gegen das Gesetz über nationales gestohlenes Eigentum von 1994 zu verstoßen, indem sie Güter im Werte von mindestens $ 5.000 im Handel zwischen Bundesstaaten oder Außenhandel transportierten, übermittelten oder transferierten, mit dem Wissen, dass diese gestohlen, umgetauscht oder durch Betrug weggenommen worden waren *[Siehe 18 USCA § 2314]*; und indem sie Güter im Werte von mindestens $ 5.000, die die Grenzen eines Bundesstaates oder der Vereinigten Staaten überschritten, nachdem sie gestohlen, unrechtmäßig umgetauscht oder weggenommen worden waren, mit dem Wissen, dass sie gestohlen, umgetauscht oder durch Betrug weggenommen worden waren *[Siehe 18 USCA § 2315]*, erhielten, besaßen, verbargen, lagerten, damit handelten, verkauften oder beseitigten.

139. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig gegen „Artikel 56 der Haager Konvention von 1899" zu verstoßen, welcher verlangt, dass „Kunst wie Privatvermögen behandelt wird und nicht beschädigt, zerstört oder enteignet werden darf".

140. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig

und/oder auf sonstige Weise unrechtmäßig gegen die „ Haager Konvention von 1907" zu verstoßen, welche einer Armee verbietet, „JEGLICHES Eigentum als Besitz zu übernehmen, das nicht für Militärzwecke benötigt wird".

141. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig den „Vertrag über gute Nachbarschaft von 1990" zwischen DEUTSCHLAND und UNGARN zu verletzen, der DEUTSCHLAND verpflichtete, die Rückgabe von Geraubter Kunst und/oder Sammlungen, die Klägern gehört, die sich derzeit in UNGARN befinden, sicherzustellen, sodass sie „ihren Eigentümern oder Rechtsnachfolgern", den Klägern, „zurückgegeben werden" können.

142. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig gegen die „Unidroit-Konvention über gestohlene oder rechtswidrig ausgeführte Kriegsgüter" von 1995 (die die UNESCO-Konvention von 1970 novelliert) zu verletzen, die dazu aufruft, „den enteigneten Eigentümern ..." (z.B. den hier genannten Klägern) „Priorität einzuräumen", „...im Gegensatz zum Käufer, selbst wenn der Käufer das Objekt in gutem Glauben erwarb".

143. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig, (i) US-Recht, Abkommen und/oder Statuten, (ii) internationales Recht und *jus cogens*, und (iii) internationale Verträge, Konventionen und bilaterale Abkommen zu verletzen.

144. Die Verschwörung, die bis in die Gegenwart andauert, erforderte/erfordert von den Beklagten DEUTSCHLAND und UNGARN, wissentlich, fahrlässig, sorglos, mutwillig und/oder auf sonstige Weise unrechtmäßig die Gesetze, Statuten, Verträge, Konventionen zu verletzen, im Austausch für den Nutzen, den sie aus der Verschwörung zogen.

145. Als direktes und unmittelbares Ergebnis der Verschwörung konnten die Beklagten DEUTSCHLAND und UNGARN von den 1950er Jahren bis in die Gegenwart das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger, in geheimen und/oder ungenannten Orten zurückhalten und behalten, und taten dies.

146. In periodischen Abständen von den 1960er Jahren bis in die Gegenwart verlangten die Kläger/Vorgänger der Kläger die Rückgabe, Restitution und/oder Entschädigungszahlungen

sowie eine Offenlegung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger.

147. Von den 1950er Jahren bis in die Gegenwart verweigerten die Beklagten DEUTSCHLAND und UNGARN die Rückgabe, Zahlung von Restitution und/oder Entschädigungszahlungen und/oder eine Offenlegung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger.

148. Kürzlich gaben die Beklagten DEUTSCHLAND und UNGARN zu, dass sie bestimmte Teile des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger, in ihrem Besitz, ihrer Obhut und/oder Kontrolle hätten.

149. Beispielsweise wurden die folgenden Eingeständnisse gemacht:

   a. Im Jahr 2003 das Eingeständnis der Beklagten UNGARN an die Kläger, dass sie bestimmte Werke des Gestohlenen Eigentums in ihrem Besitz, ihrer Obhut und/oder Kontrolle hat, einschließlich Werke der Hâtvany-Sammlung und andere, die den Klägern/Vorgängern der Kläger gehören, einschließlich Werke, die im Besitz, in der Obhut und/oder Kontrolle eines der Museen, Lagerhallen, Auktionshäuser oder anderer Behörden der Beklagten UNGARN sind; und

   b. Im Jahr 2004, das Eingeständnis der Beklagten DEUTSCHLAND an die Kläger, dass sie bestimmte Teile des Gestohlenen Eigentums in ihrem Besitz, ihrer Obhut und/oder Kontrolle hat, einschließlich Werke der Hâtvany-Sammlung und andere, die den Klägern/Vorgängern der Kläger gehören, einschließlich Werke, die im Besitz, in der Obhut und/oder Kontrolle eines der Museen, Lagerhallen, Auktionshäuser oder anderer Behörden der Beklagten DEUTSCHLAND sind, mit einem Mindestversicherungswert von mehr als 60 Millionen Euro und anderem Eigentum, das keinen Versicherungswert hat.

150. Zusätzlich zu jenen Teilen des Gestohlenen Eigentums, einschließlich der Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, die sie bereits zugegeben haben, wird bezüglich der Beklagten DEUTSCHLAND und UNGARN vermutet, dass sie im Besitz von Teilen des Gestohlenen Eigentums seien und/oder vom Verkauf profitiert hätten, einschließlich der Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger, die aufbewahrt werden/wurden und/oder im geheimen in/durch Museen und andere Einrichtungen in ihren Ländern transportiert wurden.

151. Es geschah nur als direkte und unmittelbare Folge der oben beschriebenen Verschwörung, dass die Beklagten DEUTSCHLAND und UNGARN die Eigentümerschaft, Obhut und/oder Kontrolle von Teilen des Gestohlenen Eigentums erhielten, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger.

152. Es geschah nur als direkte und unmittelbare Folge der oben beschriebenen Verschwörung, dass die Beklagten DEUTSCHLAND und UNGARN Teile des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger, unrechtmäßig behielten und/oder enteigneten.

153. Die Beklagten DEUTSCHLAND und UNGARN haben sich geweigert, das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger, zurückzugeben.

154. Die Kläger/Rechtsvorgänger der Kläger wurden zusätzlich zu den anderen ungarischen, französischen, deutschen, österreichischen und weiteren reichen Familien von Sammlern von den Beklagten DEUTSCHLAND und UNGARN speziell ausgesondert, damit viele der Teile des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger, weggenommen werden konnten.

155. Kurz nachdem öffentlich bekannt wurde, dass die Beklagten DEUTSCHLAND und UNGARN Teile des Gestohlenen Eigentums, darunter möglicherweise Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, in ihrem Besitz, ihrer Obhut und/oder Kontrolle hatten, unterzeichneten die Beklagten DEUTSCHLAND und UNGARN internationale Abkommen, Konventionen und/oder bilaterale Vereinbarungen über ihren gegenseitigen Austausch.

156. Die Kläger/Vorgänger der Kläger wären die beabsichtigten Nutznießer dieser internationalen Abkommen, Konventionen und/oder bilateralen Vereinbarungen.

157. Anstatt jedoch das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger zurückzugeben, unterließen es die Beklagten DEUTSCHLAND und UNGARN, diese internationalen Abkommen, Konventionen und/oder bilateralen Vereinbarungen, deren beabsichtigte Nutznießer die Kläger/Vorgänger der Kläger waren, einzuhalten.

158. Zusätzlich zu ihrer Unterlassung, die Anforderungen der oben erwähnten internationalen Abkommen, Konventionen und/oder bilateralen Abkommen nach ihrer Unterzeichnung einzuhalten, führte die Beklagte UNGARN Gesetze ein und/oder unternahm Schritte, um das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes

Eigentum der Kläger/Vorgänger der Kläger, die in ihrem Besitz, ihrer Obhut und/oder Kontrolle standen und die sie auch durch die oben beschriebene Verschwörung erhalten hatte, zu verstaatlichen und/oder um sich den Bemühungen um eine Rückgewinnung zu widersetzen, sie zu stören oder zunichte zu machen.

159. Die Einführung von Gesetzgebung und/oder von Schritten durch die Beklagte UNGARN, um das Gestohlene Eigentum zu verstaatlichen und und/oder um sich den Bemühungen um eine Rückgewinnung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, zu widersetzen, sie zu stören oder zunichte zu machen, war unrechtmäßig und illegal.

160. Die Wegnahme, Beschlagnahme, Einbehaltung und/oder Vorenthaltung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, durch die Beklagten UNGARN und DEUTSCHLAND war eine direkte Verletzung internationaler Abkommen, Konventionen und/oder bilateraler Vereinbarungen, einschließlich jener, auf die hier Bezug genommen wird, sowie von *jus cogens* und anderen internationalen Gesetzen und Normen.

161. Die Wegnahme, Beschlagnahme, Einbehaltung und/oder Vorenthaltung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, durch die Beklagten UNGARN und DEUTSCHLAND ist eine Verletzung von zahlreichen internationalen Abkommen, Konventionen und/oder bilateralen Vereinbarungen wie folgt.

162. Die Beklagten UNGARN und Deutschland sind/waren Vertragspartner in Abkommen, die die Plünderung oder Beutezüge als Kompensation für im Krieg erlittenen Verluste verurteilten und die Wegnahme, Beschlagnahme, Einbehaltung und/oder Vorenthaltung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger verboten.

163. Die Beklagten DEUTSCHLAND und UNGARN sind/waren Unterzeichner von drei Haager Konventionen, die die Wegnahme, Beschlagnahme, Einbehaltung und/oder Vorenthaltung und/oder Enteignung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger verboten.

164. Die Beklagten DEUTSCHLAND und UNGARN sind/waren Unterzeichner von Artikel 53 der Haager Konvention über die Gesetze und Gebräuche des Landkrieges von 1899, in welcher festgestellt wird, dass „ein Besatzungsheer nur Eigentum, das geeignet erscheint, für militärische Operationen zu dienen, beschlagnahmen kann", und deshalb die

Beschlagnahme des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, verbot.

165. Die Beklagten DEUTSCHLAND und UNGARN sind/waren Unterzeichner von Artikel 56 der Haager Konvention über die Gesetze und Gebräuche des Landkrieges von 1899, in welcher festgelegt wird, dass „ ... Eigentum wie Kunst und religiöses Eigentum als Privateigentum zu behandeln und nicht absichtlich zu zerstören oder zu beschädigen sind ...“; dies trifft auf das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger zu.

166. Die Beklagten DEUTSCHLAND und UNGARN sind/waren Unterzeichner der Haager Konvention von 1907, die ähnliche Bestimmungen wie die Haager Konvention von 1899 enthielt.

167. Die Haager Konvention von 1907 untersagte den Beklagten DEUTSCHLAND und UNGARN die Wegnahme, Beschlagnahme, Einbehaltung, Vorenthaltung und/oder Enteignung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger.

168. Die Beklagten DEUTSCHLAND und UNGARN sind/waren Unterzeichner der Haager Konvention von 1954, die den Gebrauch, die Wegnahme, Enteignung und/oder Einbehaltung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, verbot.

169. Die Beklagten DEUTSCHLAND und UNGARN wussten oder hätten wissen sollen, dass die oben erwähnten Abkommen, Konventionen und/oder bilateralen Vereinbarungen sowie *jus cogens* und US- und internationale Gesetze und Normen ein Verbot erließen, wonach „Beschädigungen von Eigentum, wem auch immer es gehört, Beschädigungen des kulturellen Erbes der ganzen Menschheit sind“, wie beispielsweise das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger,

170. Die Beklagten DEUTSCHLAND und UNGARN sind/waren Unterzeichner der UNESCO-Konvention von 1970, die die fortgesetzte Einbehaltung von Gestohlenem Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, verbot.

171. Die Beklagten UNGARN und DEUTSCHLAND kannten oder hätten die Prinzipien der UNESCO-Konvention von 1970 kennen sollen, die von ihnen erforderten, die notwendigen

Schritte zu setzen, um das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, zurückzugeben.

172. Die Beklagten DEUTSCHLAND und UNGARN unterließen es, die oben erwähnten Haager Konventionen und die Verpflichtungen durch die UNESCO einzuhalten, indem sie das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, nicht zurückgaben.

173. Die Beklagten UNGARN und DEUTSCHLAND verletzten die relevanten Teile der Verpflichtungen aus dem „Vertrag über gute Nachbarschaft von 1990", indem sie es unterließen, die Rückgabe des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger sicherzustellen.

174. Die Versuche der Beklagten DEUTSCHLAND und UNGARN, Gesetze zu initiieren, mit denen sie die Beschlagnahme, den Diebstahl, die Einbehaltung und/oder Vorenthaltung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger retroaktiv zu legitimieren versuchten, waren unrechtmäßig.

175. Nachdem über das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, bekannt wurde und/oder herausgefunden wurde, dass es im Besitz, in der Obhut und/oder Kontrolle der Beklagten DEUTSCHLAND und UNGARN sei, hatten diese die Pflicht, sich darum zu kümmern und es an die Kläger/Vorgänger der Kläger zurückzugeben.

176. Im Gegensatz zu ihren Verpflichtungen und nachdem das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger in Besitz, Obhut und/oder Kontrolle der Beklagten DEUTSCHLAND und UNGARN kamen und/oder dies entdeckt wurde, platzierten sie es in Galerien, Museen, Tresorräumen, Lagerhallen, Büros und anderen Orten in ganz UNGARN und DEUTSCHLAND; die Fakten und die Örtlichkeiten, wo die Gegenstände gelagert wurden, sind den Klägern/Vorgängern der Kläger nie zur Gänze mitgeteilt worden.

177. Es war die Pflicht der Beklagten DEUTSCHLAND und UNGARN sicherzustellen, dass das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, welches in ihren Besitz, ihre Obhut und/oder ihre Kontrolle gekommen war und/oder entdeckt wurde, an die rechtmäßigen Eigentümer, nämlich an die Kläger/Vorgänger der Kläger, restituiert würde.

178. Wie oben erläutert, gingen die Beklagten UNGARN und DEUTSCHLAND eine Verschwörung ein, um das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger unrechtmäßig einzubehalten.

179. Wie oben erläutert, halfen die Beklagten UNGARN und DEUTSCHLAND anderen bei der unrechtmäßigen Weitergabe von Gestohlenem Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger.

180. Wie oben erläutert, setzten die Beklagten UNGARN und DEUTSCHLAND Handlungen, um ihre oben erwähnten Handlungen zu verheimlichen, damit sie den Klägern/Vorgängern der Kläger, d.h. den rechtmäßigen Eigentümern, ihre Rechte, Rechtstitel und Anteile am Gestohlenen Eigentum, einschließlich der Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, entziehen konnten.

181. Jede der oben beschriebenen Handlungen oder Unterlassungen war Teil eines Vorhabens, Plans und/oder einer Intrige, um die Kläger/Vorgänger der Kläger bezüglich Wiedererlangung und/oder Restitution des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger zu betrügen (im Folgenden *„Die Intrige, um die Kläger/Vorgänger der Kläger zu betrügen"*).

182. Wie oben erläutert, waren die Handlungen der Beklagten UNGARN und DEUTSCHLAND in Bezug auf die Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, unrechtmäßig.

183. Das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, um das es bei der Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, ging, beinhaltete einige der größten, wichtigsten und wertvollsten Meisterwerke der ganzen Welt, darunter Werke von Meistern wie Rembrandt, Monet, Manet, Renoir, van Gogh, Degas, Delacroix, El Greco, Ingres, Titian, Tintoretto und anderen.

## **<u>VERJÄHRUNG GEHEMMT</u>**

184. Die anwendbare Verjährung für die vorliegenden Klagegründe ist gehemmt, da für die hier beklagten Handlungen keine Verjährungsfrist gilt, oder weil sie erst kürzlich entdeckt werden konnten oder wurden und/oder weil sie fortlaufende Handlungen sind und/oder fortlaufendes Unrecht darstellen.

185. Die Kläger haben erst kürzlich die Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, entdeckt, genauso wie die unrechtmäßige Beschlagnahme, Enteignungen, Verheimlichung, Vorenthaltung, Lagerung und/oder Einbehaltung des Gestohlenen Eigentums, einschließlich Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, die Gegenstand dieser Klage sind.

186. In Bezug auf die Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, sind die Kläger erst kürzlich in Besitz und Kenntnis von Fakten gelangt, die einige der Wege aufzeigen, wie das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, die Gegenstand dieser Klage sind und die konservativ geschätzt MILLIARDEN von Dollar wert sind, in den Besitz, die Obhut und/oder Kontrolle der Beklagten gelangte und wie es unrechtmäßig einbehalten, zurückbehalten, versandt, übermittelt, verkauft, verheimlicht und/oder enteignet wurde.

187. Die Beklagten DEUTSCHLAND und UNGARN verheimlichten bewusst ihre unrechtmäßigen Handlungen zur Förderung der Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, und/oder bemühten sich und/oder setzten fort, sie zu verheimlichen.

188. Als Teil der Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, verheimlichten die Beklagten DEUTSCHLAND und UNGARN - oder bemühten sich zu verheimlichen oder setzten fort zu verheimlichen - bewusst ihre unrechtmäßigen Handlungen vor den Klägern oder, unter anderen, den Vertretern anderer Opfer, Anwälten, Politikern, Gerichten, internationalen Kommissionen, Mediatoren, Historikern und anderen interessierten Parteien, denen gegenüber die Beklagten eine Verpflichtung haben, (i) das Gestohlene Eigentum, einschließlich Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, zu restituieren, und (ii) wahrhaftig und vollständig die Existenz von Aufzeichnungen und Informationen über das Gestohlene Eigentum und die Hâtvany-Sammlung bekannt zu geben.

## PUNKT I – UNRECHTMÄSSIGE ENTEIGNUNG / WEGNAHME VON EIGENTUM

189. Die Kläger wiederholen jede einzelne der in den oben angeführten Punkten enthaltenen Aussagen, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

190. Die oben beschriebene Verschwörung und Handlungen oder Unterlassungen der Beklagten DEUTSCHLAND und UNGARN stellen eine unrechtmäßige Enteignung und/oder Wegnahme des Eigentums der Kläger/Vorgänger der Kläger, Werken der Hâtvany-

Sammlung und anderen Eigentums der Kläger/Vorgänger der Kläger, die Gegenstand dieser Klage sind, dar.

191. In der oben beschriebenen Verschwörung, den Handlungen oder der unrechtmäßigen Enteignung und/oder Wegnahme waren die Beklagten DEUTSCHLAND und UNGARN involviert, indem sie

    a.   transportiert, versandt, gelagert, verkauft, ausgestellt und/oder andere Handlungen in Bezug auf die gestohlenen Kunstwerke in den USA gesetzt hatten und/oder andere Handlungen in Bezug auf die Gestohlenen Kunstwerke setzten oder die eine Auswirkung auf die Rechte und das Eigentum der Kläger/Vorgänger der Kläger in den USA oder auf dem kommerziellen Kunstmarkt in den USA hatten, oder andere Handlungen setzten, die eine direkte Auswirkung auf ähnliche Rechte und/oder kommerzielle Märkte in den USA hatten und eine direkte Verletzung von *28 U.S.C.A. § 1605 (a) (2) darstellten*;

    b.   den Klägern/Vorgängern der Kläger Vermögen und Rechte in den USA entzogen und/oder eine negative Wirkung darauf hatten, oder auf Eigentum, das für Eigentum in den USA getauscht worden war; all diese Aktivitäten standen in Verbindung mit dem kommerziellen Kunstmarkt und waren eine direkte Verletzung von *28 U.S.C.A. § 1605 (a) (3)*;

    c.   dem Eigentum der Kläger/Vorgänger der Kläger in den USA Schäden zugefügt und/oder Verlust verursacht hatten, und diese Schäden und/oder Verluste wurden durch unerlaubte und/oder unrechtmäßige Handlung(en) oder Unterlassung(en) von Ministern, Beamten, Angestellten, Vertretern und/oder Repräsentanten der erwähnten Beklagten und/oder eines ihrer Ministerien, Regierungsstellen, Organe und/oder Behörden verursacht, während diese im Rahmen ihres Amtes oder ihrer Beschäftigung handelten, in direkter Verletzung von *28 U.S.C.A. § 1605 (a) (5)*;

    d.   Handlungen begangen hatten, die das Gesetz zur Entschädigung von Opfern des Holocaust von 1998 verletzten;

    e.   Handlungen begangen hatten, die das Gesetz über nationales gestohlenes Eigentum von 1994 verletzten;

    f.   Handlungen begangen hatten, die die Haager Konvention von 1899 und 1907 verletzten;

    g.   Handlungen begangen hatten, die den Vertrag über gute Nachbarschaft von 1990 verletzten;

h. Handlungen begangen hatten, die die Unidroit-Konvention von 1995 verletzten; und

i. Handlungen begangen hatten, die andere anwendbare internationale Verträge und *jus cogens* verletzten.

192. Als direkte und unmittelbare Folge der oben geschilderten Verschwörung, unrechtmäßiger Handlungen, Unterlassungen und/oder unrechtmäßiger Enteignungen und/oder Wegnahme durch die Beklagten DEUTSCHLAND und UNGARN erlitten die Kläger finanzielle und andere Schäden.

WESHALB die Kläger ein Urteil gegen die Beklagten DEUTSCHLAND und UNGARN verlangen, einzeln, gemeinsam, gesondert und/oder alternativ aus diesem Klagegrund für (i) Restitution und/oder ausgleichenden Schadenersatz für spezifische Gegenstände aus dem Gestohlenen Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, einschließlich von Gemälden, die in Galerien, Museen, Lagerräumen, Restaurierungs- und anderen Einrichtungen der Beklagten DEUTSCHLAND und/oder UNGARN gefunden worden sind, in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (ii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-DOLLAR (6.000.000.000 US-Dollar)**; und (iii) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## PUNKT II – VERSCHWÖRUNG

193. Die Kläger wiederholen jede einzelne der in den oben angeführten Punkten enthaltenen Aussagen, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

194. Die oben dargestellten Handlungen oder Unterlassungen der Beklagten DEUTSCHLAND und UNGARN waren Teil einer Verschwörung, die geplant worden war, um den rechtmäßigen Eigentümern, einschließlich der hier genannten Kläger, Gestohlenes Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger zu entziehen.

195. Die oben dargestellte Verschwörung, der Betrug und andere Handlungen der Beklagten DEUTSCHLAND und UNGARN waren unrechtmäßig.

196. Die oben dargestellte Verschwörung, der Betrug und andere Handlungen verletzten anwendbare Gesetze und Verordnungen, die die Handlungen und Verpflichtungen der

Beklagten DEUTSCHLAND und UNGARN in Bezug auf das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger regelten.

197. Als direkte und unmittelbare Folge der oben geschilderten Verschwörung, des Betrugs und anderer unrechtmäßiger Handlungen durch die Beklagten DEUTSCHLAND und UNGARN erlitten die Kläger finanzielle und andere Schäden.

198. WESHALB die Kläger ein Urteil gegen die Beklagten DEUTSCHLAND und UNGARN verlangen, einzeln, gemeinsam, gesondert und/oder alternativ aus diesem Klagegrund für (i) Entschädigung für ihren Anteil an der Verschwörung und am Betrug in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (ii) Restitution und/oder ausgleichenden Schadenersatz für spezifische Gegenstände aus dem Gestohlenen Eigentum, Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, einschließlich von Gemälden, die in Galerien, Museen, Lagerräumen, Restaurierungs- und anderen Einrichtungen der Beklagten DEUTSCHLAND und/oder UNGARN gefunden worden sind, in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (iii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-DOLLAR (6.000.000.000 US-Dollar)**; und (iv) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## PUNKT III – FAHRLÄSSIGKEIT und/oder FAHRLÄSSIGE AUFSICHT

199. Die Kläger wiederholen jede einzelne der in den oben angeführten Punkten enthaltenen Aussagen, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

200. Die Beklagten DEUTSCHLAND und UNGARN hatten die Verpflichtung, Sorgfalt anzuwenden in Bezug auf die Identifizierung von Gestohlenem Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, die in ihren Besitz kamen und/oder in ihrem Besitz entdeckt wurden, und es prompt zurückzugeben ohne Verzögerung oder Schäden am Eigentum oder an den Klägern/Vorgängern der Kläger durch eine potentielle Verzögerung bei der Rückgabe von solchem Eigentum.

201. Die Beklagten DEUTSCHLAND und UNGARN hatten die Verpflichtung, ihre Vertreter, Angestellten, Repräsentanten und/oder alle Personen, die mit ihrer tatsächlichen und/oder vermeintlichen Autorität handelten, zu überwachen, um sicherzustellen, dass solche Personen, einschließlich der individuell genannten beklagten Personen und/oder Unternehmen richtig und mit der gebührenden Sorgfalt handelten, um ihnen nicht zu

ermöglichen, jene Handlungen zu begehen, wie sie hier in Bezug auf die Identifizierung des Gestohlenen Eigentums, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger vorgebracht wurden.

202. Die Beklagten DEUTSCHLAND und UNGARN waren fahrlässig bei der Einhaltung der oben genannten Verpflichtungen, einschließlich (i) der Pflicht, das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, das in ihren Besitz kam und/oder in ihrem Besitz entdeckt wurde, prompt zu identifizieren und zurückzugeben; damit dieses prompt und ohne Verzögerung oder Schäden am Eigentum oder an den Klägern/Vorgängern der Kläger durch eine potentielle Verzögerung bei der Rückgabe von solchem Eigentum zurückgegeben wird, und (ii) der Pflicht, angemessene Kontrolle und Überwachung der individuell genannten beklagten Personen und/oder Unternehmen auszuüben, um ihnen nicht zu ermöglichen, jene Handlungen zu begehen, wie sie hier in Bezug auf das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger vorgebracht wurden.

203. Als direkte und unmittelbare Folge der Fahrlässigkeit und/oder des Versäumnisses der Beklagten UNGARN und DEUTSCHLAND, die individuell genannten beklagten Personen und/oder Unternehmen angemessen zu kontrollieren und/oder zu überwachen, erlitten die Kläger finanzielle und andere Schäden.

204. WESHALB die Kläger ein Urteil gegen die Beklagten DEUTSCHLAND und UNGARN verlangen, einzeln, gemeinsam, gesondert und/oder alternativ aus diesem Klagegrund für (i) Entschädigung für die Fahrlässigkeit in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (ii) Restitution und/oder ausgleichenden Schadenersatz für die spezifischen Gegenstände aus dem Gestohlenen Eigentum, Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, einschließlich von Gemälden, die in Galerien, Museen, Lagerräumen, Restaurierungs- und anderen Einrichtungen der Beklagten DEUTSCHLAND und/oder UNGARN gefunden worden sind, in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (iii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-DOLLAR (6.000.000.000 US-Dollar)**; und (iv) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## PUNKT IV – UNGERECHTFERTIGTE BEREICHERUNG

205. Die Kläger wiederholen jede einzelne der obigen Aussagen, führen sie erneut an und gliedern sie hier ein, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

206. Durch die oben genannten Handlungen, Nicht-Handlungen, fahrlässigen, unrechtmäßigen und/oder missbräuchlichen Handlungen hatten und haben sich die Beklagten DEUTSCHLAND und UNGARN ungerechtfertigt bereichert durch Beschlagnahme, versuchte Enteignung, Wegnahme, Einbehaltung, Vorenthaltung und/oder Versäumnis der Restitution des Gestohlenen Eigentums, Werken der Hâtvany-Sammlung und anderen Eigentums der Kläger/Vorgänger der Kläger.

207. Die Beklagten DEUTSCHLAND und UNGARN haben sich ungerechtfertigt bereichert durch Profite, die sie durch Ausstellungen machten und/oder andere Profite in Zusammenhang mit ihrer Zurückbehaltung des Gestohlenen Eigentums, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger.

208. Die Beklagten DEUTSCHLAND und UNGARN haben sich ungerechtfertigt bereichert, indem sie Honorare und andere Gelder sparten, verdienten und/oder zurückbehielten aufgrund von und/oder sich ergebend aus dem Gestohlenen Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger.

209. Als direkte und unmittelbare Folge der ungerechtfertigten Bereicherung der Beklagten DEUTSCHLAND und UNGARN aus dem Gestohlenen Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, die Gegenstand dieser Klage sind, erlitten die Kläger finanzielle und andere Schäden.

210. WESHALB die Kläger ein Urteil gegen die Beklagten UNGARN und DEUTSCHLAND verlangen, einzeln, gemeinsam, gesondert und/oder alternativ für (i) Entschädigung in der Höhe ihrer ungerechtfertigten Bereicherung; dieser Betrag übersteigt die Streitwert-Grenzen dieses Gerichts; (ii) Restitution und/oder ausgleichenden Schadenersatz für die spezifischen Gegenstände aus dem Gestohlenen Eigentum, Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, einschließlich von Gemälden, die in Galerien, Museen, Lagerräumen, Restaurierungs- und anderen Einrichtungen der Beklagten DEUTSCHLAND und/oder UNGARN gefunden worden sind, in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (iii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-**

**DOLLAR (6.000.000.000 US-Dollar)**; und (iv) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## PUNKT V – GERECHTE AUSSCHÜTTUNG VON GELDERN

211. Die Kläger wiederholen jede einzelne der obigen Aussagen, führen sie erneut an und gliedern sie hier ein, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

212. Die oben genannten Handlungen und/oder Nicht-Handlungen der Beklagten DEUTSCHLAND und UNGARN waren ungerecht, ungehörig, unrechtmäßig, fahrlässig und/oder eine Verletzung von anwendbaren Gesetzen, Abkommen, Konventionen, Gebräuchen, Regeln und Normen.

213. Die ungerechtfertigte Bereicherung der Beklagten DEUTSCHLAND und UNGARN aus den oben genannten Handlungen, Nicht-Handlungen ist ungerecht, ungehörig, unbillig, unrechtmäßig, fahrlässig und/oder anderweitig rechtswidrig.

214. Als direkte und unmittelbare Folge der ungerechtfertigten Bereicherung der Beklagten DEUTSCHLAND und UNGARN erlitten die Kläger finanzielle und andere Schäden.

215. WESHALB die Kläger ein Urteil gegen die Beklagten UNGARN und DEUTSCHLAND verlangen, einzeln, gemeinsam, gesondert und/oder alternativ für (i) Entschädigung in der Höhe ihrer ungerechtfertigten Bereicherung; dieser Betrag übersteigt die Streitwert-Grenzen dieses Gerichts, dieser Betrag sollte ausgeschüttet und an die Kläger bezahlt werden; (ii) Restitution und/oder ausgleichenden Schadenersatz für die spezifischen Gegenstände aus dem Gestohlenen Eigentum, Werke der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, einschließlich von Gemälden, die in Galerien, Museen, Lagerräumen, Restaurierungs- und anderen Einrichtungen der Beklagten DEUTSCHLAND und/oder UNGARN gefunden worden sind, in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (iii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-DOLLAR (6.000.000.000 US-Dollar)**; und (iv) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## PUNKT VI – GERECHTE RECHENSCHAFTSABLEGUNG

216. Die Kläger wiederholen jede einzelne der obigen Aussagen, führen sie erneut an und gliedern sie hier ein, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

217. Die Beklagten DEUTSCHLAND und UNGARN sind den Klägern/Vorgängern der Kläger Rechenschaft schuldig über das Gestohlene Vermögen, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, das sie nahmen, stahlen, entgegennahmen, lagerten, für sich beanspruchen und/oder das in ihren Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN ist und dort aufbewahrt wird/wurde oder entdeckt wurde – soweit sie davon Kenntnis hatten.

218. Zu allen hier relevanten Zeiten stellten die Kläger/Vorgänger der Kläger Anfragen und/oder verlangten von den Beklagten UNGARN und DEUTSCHLAND eine Offenlegung, damit sie Rechenschaft ablegen über das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, das sie nahmen, stahlen, erhielten, lagerten, für sich beanspruchen und/oder das in ihren Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN ist und dort aufbewahrt wird/wurde oder entdeckt wurde – soweit sie davon Kenntnis hatten.

219. Die Beklagten DEUTSCHLAND und UNGARN legten nie Rechenschaft ab, unterließen es und/oder weigerten sich, den Klägern/Vorgängern der Kläger die geforderte Rechenschaft zu geben über das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, das sie nahmen, stahlen, erhielten, lagerten, für sich beanspruchen und/oder das in ihren Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN ist und dort aufbewahrt wird/wurde oder entdeckt wurde – soweit sie davon Kenntnis hatten.

220. Die Beklagten DEUTSCHLAND und UNGARN entstellten die richtige Abrechung an die Kläger/Vorgänger der Kläger fahrlässig, sorglos, mutwillig und/oder absichtlich in Bezug auf das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, das sie nahmen, stahlen, entgegennahmen, lagerten, für sich beanspruchen und/oder das in ihren Museen, Archiven, Lagereinrichtungen, Tresorräumen, Restaurierungseinrichtungen und an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN ist und dort aufbewahrt wird/wurde oder entdeckt wurde – soweit sie davon Kenntnis hatten.

221. Durch ihre Handlungen oder Unterlassungen zu handeln, und als Teil der Intrige, um die Kläger/Vorgänger der Kläger zu betrügen, verletzten die Beklagten ihre Pflicht gegenüber den Klägern/Vorgängern der Kläger.

222. Das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger wurde beschlagnahmt, genommen, enteignet, entgegengenommen, gelagert, beansprucht und/oder in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten und war bekannt, hätte bekannt sein sollen und/oder – wenn richtige und gebührende Sorgfalt angewandt worden wäre – hätte man entdecken können, dass es den Klägern und anderen Holocaust-Opfern gehört.

223. Die Beklagten DEUTSCHLAND und UNGARN hatten und haben weiterhin bestimmte vertragliche und/oder rechtliche Verpflichtungen, genaue Aufzeichnungen in Bezug auf das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger zu führen.

224. Die Beklagten DEUTSCHLAND und UNGARN gingen nach dem Zweiten Weltkrieg Verpflichtungen ein, genaue Aufzeichnungen zu führen, Rechenschaft abzulegen und über die Existenz von Gestohlenem Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger zu berichten, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten.

225. Die Beklagten DEUTSCHLAND und UNGARN hatten und haben immer noch die gesetzliche Verpflichtung, die den Beklagten DEUTSCHLAND und UNGARN durch die Gesetze des Bundesstaates New York, *jus cogens*, Verträge und/oder andere internationale Vereinbarungen, Abkommen, Konventionen und/oder Statuten auferlegt wurde, über die Existenz von Gestohlenem Eigentum, einschließlich Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger zu berichten, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten.

226. Die Beklagten DEUTSCHLAND und UNGARN wurden von den Klägern/Vorgängern der Kläger und anderen gebeten, die Existenz von Gestohlenem Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger offenzulegen, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten.

227. Erst in den letzten Monaten haben die Beklagten DEUTSCHLAND und UNGARN endlich von der Existenz und/oder dem Standort von bestimmtem Gestohlenem Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger berichtet oder es offen gelegt – Eigentum, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten; über anderes Eigentum ist nie berichtet worden.

228. Die Beklagten DEUTSCHLAND und UNGARN haben es versäumt, über das System und/oder die Verfahren zu berichten oder offen zu legen, wie sie zu profitieren versuchten vom Gestohlenen Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten.

229. Zu keinem Zeitpunkt haben die Beklagten DEUTSCHLAND und UNGARN davon berichtet oder die Tatsache offen gelegt, dass sie vom Gestohlenen Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger profitierten, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten.

230. Die Beklagten DEUTSCHLAND und UNGARN haben nie über die Tatsache berichtet oder sie offen gelegt, dass sie Systeme und Schemata entwickelt haben, durch die sie profitieren konnten vom Gestohlenen Eigentum, Werken der Hâtvany-Sammlung und anderem

Eigentum der Kläger/Vorgänger der Kläger, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten.

231. Die oben genannte Weigerung und/oder Unterlassung der Beklagten DEUTSCHLAND und UNGARN, über das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, welche Gegenstand dieser Klage sind, zu berichten und/oder Rechenschaft abzulegen – Eigentum, das sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten –, war eine Verletzung der oben genannten Verpflichtungen, den Klägern/Vorgängern der Kläger zu berichten und/oder Rechenschaft abzulegen.

232. Die oben genannte Weigerung und/oder Unterlassung der Beklagten DEUTSCHLAND und UNGARN, zu berichten und/oder Rechenschaft abzulegen war unrechtmäßig, fahrlässig, sorglos und/oder anderweitig missbräuchlich.

233. Als direkte und unmittelbare Folge der Pflichtverletzung der Beklagten DEUTSCHLAND und UNGARN, Rechenschaft abzulegen, sowie der Unterlassung und/oder Weigerung, eine richtige Offenlegung zu machen, erlitten die Kläger finanzielle und andere Schäden.

234. **WESHALB** die Kläger ein Urteil gegen die Beklagte UNGARN verlangen, einzeln, gemeinsam, gesondert und/oder alternativ für Entschädigung wie folgt: (i) eine sofortige unabhängige Offenlegung des Gestohlenen Eigentums, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, welches sie genommen, gestohlen, entgegengenommen, gelagert, beansprucht haben und/oder das in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets von DEUTSCHLAND und UNGARN zurückbehalten wird und wurde oder entdeckt wurde, so weit sie davon Kenntnis hatten; (ii) Kosten der oben genannten unabhängigen Offenlegung und einer historischen Untersuchung der Handlungen der Beklagten DEUTSCHLAND und UNGARN; und (iii) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## **PUNKT VII – AUFERLEGUNG EINES TREUHANDVERHÄLTNISSES**

235. Die Kläger wiederholen jede einzelne der obigen Aussagen, führen sie erneut an und gliedern sie hier ein, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

236. Die Beklagten DEUTSCHLAND und UNGARN wussten und/oder hatten genügend Basiswissen, um daraus zu schließen, dass ihnen die oben genannten Transaktionen NICHT gestattet waren.

237. Die Beklagten DEUTSCHLAND und UNGARN beschlagnahmten, nahmen, enteigneten, nahmen entgegen, lagerten, beanspruchten und/oder behielten das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger in ihren Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets der Beklagten DEUTSCHLAND und UNGARN.

238. Zu allen hier relevanten Zeiten hatten die Beklagten DEUTSCHLAND und UNGARN unmittelbaren und/oder mittelbaren Besitz und/oder Rechtstitel am Gestohlenen Eigentum, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger.

239. Der geschätzte und/oder annähernd reale Wert des Gestohlenen Eigentums, Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, das die Beklagten DEUTSCHLAND und UNGARN beschlagnahmten, nahmen, enteigneten, entgegennahmen, lagerten, beanspruchten und/oder in Museen, Archiven, Lagern, Tresorräumen, Restaurierungseinrichtungen und/oder an anderen Orten innerhalb des Gebiets der Beklagten DEUTSCHLAND und UNGARN behielten, beträgt Hunderte Millionen, wenn nicht Milliarden von Dollar (US-Dollar).

240. Das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger gehört den Klägern/Vorgängern der Kläger und/oder anderen Holocaust-Opfern, Erben, Begünstigten, Vertretern und/oder Rechtsvorgängern.

241. Die Beklagten DEUTSCHLAND und UNGARN wussten, hätten wissen sollen und/oder hätten feststellen können, wenn sie angemessene Sorgfalt angewandt hätten, dass das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger ihnen und/oder den Person(en), die verursacht hatten, dass es in Besitz, Obhut und/oder Kontrolle der Beklagten DEUTSCHLAND und UNGARN kam, nicht gehörte.

242. **WESHALB** die Kläger ein Urteil gegen die Beklagten DEUTSCHLAND und UNGARN verlangen, einzeln, gemeinsam, gesondert und/oder alternativ für (i) die Auferlegung eines

Treuhandverhältnisses für, auf und/oder betreffend die spezifischen Gegenstände des Gestohlenen Eigentums, Werke der Hâtvany-Sammlung und anderen Eigentums der Kläger/Vorgänger der Kläger, das unrechtmäßig in DEUTSCHLANDS und UNGARNS Nationaler Galerie, in Museen, Lagern, Restaurierungs- und anderen Einrichtungen behalten wird, in der Höhe von nicht weniger als **EINE MILLIARDE US-DOLLAR (1.000.000.000 US-Dollar)**; (ii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-DOLLAR (6.000.000.000 US-Dollar)**; und (iii) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

## PUNKT VIII – RESTITUTION und/oder KLAGE AUF HERAUSGABE

243. Die Kläger wiederholen jede einzelne der obigen Aussagen, führen sie erneut an und gliedern sie hier ein, so als ob sie hier ausführlich und in voller Länge dargelegt würden.

244. Zu allen hier relevanten Zeiten hatten die Beklagten DEUTSCHLAND und UNGARN die Verpflichtung, spezifische Restitution und/oder Entschädigungen für das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger zu zahlen.

245. Zu allen hier relevanten Zeiten hatten die Beklagten DEUTSCHLAND und UNGARN die Verpflichtung, den anwendbaren internationalen Konventionen und/oder Verträgen der Europäischen Union Geltung zu verschaffen, um sicherzustellen, dass das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger restituiert und/oder Entschädigungen an die Kläger/Vorgänger der Kläger bezahlt würden.

246. Die Beklagten DEUTSCHLAND und UNGARN haben NICHT spezifische Restitution und/oder Entschädigungen für das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger und die anderen Gemälde und/oder Gegenstände gezahlt, die sich unrechtmäßig in den Museen, Lagern, Restaurierung- und sonstigen Einrichtungen der Beklagten UNGARN und DEUTSCHLAND befinden.

247. Die Beklagten DEUTSCHLAND und UNGARN unterließen es, den anwendbaren internationalen und/oder EU-Abkommen, Konventionen und/oder Vereinbarungen Geltung zu verschaffen und/oder sie einzuhalten, um sicherzustellen, dass das Gestohlene Eigentum, Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger restituiert und/oder Entschädigungen an die Kläger/Vorgänger der Kläger bezahlt würden.

248. Die Kläger/Vorgänger der Kläger gehörten zu den geplanten Begünstigten aus den oben genannten Verpflichtungen der Beklagten DEUTSCHLAND und UNGARN.

249. Zu allen hier relevanten Zeiten hatte die Beklagte PHILIPS die Verpflichtung, die Dokumente über Provenienz, Rechtstitel und Eigentümerschaft von Gestohlenem Eigentum, einschließlich eines Meisterwerks von Ingres und möglicherweise anderen Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, welche in ihre Obhut, ihren Besitz und/oder Kontrolle kamen, gründlich zu prüfen.

250. Zu allen hier relevanten Zeiten entdeckten die Kläger/Vorgänger der Kläger Beweise, die vermuten lassen, dass das Meisterwerk von Ingres und möglicherweise andere Werke der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, welche in ihre Obhut, ihren Besitz und/oder Kontrolle kamen, von zweifelhafter Herkunft sind und von Personen kommen, die dubiose Zeugnisse über ihre Eigentümerschaft hatten, sodass es deutliche Warnsignale bezüglicher der Gemälde geben hätte sollen.

251. Zu allen hier relevanten Zeiten kam die Beklagte PHILIPS ihrer Verpflichtung nicht nach, die Dokumente über Provenienz, Rechtstitel und Eigentümerschaft von Gestohlenem Eigentum, einschließlich einem Meisterwerk von Ingres und möglicherweise anderen Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, welche in ihre Obhut, ihren Besitz und/oder Kontrolle kamen, gründlich zu prüfen.

252. Zu allen hier relevanten Zeiten, wenn die Beklagte PHILIPS ihren Verpflichtungen nachgekommen wäre, die Dokumente über Provenienz, Rechtstitel und Eigentümerschaft von Gestohlenem Eigentum, einschließlich eines Meisterwerks von Ingres und möglicherweise anderer Werken der Hâtvany-Sammlung und anderem Eigentum der Kläger/Vorgänger der Kläger, welche in ihre Obhut, ihren Besitz und/oder Kontrolle kamen, gründlich zu prüfen, hätte sie erkannt, dass solche Gemälde eine zweifelhafte Herkunft und Provenienz hatten und dass sie sich mit den Eigentümern beraten und/oder solche Gemälde zurückgeben hätte sollen, darunter sind die Kläger/Vorgänger der Kläger.

253. Als direkte und unmittelbare Folge der Unterlassung durch die Beklagten DEUTSCHLAND, UNGARN und PHILIPS, ihre oben genannten Verpflichtungen einzuhalten, erlitten die Kläger substantielle und kontinuierliche finanzielle Schäden.

254. **WESHALB** die Kläger ein Urteil gegen die Beklagten DEUTSCHLAND, UNGARN und PHILIPS verlangen, einzeln, gemeinsam, gesondert und/oder alternativ für Entschädigung wie folgt: (i) Restitution und /oder ausgleichenden Schadenersatz für spezifische Gegenstände des Gestohlenen Vermögens, darunter ein Meisterwerk von Ingres und

möglicherweise andere Werken der Hâtvany-Sammlung und anderes Eigentum der Kläger/Vorgänger der Kläger, die im Besitz, der Obhut und/oder Kontrolle der obigen Beklagten sind, in einer Höhe, die dem tatsächlichen gegenwärtigen Wert des genannten Besitzes entspricht; (ii) exemplarischen und/oder Strafschadenersatz in der Höhe von **SECHS MILLIARDEN US-DOLLAR (6.000.000.000)**; und (iii) Zinsen, Anwaltshonorare und die Kosten dieser Klage.

Datiert: 3. März 2005

*Unterschrift* _____                          *Unterschrift* _____
Edward D. Fagan, Esq.                         Morse Geller Esq.
140 Broadway, 46th Floor                      277 Sycamore Street
New York, NY 10005                            West Hempstead NY  11552
Tel. (212) 858-7605                           Tel. (516) 564 6734
Kläger und Anwalt der Kläger                  Anwalt der Kläger