UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------- X
ASSOCIATION OF HOLOCAUST VICTIMS              :
FOR RESTITUTION OF ARTWORK                     :
and MASTERPIECES, a/k/a "AHVRAM", et al        :    04 – CIV – 8457 (LTS)
               Plaintiffs,     :
vs.                                             :
                               :
REPUBLIC OF HUNGARY, et al                     :    DECLARATION OF
               Defendants.:   :    EDWARD D. FAGAN
------------------------------------------------------------------------------- X

Edward D. Fagan, hereby declares and says:

## INTRODUCTORY STATEMENT

1. I am one of the plaintiffs in this matter and I make this application in support of plaintiffs' request that the Court permit the case to continue.

2. I am providing this Affidavit from Florida where I am presently and I apologize to the Court that I could not get it in sooner. I am here with my daughter – with whom I have not been able to spend more than a few hours at a time during the last six months due to personal and professional reasons. I will be submitting this Affidavit today and one more Affidavit tomorrow morning and I pray the Court will accept and consider same before determining how the claims can and should proceed.

3. In this Affidavit, I will outline what the problems were that plagued plaintiffs during the last 6 months and how they have been corrected now so that the prosecution can continue.

---------------
*December 27, 2005 Affidavit of Edward D. Fagan in Support of Motion to Continue Prosecution*
<u>AHVRAM et al v. Republic of Hungary et al</u> – *04 Civ 8457 (LTS)* – Page 1

4. In the next Affidavit, I will outline the things which have been done, including the forwarding of:

   a. The Amended Summonses & Amended Complaints to internationally approved professional process servers who have assured plaintiffs that they can expedite the formal service of defendant Germany and Hungary and their officials;

   b. The Request for Issuance of *Subpoena Duces Tecum* to secure a single document which will establish and confirm many of the plaintiffs allegations about the wrongful acts by defendants Germany and Hungary and others and which documents is in the possession of a NY lawyer;

   c. The Request for Permission to take a depositions *de bene esse* of among others plaintiff Erna Deutsch who is 94 years old and in failing health; and

   d. The Request for a Status Conference at which counsel for defendants Germany and Hungary can appear and be heard about the establishment of a briefing schedule and an interim discovery schedule to preserve evidence while the Motions are briefed and argued.

5. I will also explain in this Affidavit what the original and newly constituted team has done to advance the claims by way of investigations, discovery of evidence, location of witnesses, attraction of additional claimants, support from prominent Holocaust survivors and organizations and involving international experts in human and victims' rights claims.

6. I have assisted Dr. Deutsch in the preparation of his Affidavit and understand that he will be submitting an Affidavit describing what he has done and anticipates doing to (i) help advance the prosecution of the AHVRAM cases and help advance his family's individual claims..

### **DIFFICULTIES THIS PAST YEAR**

7. During the past year, there have been considerable stresses on plaintiff Deutsch who was the spokesperson for AHVRAM.

8. Money was tight and often times he did not have the necessary resources to do all the things he wanted to do for his aged and infirm mother, or for his business or to investigate or assist others in the investigation of the claims into what happened to his father Prof. Hans Deutsch and the family fortune as a direct result of the conspiracy which is at the heart of this case.

9. Plaintiff Erna Deutsch is 94 years old and she has had multiple surgeries and other physical problems which at times have made it necessary for the other persons with whom I have worked carry on without me.

10. Plaintiff Deutsch also had financial difficulties which limited his ability to contribute to the prosecution and the investigations as much as he would have otherwise liked.

11. Plaintiff Dr. Deutsch is submitting a separate Affidavit that will explain these problems and what has been done to fix them and in which he begs this Court to allow the continued prosecution of this case.

## REMEDIAL ACTIONS TAKEN

12. Other members of the team involved with the AHVRAM claims and I have helped the Deutsch's with their individual claims and as explained below have assumed the burden from Dr. Deutsch of future prosecution of these claims.

### The Team

13. During the past year, plaintiffs have been able to assemble and keep a team of professionals who are dedicated to these claims.

14. The persons on the team include Investigative Journalist and Documentary Producer - Mike Juncker, Investigative Art Journalist - Burkhart List, Austrian Researcher and Investigative Journalist - Margarete Endl, Austrian lawyers - Dr. Gerhard Podovsovnik and Dr. Herwig Hasslacher, International Art Expert – Konstantin Akinsha and others.

### AHVRAM - Restructured and New Claimants

15. Because of some of the problems that occurred in the past, it was necessary to restructure some aspects of AHVRAM. The restructuring was to insure, the effective prosecution of the claims even in the event that Dr Deutsch or one of the other AHVRAM officials was unable to participate as much as he/she would have liked, whether for personal or professional reasons.

16. In addition to the restructuring, I have been able to involve additional persons with Art claims, who are joining AHVRAM. These persons are from the US, France and Israel.

**Prominent Holocaust Survivors & Organizations Joining / Supporting Claims**

17. The claims which AHVRAM is making in NY have also been bolstered by prominent Holocaust Survivors and Organizations from the US and Israel.

18. These are persons with individual and group claims and who are members of some of the largest Holocaust survivor organizations in the world.

19. Among them are persons from Centre for Holocaust Survivors of Israel, the Conference of Lithuanian Jewry and other Holocaust survivor groups, as well as from the Raoul Wallenberg Foundation.

**Oxford University Scholars and International Lawyers Providing Expertise**

20. In addition to the survivors and survivor organization, I have been able to secure the expertise and involvement of a group of International Human and Victims Rights Lawyers, Barristers, Scholars and Professors from the Public Interest Law Group of the Centre for Socio Legal Studies at the University of Oxford in England.

21. AHVRAM has been pleased to involve Dr. Kaveh Moussavi, Head of Public Interest Law at the University of Oxford in England. Dr. Moussavi teaches the International Human Rights Seminar at Oxford. He has been professionally involved in human rights litigation in numerous jurisdictions. As part of that, Dr. Moussavi has been focused on locating assets stolen by dictators from their nationals or treasuries. In particular he was involved in litigation under the Alien Tort Claims Act in the DC Circuit where the plaintiffs are/were torture and human rights victims seeking reparations from the current Iranian leadership. As part of

that work, Dr. Moussavi litigated and served as an expert in on issues of proper forum and competing interest in adjudication claims in multiple countries involving conflict of laws issues.  In the past three years, Dr. Moussavi's main pre-occupation has been Guantanamo Bay litigation involving 47 different nationalities and the complex jurisdictional international law issues.  These include *Hamdan v. Bush* and *Rasul v. Bush*, both of which were litigated and won before the Supreme Court of the United States, which gave the detainees the rights to hearings, right to counsel and other due process rights under the supervision of the US Federal courts.  Dr. Moussavi was also honored to represent a consortium of human rights NGOs at the 2001 International Conference to Review and Make Recommendation for the Revision of the Hague Convention on Civil Judgments and jurisdiction.

22. In addition to Dr. Moussavi, plaintiffs have also been privileged to have other lawyers join the case and they will be entering their appearances and/or requesting *pro hac vice* admissions.

## PAST DIFFICULTIES WILL NOT AFFECT FUTURE PROSECUTION

23. While there were problems in the past, those problems have been remedied and will NOT affect the future prosecution.

24. One of the biggest problems experienced these past many months resulted from the unavailability of Dr. Deutsch to participate more actively and fully in the claims.

25. As indicated in the accompanying Affidavit of Dr. Deutsch, the prior problems will not reoccur.

26. Also, to the extent necessary, I would suggest that that Court consider having the prosecution of the AHVRAM global claims go first, because the result with regard to AHVRAM will filter down to assist all the individual claims starting with Dr. Deutsch and his family.

## DISCOVERIES TO AID IN FUTURE PROSECUTION

27. One of the most significant events that helped plaintiffs was the release a few months ago of an independent documentary entitled *"Germany vs. Deutsch"* which was produced for the Berlin Film Festival and which shows the entire conspiracy against Holocaust Art restitution and Prof. Hans Deutsch in particular.

28. The film was produced by Mike Juncker of Kick Films of Munich Germany and I am submitting a hard copy of the DVD for the Court's consideration.

29. This film was the result of investigations by Mike Juncker, Burkhart List (Austrian and/or Holocaust Art historian), Konstantin Akinsha (Presidential Appointee to Holocaust Art Commission & Restitution issues) and others.

30. I respectfully urge the Court to view the film – before deciding the Order to Show Cause. The film shows that plaintiffs have been very busy and that there is credible evidence to support the group and individual claims.

31. Aside from the film, our own researchers have discovered evidence to support the conspiracy described in the complaint.

32. As explained below, many of the documents were intentionally concealed and/or withheld from plaintiffs, other Holocaust victim claimant families and virtually anyone who started to inquire about what happened to the thousands of masterpieces and/or pieces from collections which were never restituted to the rightful owners.  Many of those masterpieces and/or pieces from collections are subject of this action.  And, many of them were "nationalized" as a result of the underlying conspiracy and are being held in Austria, Hungary and Russia.

### RELATIONSHIP WITH AHVRAM

33. I am working for AHVRAM on a *pro bono* basis.

34. I provide my professional assistance and services to AHVRAM members because of my commitment to what Prof. Hans Deutsch sought to achieve for Holocaust Victims – to wit: increased restitution, which was never achieved.

35. I have no individual or other claim for a percentage of whatever it is that the individual AHVRAM members may recover.

36. The only claim I have or may ever have is for reimbursement of verifiable and reasonable expenses directly related to the individual AHVRAM members' claims and recovery.

### AHVRAM vs OTHER ORGANIZATIONS TRYING TO RECOVER ARTWORK

37. AHVRAM is the only organization that serves its members in this way.

38. The only other similar organization which deals with restitution and/or makes claims for artwork is the Commission for Art Recovery ("CAR"), which is an affiliate of the World Jewish Congress ("WJC").

39. CAR holds itself, or the WJC holds CAR, out to the public as a *not-for- profit* organization working for the greater good of the Jewish people and Holocaust victims seeking restitution of stolen and/or looted artwork.  However, that is not correct.  CAR makes or stands to make a fortune from each claim.

40. This happens because a Holocaust victim making a claim for restitution of artwork with or through CAR is assigned a lawyer and the Holocaust victim is charged a minimum of 33 1/3 of whatever is achieved or recovered.

41. CAR will often charge or seek to charge claimants additional monies to make certain applications.

42. It was precisely handling of claims by CAR that led to plaintiffs being able to trace and make a claim for the ***El Greco***.  Even though they were asked, CAR first refused to take any action related to the ***El Greco***, then was going to charge substantial fees before it would take action and finally ended up giving up any and all rights or interests it claimed to have in relation to the ***El Greco.***

43. When that happened, Dr. Deutsch and I realized how important it is/was to form AHVRAM as a true non-profit alternative for Holocaust victims.

### WITHHELD DOCUMENTS RELEVANT TO THESE CLAIMS

44. Little did plaintiffs know, as we would later discover and as is explained below, that CAR and/or the WJC had documents which it/they refused to provide copies to me, which documents showed proof of the conspiracy against Prof. Hans Deutsch individually and Holocaust Restitution in general.

45. These documents were an important piece in the puzzle through which we could trace the *El Greco* and in tracing the El Greco, plaintiffs discovered the conspiracy involving these defendants and others.

46. As a part of the Kick film, we were able to get access to certain documents that were never before available to me, or to anyone else for that matter.

### OUR RESEARCH / INVESTIGATION DISCOVERIES & PROBLEMS

47. The investigations to date included extensive trips and research into NY, Moscow, Budapest, Vienna, Switzerland, Washington and Germany.

48. For most of the period, we were given unrestricted access to records and we were even given assistance by certain government authorities and agencies.

49. However, when we started to discover documents that identified various entities which were part of a conspiracy and/or which profited from the conspiracy against restitution, the cooperation stopped.

50. This was a conspiracy at the highest levels of government. It was a conspiracy which used some of the robbers – who were actually NAZIS during World War II – and who in the 1970s included such notable "crooks" or Nazi Ideologists as Feux de la Croix, Erich Fuhrer, Wilhelm Hottle and others.

51. These were NOT acts during the World War II.

52. These acts started in the 1960s, continued into the 1970s and 1980s and are ongoing.

53. In the case of defendant Germany, many of the files were removed from public access and taken into the custody of the defendant Ministry of Finance.

---------------
*December 27, 2005 Affidavit of Edward D. Fagan in Support of Motion to Continue Prosecution*
<u>AHVRAM et al v. Republic of Hungary et al</u> – *04 Civ 8457 (LTS)* – Page 10

54. All of this was discovered as a result of the investigation made possible by the Kick Film.

55. However, we were not able to see or use the evidence from the film until after it was publicly broadcast earlier this year.

56. Once that occurred, we were able to use and follow up on the information contained in the film which led to even further discoveries.

### **DEFENDANT GOV'T ENTITIES & OTHERS INVOLVED IN CONSPIRACY**

57. What plaintiffs have discovered is evidence to show that the defendant governmental and private entities, including banks and museums, were part of and benefited from the conspiracy against Holocaust Restitution in general and against Prof. Hans Deutsch in particular.

58. Every individual, every institution and every government and/or governmental entity involved in this conspiracy was paid, and/or received something of benefit or value.

59. The Germans, Hungarians, Austrians and Russians received or kept important paintings and collections and/or received monies.

60. The Germans saved billions and kept important paintings and collections. Jewish organizations received additional allocations.

61. Prof. Hans Deutsch went to jail and plaintiff Deutsch's entire fortune was taken and their name was slandered.

62. Holocaust victims were given a pittance of what would have been their due.

63. All of this was only discovered through the film and the ongoing and following investigations.

64. None of this information was known or available to plaintiffs:

    a. in 1996 when the lawsuits were filed against the Swiss banks; or

    b. in 1998 when the lawsuits were filed against the German banks; or

    c. in 1998 when the lawsuit were filed against Austrian banks; or

    d. in 1999 when the lawsuits were filed against the Republic of Austria; or

    e. in 1999 when any of the settlements were entered into; or

    f. when this lawsuit was initiated.

### EVIDENCE DISCOVERED BY BURKHART LIST

65. One of our primary researchers, Burkhart List, first discovered the existence of the „Mount Sinai" painting of *El Greco* for the first time in 1985. The importance of this discovery is that the trail of the *El Greco* would prove to be the key that led our researchers to the discovery of the evidence to show, as explained below, that the defendants and others who will be joined in this case, to wit: German, Austrian and Hungarian officials conspired to destroy Prof. Hans Deutsch and to thereby all Holocaust victim art restitution.

66. The research was conducted over a period of 3 – 4 years and is ongoing.

67. One of the most important pieces of evidence that was discovered by Mr. List relates to a document that is IN NY in the possession of a NY lawyer and as to which plaintiffs are submitting a subpoena requesting the Court to issue same.

68. The document is a report of a meeting or a report written by persons from the Hungarian government.  Dr. Deutsch saw this document but was NOT permitted to get a copy of it.   It is a translation from Hungarian into English and is about five to eight pages long.

69. According to Mr. List, the report shows that Ernst Féaux de la Croix, the head of the defendant Germany's Ministry of Finance Department of Restitution went to Hungary to convene a meeting of German, Hungarian and Austrian officials.  At the meeting de la Croix made a deal with the Hungarians and Austrians through which these defendants government officials would provide false, fabricated and/or perjurious information which would be used to "kill" Holocaust Art restitution programs and to destroy Prof. Hans Deutsch in particular.

70. In exchange for the false, fabricated and/or perjurious information, defendant German officials, offered and paid the defendant Hungarian government official a "bribe" through which defendant Germany would agree to provide the government of Hungary with monies and would allow it to keep the paintings which were/are a part of this claim.

71. According to Mr. List, the report also mentioned additional investigations and actions that were to be taken against Holocaust Art restitution claims and Prof. Deutsch, which actions were to be taken by defendants Hungary and Germany officials, as well as Austrian officials, en for verification.  According to Mr. List, the report also shows that without a doubt the defendants conspired to "steal" masterpieces and/or painting which are part of this claim.

72. Aside from Dr. Deutsch confirming the existence of this document, Mr. List also has spoke with the NY lawyer - Roman Pipko Esq. – to inquire, among other things, about the document and to request a copy of it.

73. According to Mr. List, Attorney Pipko, refused to provide a copy of the report saying words to the effect of the document is "much too hot" to be made public.

74. We have tried to get the document but our requests were rejected, which is why a subpoena is necessary and is being submitted to the Court.

75. Before the Court decides the future of these claims, plaintiffs respectfully request that the Court have the opportunity to review this document first.

## ADDITIONAL PROBLEMS ENCOUNTERED IN SECURING DOCUMENTS

76. The problems we originally encountered in our investigations to locate and secure documents relevant to these claims have become worse.

77. After we discovered the existence of the conspiracy, started to find documents and witnesses to support the claims and the claims started to become public, documents in the US, Russia or Europe which were open to the public, suddenly became sealed or were moved to restricted locations.

78. Witnesses disappeared and/or became "unavailable or uncooperative".

79. In addition to doors being slammed in our faces, we have been informed that

   a. some of our conversations are being listened to by unintended and unauthorized persons;

   b. our phones are tapped; and

   c. we are followed and our actions observed.

80. In some instances we have received credible information to suggest that there are serious safety concerns or issues relating to persons within our group, including Dr. Deutsch, Mr. List, some of our other researchers and witnesses and me.

81. Therefore the matter of the document last seen in the possession of NY attorney Roman Pipko - for which plaintiffs are requesting and submitting to the Court a *Subpoena Duces Tecum* - is even more important.

82. Plaintiffs submit that it is more than possible that there will be resistance to the production of this document and there may also be efforts to quash the subpoena. In that regard, plaintiffs respectfully submit that the document is or should also be in the possession of the defendants Germany and Hungary and that these defendants can and should be directed to produce the document to plaintiffs or, at a minimum, to the Court for its *in camera* inspection.

**SECRECY NEEDED TO PROTECT ABILITY TO ACCESS NEW EVIDENCE**

83. Other of plaintiffs' researchers have informed me that they believe they are close to securing other documents which will expose the conspiracy and identify with specificity the conspirators (individuals, institutions and government entities) in Austria, Germany, Hungary, Switzerland, the US and other countries.

84. I have been briefed on some of the discoveries and I can state unequivocally that the evidence – combined with the document for which plaintiffs are requesting the Court's issuance of a *Subpoena Duces Tecum* will show unequivocally that everything we explained to the Court when this case started is true and that a

conspiracy at the highest levels of government and government owned institutions (such as banks and museums) is behind the defendants actions as outlined in the Amended Complaint and which caused BILLIONS of dollars of artwork and masterpieces to be withheld, concealed, expropriated, nationalize and/or stolen and for which no restitution was ever paid.

85. After the additional evidence (documents and witness testimony) as described above is secured and safeguarded and after plaintiffs' researchers, art experts and international legal team, have had a chance to review and analyze them, plaintiffs believe there may be a need for a Second Amended Complaint. However, the filing of a Second Amended Complaint will not interfere with the future and orderly prosecution of this case.

## **CONCLUSION**

86. I apologize to the Court for any of the problems that may have occurred in the past and I promise that – to the extent they are within my control - they will not happen again.

87. I pray that the Court review the DVD which I am submitting and for which a Notice of Filing is being made, and consider this Affidavit, as well as the Affidavit of Dr. Joram Deutsch and my second Affidavit in order to understand what has been achieved despite the problems, how the problems have been remedied, and how the plaintiffs can expeditiously and effectively prosecute these claims,

88. In that regard, plaintiffs also pray that the Court:

    a. Permit plaintiffs an additional 120 days within which to provide formal and informal proof of service of the Amended Summonses & Amended Complaints on defendant German and Hungarian entities;

    b. Permit issuance of *Subpoena Duces Tecum* on or before January 6, 2006, to secure a single document which will establish and confirm many of the plaintiffs allegations about the wrongful acts by defendants Germany and Hungary and others and which documents is in the possession of NY lawyer Roman Pipko;

    c. Permit plaintiffs to take depositions *de bene esse* of among others plaintiff Erna Deutsch who is 94 years old and in failing health; and

    d. Schedule a Status Conference at the Court's earliest convenience at which counsel for defendants Germany and Hungary can appear and be heard about the establishment of a briefing schedule and an interim discovery schedule to preserve evidence while the Motions are briefed and argued

89. This case is one of the last great struggles for Holocaust restitution and its impact on human and victim rights is important to not only the plaintiffs in this case but to future plaintiffs in other cases against governmental and/or private entities which take advantage of the weak. It was precisely because of this principal that the plaintiffs and their team have refused to give up despite all the hardships. It was also because of this principal that the international Holocaust Survivor

representatives and groups and the Oxford Human Rights team have agreed to join and assist in plaintiffs claims.

90. Plaintiff therefore respectfully pray that the Court and to allow us to continue with the prosecution of this case.

## **VERIFICATION**

I hereby confirm that the foregoing statements are true to the best of my knowledge information and belief and/or are based on information that I have learned and which has been provided to me through the ongoing investigation and/or from our investigators.

/s/_____
Edward D. Fagan

Dated:     December 27, 2005
           Tampa, Florida

*Note:  A hard copy of the original signature page of
        this document is being filed separately.*

---------------
*December 27, 2005 Affidavit of Edward D. Fagan in Support of Motion to Continue Prosecution*
<u>*AHVRAM et al v. Republic of Hungary et al*</u> *– 04 Civ 8457 (LTS) –* Page 18